## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| Venoco, Inc., *et al.*, | Case No. 16-10655 (KG) |
| Debtors.[1] | (Joint Administration Requested) |

**DECLARATION OF SCOTT M. PINSONNAULT, CHIEF FINANCIAL OFFICER AND CHIEF RESTRUCTURING OFFICER OF VENOCO, INC., IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS**

Pursuant to 28 U.S.C. § 1746, I, Scott M. Pinsonnault, hereby declare under penalty of perjury that the following is true and correct to the best of my knowledge and belief:

1.      I am the Chief Financial Officer and Chief Restructuring Officer of Venoco, Inc. ("Venoco"), a Delaware corporation and one of the above-captioned debtors and debtors in possession (together, the "Debtors"). I have served as Chief Financial Officer since May 2015 and was appointed the Chief Restructuring Officer on February 16, 2016. I am above 18 years of age and I am competent to testify.

2.      Prior to joining Venoco, I was a Managing Director at Opportune LLP ("Opportune"), a leading international energy consulting firm that advises clients throughout the energy sector on operational and financial matters. While I was at Opportune, I focused primarily on restructuring in the energy sector.

3.      On November 3, 2014, the Debtors retained Opportune to assist them with liquidity and balance sheet financing matters. At that time, I was appointed interim Chief

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Venoco, Inc. (5555); Denver Parent Corporation (1005); TexCal Energy (LP) LLC (0806); Whittier Pipeline Corporation (1560); TexCal Energy (GP) LLC (0808); Ellwood Pipeline, Inc. (5631); and TexCal Energy South Texas, L.P. (0812). The Debtors' main corporate and mailing address for purposes of these chapter 11 cases is: Venoco, Inc., 370 17th Street, Suite 3900, Denver, CO 80202-1370.

Financial Officer and oversaw the Opportune team engaged by the Debtors. In that role, and now serving as Chief Financial Officer, I have become familiar with the Debtors' day-to-day operations, business and financial affairs, and books and records.

4.      On March 18, 2016 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware. To help minimize the impact of these filings on their business operations, the Debtors also filed certain motions and pleadings seeking various types of "first day" relief (collectively, the "First Day Pleadings") intended to allow the Debtors to perform and meet obligations necessary to fulfill their duties as debtors in possession. I am familiar with the contents of each First Day Pleading and believe that the relief requested (a) is necessary to enable the Debtors to operate in chapter 11 with minimum disruption and loss of value to the Debtors' estates, (b) is critical to achieving a successful outcome for the Debtors and (c) best serves the interests of all stakeholders. A description of the relief requested and the facts supporting each First Day Pleading are incorporated herein by reference and included in **Exhibit A** attached hereto.

5.      I submit this declaration (this "Declaration") to provide an overview of the Debtors, their businesses, assets and liabilities, and the reasons for commencing these chapter 11 cases, as well as to support the Debtors' chapter 11 petitions and First Day Pleadings. Unless otherwise indicated herein, all facts set forth in this Declaration are based upon my personal knowledge of the Debtors' operations and finances, information learned from my review of relevant documents, information supplied to me by members of the Debtors' management team and the Debtors' advisors, or my opinion based on my experience, knowledge, and information concerning the Debtors' assets, liabilities, operations and financial condition. I am authorized to

submit this Declaration on behalf of the Debtors, and, if called upon to testify, I could and would testify competently to the facts set forth herein.

## I. BACKGROUND

6.     The Debtors are independent energy companies primarily focused on the acquisition, exploration, production and development of oil and gas properties in California. The Debtors' corporate office and principal place of business is located at 370 17th Street, Suite 3900, Denver, Colorado 80202-1370. The Debtors also maintain a regional office in Carpinteria, California, where a majority of their personnel are located. As of the Petition Date, the Debtors employed approximately 160 full-time employees across their various operations, none of whom are party to collective bargaining agreements.

7.     The Debtors' principal producing properties are located both onshore and offshore in Southern California and are heavily oil-weighted. Their leasehold interests are in mature plays and have proven reserves and stable production. The properties also have substantial opportunities for further development and the Debtors are pursuing an opportunity to adjust the boundries of the line of their lease in the South Ellwood Field to allow for a more efficient recovery of the remaining oil in place. The following map illustrates the location of the Debtors' principle operations:



8.      Despite having a strong asset base, the Debtors, like many of their industry peers, have struggled this past year to maintain liquidity as a result of the protracted and continuing decline in oil prices and the general dislocation of the energy markets. Although the Debtors tried to secure additional financing in lieu of commencing these cases, the continued downward trend in oil prices and the state of the industry generally, foreclosed the possibility of raising capital outside of a bankruptcy filing. Operational challenges at the Debtors' South Ellwood Field further negatively impacted liquidity. Specifically, roughly one-half of the Debtors' daily production from the South Ellwood Field has been shut in since approximately May 22, 2015, as a result of an unrelated, third-party pipeline shut down.

9.      In commencing these chapter 11 cases, the Debtors seek to restructure their outstanding debt obligations and to secure additional capital for the continued development of their business plan. The Debtors' proposed restructuring has already garnered the support of their prepetition senior secured noteholders who executed a restructuring support agreement on March 17, 2016. Upon consummation of the proposed reorganization, the Debtors believe they will be

well positioned to maintain their operations and to take advantage of their significant potential growth opportunities when macroeconomic factors in the industry improve.

## II.  THE COMPANY'S HISTORY AND BUSINESS OPERATIONS

### a.  The Debtors' Corporate History

10.    The Debtors were founded by Timothy M. Marquez in Carpinteria, California in 1992. Mr. Marquez earned a bachelor of science degree in petroleum engineering at the Colorado School of Mines. He served as Chief Executive Officer of Venoco from its founding until June 2002. He then returned to serve as Chairman, Chief Executive Officer, and President in 2004, and has served as the Executive Chairman of the Board since August 2012.

11.    In founding the company, Mr. Marquez hoped to use his considerable technical and operational expertise to acquire and reinvigorate undervalued and under-exploited properties. Under his leadership, the Debtors strategically acquired an attractive and valuable portfolio of leasehold interests in California and in Texas. What set the Debtors apart was their ability to operate and prosper in environmentally sensitive and rigorous regulatory areas. Ultimately, the Debtors grew into one of the largest independent oil and natural gas companies in California based on production volumes. In 2006, Venoco, launched an initial public offering and became a public company whose equity was traded on the New York Stock Exchange.

12.    In January 2012, Denver Parent Company ("DPC"), an affiliate of Mr. Marquez, who then owned 50% of the outstanding shares of Venoco common stock, took the company private again by acquiring all of the outstanding common stock for $12.50 per share. The privatization transaction was completed in October 2012. Thereafter, and through the Petition Date, the Debtors' corporate organizational structure has been as follows:



13.     Venoco is currently governed by a three-member board of directors (the "<u>Board</u>"). In addition to Mr. Marquez, the Board has two independent directors, Joseph A Bondi, a former managing director of Alvarez & Marsal's North American Commercial Restructuring Group, and Richard Keller, a former executive of Unocal Corporation.

### b.  The Debtors' Business Operations

14.     After going private, the Debtors were left with significant debt obligations, which in 2012 exceeded $845 million. Between 2012 and 2014, the Debtors completed a number of asset sales, generating over $470 million in net proceeds for capital expenditures and for paydowns of the debt. Included in those assets sales was (a) the sale of certain property in the Sacramento Basin and San Joaquin Valley, which generated $250 million in net proceeds, (b) a sale of the Debtors' interests in the Santa Clara Avenue field in Southern California for $23.4 million (after closing adjustments) and (c) the sale of properties in the West Montalvo field in

Ventura County to an unrelated third party for $200.2 million. The Debtors also used their revolving credit line to refinance and retire their outstanding term loan debt, saving over $13 million in annual interest payment expenses alone.

15.     As a result of these M&A transactions, the Debtors' operations are now centered on their core properties as follows:

   **a.  South Ellwood Field**

   The South Ellwood field is located in California state waters approximately two miles offshore along the northern margin of the Santa Barbara Channel. The Debtors conduct operations in this field from Platform Holly, own 100% of the working interests in the relevant leaseholds, and own related onshore processing facilities. Approximately 50% of the Debtors' annual production comes from this field.

   The Debtors have also submitted an application for a lease line adjustment ("LLA") with respect to California State Lands Commission ("CSLC") Lease PRC 3242.1 which is part of the South Ellwood Field and which, if granted, would give them the right to drill on approximately 3400 additional acres immediately adjacent to the Debtors' current leasehold in this field. In exchange for additional acreage, the Debtors will quitclaim back to the State of California certain acreage currently under lease, and the Debtors' net acreage holdings will decrease by 431 acres. Although the Debtors application was completed in late 2014, the application remains subject to review by the CSLC under the California Environmental Quality Act ("CEQA"), which requires an environmental impact report ("EIR"). In May 2015, CSLC initiated the environmental impact review process and began preparing the related report required by CEQA. The Debtors anticipate a draft EIR to be issued in the first quarter of 2016, though the timing cannot be assured.

   **b.  Santa Clara Federal Unit**

   The Santa Clara Federal Unit is located in federal waters approximately 10 miles offshore in the Santa Barbara channel near Oxnard, California. The Debtors conduct operations in this unit from two platforms—Platform Gail in the Sockeye field and Platform Grace in the Santa Clara field. Production from these platforms is transported via pipeline to Los Angeles, CA, where it is sold to Tesoro Refining and Marketing Company. The Debtors are the operators of these platforms and have a 100% working interest in them.

### c.  **Dos Cuadras and Beverly Hills West**

The Debtors own a 25% non-operated working interest in the Dos Cuadras field, with working interests ranging from 17.5% to 25% in the associated onshore facility and pipelines. The field is located in federal waters approximately five miles offshore of California in the Santa Barbara channel and is operated by an unaffiliated third party.

The Debtors also operate in the Beverly Hills West field, located in Beverly Hills, California. The lease for this field expires in 2016, and the Debtors are in negotiations to acquire a lease extension.

### d.  **Hastings Field – $CO_2$ Flood Project**

In February 2009, the Debtors sold certain properties in the Hastings Complex near Houston, Texas to Denbury Resources, Inc. ("Denbury") for approximately $247.7 million. Denbury is using the property to develop a $CO_2$ enhanced recovery project and has already incurred over $330 million in capital expenditures related thereto. The Debtors own a 22.45% reversionary working interest in the Denbury Hastings Complex after Denbury has recouped its operating costs and a portion of its purchase price, plus 130% percent of its capital expenditures made on the project.

16.     In total, as of the Petition Date the Debtors held interests in approximately 72,053 net acres[2] in California, of which 48,836 are developed. The Debtors have working interests in 141 producing wells (including those shut in at the South Elwood Field) and had proved

---

[2]  "Net" acres or net wells means the amount of leased real estate that a petroleum and/or natural gas company has a true working interest in, calculated by taking the gross acres or wells, as applicable, multiplied by the working interests owned. In comparison, "gross" acres or gross wells means the total acres or wells, as applicable, in which a working interest is owned.

reserves[3] of approximately 13.1 MMBOE,[4] of which 88% were oil, 6% NGL and 100% were proved developed.[5]

17.    The majority of the Debtors' revenues are derived through sales of oil to competing buyers, including large oil refining companies and independent marketers. Approximately 94% of the Debtors' annual revenues are generated from sales to two purchasers: Phillips 66, and Tesoro Refining and Marketing Company. Prior to the latest downturn in commodity prices, the Debtors generated approximately $325 million in revenue from their operations, on an annual basis.

### III.  THE DEBTORS' CAPITAL STRUCTURE

18.    As of the Petition Date, the Debtors' primary liabilities consist of: (a) First Lien Secured Notes (as defined below); (b) Second Lien Secured Notes (as defined below); (c) 8.875% senior notes issued by Venoco; and (d) PIK toggle notes issued by DPC.[6]  In addition, the Debtors were generally paying undisputed trade creditors on a current basis prior to the filing and the Debtors anticipate they have a limited amount of trade debt and royalty obligations that remain outstanding.

---

[3]   "Proved oil and gas reserves," as defined in Rule 4-10 of SEC Regulation S-X, refers to the quantities of oil and gas, which, by analysis of geoscience and engineering data, can be estimated with reasonable certainty to be economically producible—from a given date forward, from known reservoirs, and under existing economic conditions, operating methods, and government regulations—prior to the time at which contracts providing the right to operate expire, unless evidence indicates that renewal is reasonably certain, regardless of whether deterministic or probabilistic methods are used for the estimation.

[4]   "BOE" stands for one stock tank barrel of oil equivalent, using the ratio of six Mcf of natural gas to one barrel of crude oil, condensate or natural gas liquids. "MMBOE" stands for one million BOEs.

[5]   "Proved developed reserves" are proved reserves that can be expected to be recovered through existing wells with existing equipment and operating methods, or for which the cost of the required equipment is relatively minor compared to the cost of a new well.

[6]   Venoco was previously party to a $75 million term loan facility for funding LLA-related transactions once the LLA is approved. That term loan was satisfied and then terminated around June 11, 2015, with the proceeds of a new term loan facility on better economic terms (the "Term Loan Facility"). The Term Loan Facility was fully drawn at closing, but the proceeds thereof were segregated pending approval of the LLA and satisfaction of certain other conditions. The Debtors' obligations under the Term Loan Facility were secured by a first priority lien on the segregated proceeds of the loan and were guaranteed by Venoco's subsidiaries that guarantee the First Lien Secured Notes and the Second Lien Secured Notes. The Term Loan Facility was repaid on March 16, 2016.

### a. The First Lien Secured Notes

19.     On April 2, 2015, Venoco issued $175 million in principal amount of 12% first-lien senior secured notes due 2019 (the "First Lien Secured Notes") in connection with a recapitalization transaction that retired the Debtors' then-outstanding reserve-based revolving loan, thereby avoiding any breach of the financial covenants or pending maturation therein that could have been trigged by the depressed state of the energy market. The First Lien Secured Notes also provided the Debtors with approximately $87 million of incremental net capital to fund operations. Venoco's obligations under the First Lien Secured Notes are guaranteed by all of its subsidiaries (other than Ellwood Pipeline, Inc.) and secured by first priority liens on substantially all of its and their assets. As of the Petition Date, $175 million in aggregate principal amount was outstanding under the First Lien Secured Notes.

### b. The Second Lien Secured Notes

20.     In connection with the recapitalization, Venoco also exchanged $194 million in principal and accrued interest of the unsecured Venoco 8.875% Senior Notes held by certain noteholders for $150.35 million in principal amount of Second Lien Secured Notes due 2019. The Second Lien Secured Notes bear interest at 8.875% if paid in cash or 12% if paid in kind, at Venoco's option, and provided Venoco with interest relief and reduced cash interest expense. Venoco's obligations under the Second Lien Secured Notes are guaranteed by all of its subsidiaries that guarantee the First Lien Secured Notes and are secured by a second priority lien on the assets securing the obligations under the First Lien Secured Notes. As of the Petition Date, $164.14 million in aggregate principal amount remained outstanding under the Second Lien Secured Notes.

### c.  The Venoco 8.875% Senior Notes

21.     In February 2011, Venoco issued $500 million of 8.875% senior unsecured notes due 2019 (the "Venoco 8.875% Senior Notes") in connection with its "go private" transaction. Interest on the notes is payable semi-annually in arrears on February 15 and August 15 of each year. As of the Petition Date, approximately $308.2 million remained outstanding under the Venoco 8.875% Senior Notes.

### d.  Senior PIK Toggle Notes

22.     In August 2013, DPC issued $255 million principal amount of 12.25% / 13.00% senior unsecured PIK toggle notes due 2018 (the "Senior PIK Toggle Notes") at 97.304% of par. Interest on the notes is payable on February 15 and August 15 of each year and, other than the first scheduled interest payment, may be paid in cash or in kind at DPC's election, subject to certain conditions. DPC is dependent on dividends from Venoco to make its required payments under the Senior PIK Toggle Notes and has been paying its interest payments in kind throughout 2015. As of the Petition Date, there was approximately $303 million outstanding under the Senior PIK Toggle Notes.

### e.  Other Obligations

#### (i)    Trade Debt

23.     In the ordinary course of producing oil and gas from its properties, the Debtors have historically obtained goods and services from over 800 vendors. As of the Petition Date, the Debtors estimate that they owe approximately $1.2 million to their vendors.

#### (ii)    Royalty Obligations

24.     As of the Petition Date, the Debtors had approximately 2,300 royalty owners in pay status, including certain insiders of the Debtors such as the Debtors' employees and

executives. As of the Petition Date, the Debtors owed an aggregate of approximately $563,371 to various royalty owners for the prepetition period.

(iii)    <b>Hedge Agreements</b>

25.    To mitigate against commodity price fluctuations, from time to time, the Debtors have entered into certain swap floors and collar agreements related to their oil production (collectively, the "<u>Hedges</u>"). Prior to the commencement of these cases, the Debtors unwound all of their Hedges.

## IV.  EVENTS LEADING TO COMMENCEMENT OF THE CHAPTER 11 CASES

26.    An unpredictable confluence of factors in 2014 and 2015 caused the Debtors' need for the instant restructuring. First, like many other E&P companies, the dramatic decline in crude oil prices severely impacted the Debtors, whose reserves are 94% weighted in oil. While the Debtors tried to mitigate the negative impact of the downturn by cutting costs, reducing capital expenditures and carefully managing liquidity, these efforts ultimately were insufficient. Indeed, although the Debtors entered into various amendments to their credit facilities on five separate occasions in 2014 and engaged in a recapitalization of their balance sheet in early 2015, they could not counteract the nearly 70% percent drop in the price of crude oil from 2014 to today.

27.    The Debtors' ability to weather the tempest in the energy market was further hampered by a major operational set-back which shut-in production at the Debtors' South Ellwood field and deprived the Debtors of almost 50 percent of their annual production. Specifically, in May 2015, a third-party common carrier pipeline operated by Plains Pipeline, L.P. ("<u>Plains</u>") that transports the Debtors' South Elwood Field oil production ruptured, resulting in a spill near Refugio Beach State Park and halting all of the Debtors' production activities in the field. Instead of getting the revenues the Debtors desperately needed from production at

South Ellwood, the Debtors were forced to reduce operating expenses, though such reduction was not sufficient to mitigate the operating loss. The Debtors also elected to accelerate scheduled maintenance during the early shut-in period to minimize downtime to the field when production is resumed.[7]

28.     As they had done many times before, the Debtors turned to the capital markets but the Debtors could not find any parties willing to provide financing. Accordingly, the Debtors determined that a fundamental and comprehensive restructuring of their capital structure was needed and, after coming to terms with their prepetition senior secured noteholders, commenced these chapter 11 cases.

## IV. PREPETITION RESTRUCTURING EFFORTS

29.     Prior to the Petition Date, the Debtors, who have been in active negotiations with their stakeholders for several months, made meaningful progress toward a consensual restructuring with their key constituencies. The Debtors believe these prepetition negotiations and efforts will help ensure an efficient and successful restructuring in these chases.

30.     The Debtors prepetition restructuring efforts began in November 2014, when the Debtors hired Blackstone Advisory Partners, L.P. ("Blackstone" and later, "PJT")[8] to review and assist the Debtors with developing and implementing a strategic plan, evaluating and monetizing non-core assets, and right-sizing the capital structure. At the time, the Debtors' had approximately $840 million of outstanding debt on their balance sheets, in a mix of bonds and revolving credit lines, at an approximate aggregate annual cash interest cost to the Debtors of

---

[7]  The Debtors have asserted a claim for lost profits and/or impairment of earnings capacity against Plains pursuant to the Federal Oil Pollution Act of 1990, 33 U.S.C. §§2701 *et seq.* in an amount of no less than $12,417,460 through November 30, 2015, plus $108,900.50 for financial and accounting costs through December 23, 2015. To date, however, they Debtors have not received any payments in connection with these claims.

[8]  On or about October 1, 2015, Blackstone was spun off and became an independent, publicly traded company known as PJT Partners, Inc. ("PJT").

$50 million. Bracewell LLP was also engaged to advise on in and out-of-court restructuring alternatives.

31.     With the help of its advisors, the Debtors approached their existing noteholders early in the cycle to explore available options for additional liquidity so the Debtors could bridge to a recovery in commodity prices and avoid the possibility of a default under their financial covenants in the Debtors' outstanding bank debt. Ultimately, the Debtors and noteholders consisting of approximately 45% of the Venoco 8.875% Senior Notes, reached agreement on a recapitalization transaction that provided $175 million of new capital to the Debtors and exchanged $194 million in principal and accrued interest of the Venoco 8.875% Senior Notes for $150.35 million in principal amount of Second Lien Secured Notes. The First Lien Secured Notes, Second Lien Secured Notes, and Tem Loan Facility were all issued in connection with this transaction.

32.     The price of crude oil continued to fall precipitously throughout most of 2015, leaving the Debtors back in a liquidity crunch. The shut-in of South Elwood Field compounded these hardships. To raise new capital, the Debtors and their advisors contacted multiple parties including private equity funds, high net worth individuals, and hedge funds regarding possible financing alternatives. None of the parties, however, were willing to lend in the current environment or provide the Debtors with a firm commitment to fund operations long-term.

33.     Having determined that a more fundamental and comprehensive restructuring of the Debtors' capital structure would be necessary, and to preserve dwindling liquidity, the Debtors elected to forgo making a scheduled interest payment on the Venoco 8.875% Senior Notes in the approximate amount of $13.7 million due February 16, 2016. Under the terms of the indenture, this nonpayment constituted a default that, if not cured within 30 days, would

contitute an event of default giving rise to the potential acceleration of the Venoco 8.875% Senior Notes and enforcement of remedies.

34.     During the grace period, the Debtors remained engaged in discussions around how best to reduce the company's debt and ensure its long term liquidity needs are met, including the possibility of restructuring the company's balance sheet. The Debtors negotiated the underlying economics of a chapter 11 plan and other aspects of the restructuring with their prepetition senior secured noteholders. On the Petition Date, after weeks of extensive negotiations, the Debtors and holders of 100% of the First Lien Secured Notes and 100% of the Second Lien Secured Notes entered into a restructuring support agreement (the "RSA").

35.     By a motion filed on the Petition Date, the Debtors are seeking authorization to assume the RSA, which provides for a comprehensive financial restructuring of the Debtors' capital structure under a confirmable chapter 11 plan of reorganization. Having extensively explored other alternatives, the Debtors carefully determined that the transactions negotiated under the RSA represent the best alternative for the Debtors to deleverage their balance sheets and emerge from chapter 11 with a new capital structure and appropriate leverage, to the benefit of all stakeholders.

*[Remainder of Page Intentionally Left Blank]*

Dated:  March [•], 2016

/s/ *[DRAFT]*
Scott M. Pinsonnault
Chief Financial Officer and Chief Restructuring Officer
Venoco, Inc.

Dated:  March 17, 2016

Scott M. Pinsonnault
Chief Financial Officer and Chief Restructuring Officer
Venoco, Inc.