**<u>Exhibit A</u>**

**Facts In Support of "First Day" Pleadings**

## FACTUAL BACKGROUND IN SUPPORT
## OF THE DEBTORS' FIRST DAY MOTIONS

### Introduction

1.      As explained in my declaration, the Debtors have requested relief in "first day" motions and an application (each, a "<u>First Day Pleading</u>" and, collectively, the "<u>First Day Pleadings</u>").[1] I have reviewed each of the First Day Pleadings and, where I had questions, I have had their contents explained to me. The facts stated in each First Day Pleading and described below are true and correct to the best of my information and belief. I believe that the relief sought in each of the First Day Pleadings is necessary to enable the Debtors to operate in chapter 11 with minimal disruption to their business operations and constitutes a critical element in successfully restructuring the Debtors' businesses.

2.      Several of the First Day Pleadings request authority to pay certain prepetition claims. I understand that Rule 6003 of the Federal Rules of Bankruptcy Procedure provides, in relevant part, that the Court shall not consider motions to pay prepetition claims during the first 21 days following the filing of a chapter 11 petition, "except to the extent relief is necessary to avoid immediate and irreparable harm." In light of this requirement, and as set forth below, the Debtors have specified their requests for immediate authority to pay certain prepetition claims to those circumstances where the failure to pay such claims would cause immediate and irreparable harm to the Debtors and their estates. To fund these obligations, the Debtors are seeking authority to use cash collateral and the agreed upon DIP facility.

---

[1] Capitalized terms used herein and not otherwise defined shall have the meanings ascribed to such terms in the relevant First Day Motion, or my Declaration, as applicable.

**Procedural Motions**

**A.    Debtors' Motion for Entry of an Order Directing Joint Administration of Chapter 11 Cases (the "Joint Administration Motion")**

3.    The Debtors request entry of an order directing joint administration of these chapter 11 cases for procedural purposes only. Specifically, the Debtors request that the Court maintain one file and one docket for all of these chapter 11 cases under the case of Venoco, Inc. Further, the Debtors request that entry be made on the docket of each of the Debtors' chapter 11 cases, other than Venoco, Inc., to reflect the joint administration of these chapter 11 cases.

4.    Given the integrated nature of the Debtors' operations, I believe that joint administration will provide significant administrative convenience without harming the substantive rights of any party in interest. Venoco, Inc., is the direct operating entity of the Denver Parent Corporation. Additionally, because of the Debtors' interrelated businesses, each of the motions filed in these chapter 11 cases will implicate all of the Debtors. Joint administration will also reduce fees and costs by avoiding duplicative filings and objections and will allow the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") and all parties in interest to easily monitor these chapter 11 cases.

5.    I believe that the relief requested in the Joint Administration Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate in the ordinary course without disruption. Accordingly, on behalf of the Debtors, I respectfully submit that the Joint Administration Motion should be approved.

**B.     Debtors' Application for Entry of an Order Pursuant to 28 U.S.C. § 156(c) Authorizing the Employment and Retention of BMC Group, Inc., as Claims and Noticing Agent, *Nunc Pro Tunc* to the Petition Date (the "<u>BMC Group Retention Application</u>")**

6.      The Debtors request entry of an order authorizing the employment and retention of BMC Group, Inc. ("<u>BMC</u>") to perform certain claims and noticing functions in these chapter 11 cases, *nunc pro tunc* to the Petition Date, pursuant to the terms and conditions set forth in the engagement agreement between the Debtors and BMC dated as of February 9, 2016 (the "<u>Engagement Agreement</u>").

7.      The Debtors believe that they have several thousand creditors and parties' in interest that must be given notice of developments related to these chapter 11 cases. With such a significant number of parties involved in these chapter 11 cases, it is likely that heavy administrative burdens will be imposed upon the Court and the Clerk of the United States Bankruptcy Court for the District of Delaware (the "<u>Clerk's Office</u>"), absent the engagement of BMC as an independent, third-party notice and claims agent.

8.      BMC is a claims administration firm that specializes in chapter 11 administration, consulting and analysis, including noticing, claims processing, voting and other tasks in the effective administration of chapter 11 cases. BMC has developed efficient and cost-effective methods to handle the voluminous mailings associated with chapter 11 noticing and claims processing that ensure the orderly and fair treatment of creditors, interest holders and all parties in interest.

9.      I believe that engaging BMC as an independent, third-party notice and claims agent to effectively and efficiently serve notice upon all creditors and other relevant constituencies in these chapter 11 cases, as well as transmit, receive, docket and maintain all proofs of claim and proofs of interest filed in these chapter 11 cases, will relieve the Clerk's

Office of these burdens. Further, I believe that such assistance will expedite service of notices, streamline the claims administration process and enable the Debtors to focus on their reorganization efforts.

10.    I believe that the relief requested in this application is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will allow the Debtors and their professionals to focus on key aspects of the Debtors' reorganization efforts. Accordingly, on behalf of the Debtors, I respectfully submit that the BMC Group Retention Application should be approved.

**C.    Debtors' Motion for Entry of an Order Authorizing the Debtors to (I) File Consolidated Lists of the Debtors' (A) Creditors and (B) Top Thirty General Unsecured Creditors, and (II) Provide Notices, Including Notices of Commencement of Cases and Section 341 Meeting (the "Creditor Matrix Motion")**

11.    The Debtors request entry of an order authorizing the Debtors to (i) file a consolidated list of the Debtors' (a) creditors and top thirty (30) general unsecured creditors, and (ii) complete all mailings of notices, including notices of the commencement of these chapter 11 cases and of the meeting of creditors required by section 341 of the Bankruptcy Code.

12.    The Debtors have identified thousands of entities and individuals to which notice of certain events or requests for relief in these chapter 11 cases must be provided. The Debtors anticipate that such notice of events will include, without limitation, notice of: (a) the filing of the Debtors' voluntary petitions under chapter 11 of the Bankruptcy Code; (b) the initial meeting of the Debtors' creditors in accordance with section 341 of the Bankruptcy Code; (c) applicable bar dates for the filing of claims; (d) the hearing on adequacy of a disclosure statement in respect of a plan of reorganization; and (e) the hearing to confirm a plan of reorganization (collectively, the "Notices").

13.     Local Rule 1007-2 provides that in a voluntary chapter 11 case, the debtor must file "a list containing the name and complete addresses of each creditor in such format as directed by the Clerk's Office Procedures." Del. Bankr. L.R. 1007-2(a).

14.     The Debtors presently maintain various computerized lists of the names and addresses of their respective creditors that are entitled to receive the Notices and other documents. The Debtors believe that the information, as maintained in computer files (or those of their agents), may be consolidated and utilized efficiently to provide interested parties with the Notices and other similar documents, as contemplated by Local Rule 1007-2. The Debtors seek authority to file the lists on a consolidated basis, identifying their creditors in the format or formats currently maintained or developed in the ordinary course of the Debtors' businesses, which the Debtors believe will be sufficient to permit BMC to notice promptly all applicable parties.

15.     In addition, in lieu of effecting service through the Clerk's Office, the Debtors also request that they (or BMC, as the proposed claims and noticing agent) be approved and authorized to complete all mailings to creditors and equity holders in these chapter 11 cases, including the Notices. Allowing the Debtors (or BMC, as the proposed claims and noticing agent) to complete their own mailings will save significant time, cost and expense.

16.     I believe that the relief requested in the Creditor Matrix Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate in the ordinary course without disruption. Accordingly, on behalf of the Debtors, I respectfully submit that the Creditor Matrix Motion should be approved.

**Operational Motions**

**D.    Debtors' Motion For Entry Of Interim And Final Orders (I) Authorizing Debtors To (A) Obtain Postpetition Financing Pursuant To 11 U.S.C. §§ 105, 361, 362, 363(B), 364(C)(1), 364(C)(2), 364(C)(3), 364(D)(1) And 364(E) And (B) To Utilize Cash Collateral Pursuant To 11 U.S.C. § 363, (II) Granting Adequate Protection to Prepetition Secured Parties Pursuant To 11 U.S.C. §§ 361, 362, 363, 364, and 507(B), and (III) Scheduling Final Hearing Pursuant To Bankruptcy Rules 4001(B) And (C) (the "DIP Motion").**

17.    The Debtors have an immediate need for postpetition financing to continue the operation of their business. Without such funds, the Debtors will be unable to pay costs and expenses, including, but not limited to, wages, salaries, professional fees, general and administrative expenses and maintenance costs that arise in connection with the administration of these chapter 11 cases and in the ordinary course of the Debtors' businesses.

18.    Pursuant to the DIP Motion,[2] the Debtors request the Court, among other things, (a) authorize the Debtors to enter into a senior secured superpriority non-amortizing delayed draw term loan facility  in an aggregate principal amount of up to $35 million, upon the terms and conditions of the DIP Facility, and provide adequate protection to the Prepetition First Lien Lenders; (b) authorize the Debtors to grant liens, security interests, and superpriority claims (including a superpriority administrative claim pursuant to section 364(c)(1) of the Bankruptcy Code, liens pursuant to sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code, and priming liens pursuant to section 364(d) of the Bankruptcy Code) to the DIP Lenders on the Prepetition Collateral, as provided for in the DIP Facility, and to perform such other and further acts as may be necessary or appropriate in connection therewith; and (c) schedule a hearing to consider approval of the DIP Facility on a final basis.

---

[2] In further support of the DIP Motion, the Debtors have submitted the Coleman Declaration (as defined in the DIP Motion), filed concurrently herewith.

19.     Absent approval of the DIP Motion, I believe the Debtors lack sufficient funds to continue operating. I believe the DIP Facility reasonably addresses the Debtors' financing requirements and constitutes the best financing option available to the Debtors given the circumstances of their businesses, their capital structure, and these chapter 11 cases. I also believe the terms of the DIP Facility are fair and reasonable and represent the best financing available in the marketplace under the circumstances. If the Court does not grant the relief requested in the DIP Motion, the Debtors will be forced to shut down their operations to the detriment of the value of their assets and all stakeholders.

**E.     Debtors' Motion for Entry of Interim and Final Orders (A) Authorizing the Debtors to Continue to Operate Their Cash Management System, (B) Authorizing the Debtors to Maintain Existing Business Forms, and (C) Granting Administrative Priority to Postpetition Intercompany Claims and Authorizing the Debtors to Perform Under Certain Intercompany Arrangements and Historical Practices Among Debtors (the "Cash Management Motion")**

20.     The Debtors utilize a cash management system that provides well-established and efficient mechanisms for the collection, concentration, management and disbursement of the Debtors' funds (the "Cash Management System"). The Debtors use the Cash Management System to (a) collect, transfer and disburse funds from operations and (b) facilitate cash monitoring, forecasting and reporting. The Cash Management System, among other things, enables the Debtors to maintain control over their fifteen bank accounts (collectively, the "Bank Accounts"), ten of which are located at Vectra Bank and five of which are held at Deutsche Bank, Texas Capital Bank, National Union Bank, Compass Bank, Bank of America, and Citibank (together the "Banks").

21.     Pursuant to the Cash Management Motion, the Debtors request entry of interim and final orders (a) authorizing the Debtors to maintain and continue using the Debtors' existing business forms; (b) waiving the requirements of section 345(b) of the Bankruptcy Code (as

defined below); (c) granting administrative priority to Postpetition Intercompany Claims (as defined below) and authorizing the Debtors to continue to perform under certain intercompany arrangements consistent with historical practices among the Debtors, and (d) scheduling a final Hearing to consider entry of the final order, to the extent necessary. In connection with this relief, the Debtors respectfully request a waiver of certain of the operating guidelines established by the U.S. Trustee that require the Debtors to close all prepetition bank accounts, open new accounts designated as debtor in possession accounts and obtain new business forms bearing a "debtor-in possession" legend.

22.     As of the Petition Date, the Debtors have 10 Bank Accounts at Vectra, as follows:

- The General Account, which had a balance of approximately $100 million of cash as of the Petition Date. The Debtors receive all the cash and receipts from business operations into the General Account. The Debtors use this account to pay all of Debtors' obligations, including payroll, royalties, taxes, utilities, etc. The interest payments and cash payments for the Term Loan Facility, First Lien Secured Notes and Second Lien Secured Notes are also funded from the General Account. It also funds all cash disbursements to the other accounts, interest payments, debt, and manual transfers;

- Three zero balance accounts ("ZBAs") funded from the General Account, as follows:

  o   A payroll account (the "Payroll Account"). The Debtors' payroll service provider, ADP, draws the bi-weekly payroll payments from the Payroll Account;

  o   A revenue account (the "Revenue Account"). The Debtors use the Revenue Account to pay royalties, severance taxes, and revenue payments as they come due; and

  o   A delay rental account (the "Delay Rental Account"). The Debtors use the Delay Rental Account to make lease payments.

- A land account (the "Land Account"), which had a balance of approximately $4,667.90 as of the Petition Date. The Debtors use the Land Account for option and purchase payments;

- The "DPC Account", which had a balance of approximately $144,381.38 as of the Petition Date. The DPC Account has limited activity, typically less than one wire per month, and funds Denver Parent Corporation's limited operations; and

- Four other corporate accounts, with negligible balances as of the Petition Date, as follows:

    o The "TexCal L.P. LLC Account", which had a negligible balance as of the Petition Date and is manually funded by the General Account;

    o The "TexCal G.P. LLC Account", which had a negligible balance as of the Petition Date and is manually funded by the General Account;

    o The "Ellwood Pipeline, Inc. Account", which had a negligible balance as of the Petition Date and is automatically swept into the General Account;

    o The "Utility Adequate Assurance Account," which was established when the cases were filed pursuant to Section 366 of the Bankruptcy Code.

23.    The Debtors also have six security and collateral accounts, which are segregated monies to support the surety bonds and letters of credit. There are six accounts as of the Petition Date, as follows:

- A collateral account at Texas Capital Bank, which had a balance of $501,073.19 as of the Petition Date. The funds in the account are held as cash collateral for surety bond SUR0028374 with the State of California;

- A collateral account at National Union Bank, which had a balance of $50,000 as of the Petition Date. The funds in the account are held as cash collateral for the National Union Fire bond;

- A deposit account at Compass Bank, which had a balance of $9,161.93 as of the Petition Date;

- An account at Bank of America, which had a balance of $250,000 as of the Petition Date. The funds in the account are held as cash collateral for the Debtors' purchase cards; and

- An account at Citibank, which had a balance of $3,727,500 as of the Petition Date. The funds in the account are held in relation to two letters of credit, one for $800,000 and one for $2,700,000, and *de minimus* cash balances.

24.    Pursuant to the Cash Management Motion, the Debtors request that the Court authorize the Banks to (a) continue to maintain, service and administer the Bank Accounts, as

accounts of the Debtors as debtors in possession, without interruption and in the ordinary course of business; (b) receive, process, honor and pay any and all checks, ACH and other instructions, and drafts payable through, drawn or directed on such Bank Accounts after the Petition Date by holders, makers or other parties entitled to issue instructions with respect thereto; provided, however, that any check, draft or other notification that the Debtors advise the Banks to have been drawn, issued or otherwise presented before the Petition Date may be honored by the Banks only to the extent authorized by order of the Court; and (c) debit the Bank Accounts in the ordinary course of business on account of (i) checks drawn on the Debtors' accounts that are cashed at the Banks' respective counters or exchanged for cashier's checks by the payees thereof prior to the Petition Date, (ii) checks or other items deposited in the Bank Accounts before the Petition Date that have been dishonored or returned unpaid for any reason (including any associated fees and costs) to the same extent the Debtors were responsible for such items before the Petition Date, and (iii) undisputed, outstanding service charges owed to the Banks as of the Petition Date on account of the maintenance of the Debtors' Cash Management System, if any.

25.     Maintaining account controls is essential for the continuation of the Debtors' operations, particularly given the significant volume of cash and electronic transactions managed through the Cash Management System. Venoco, Inc. collects revenue and pays expenses on behalf of the Debtors' corporate group, and creates automated book entries (the "Intercompany Transactions") on behalf of the relevant Debtors in the ordinary course of business. As a result of these Intercompany Transactions, a receivable is recorded on the applicable Debtors' balance sheet, and a corresponding liability is posted on the balance sheet of the Debtor that received revenues from which reimbursements are still owed, all of which serves as the basis for the accrual of Intercompany Claims.

26.     To ensure that each individual Debtor will not fund, at the expense of its creditors, the operations of another entity, the Debtors respectfully request that, pursuant to sections 364(b), 503(b) and 507(a)(2) of the Bankruptcy Code, all Intercompany Claims arising after the Petition Date, as a result of ordinary course Intercompany Transactions through the Cash Management System (the "Postpetition Intercompany Claims"), be accorded administrative expense priority status. If Postpetition Intercompany Claims are accorded administrative priority expense status, each entity utilizing funds flowing through the Cash Management System will receive credit or bear ultimate repayment responsibility for such ordinary course transactions.

27.     In the ordinary course of business, the Debtors conduct transactions by debit, wire or ACH and other similar methods. In addition, a large percentage of the Debtors' customer payments are received through ACH or wire transfer. The Debtors are also required by certain federal and state taxing authorities to submit tax payments electronically through wire or ACH, and failure to do so results in the imposition of penalties. The Debtors are seeking authority to continue these prepetition practices.

28.     Additionally, in the ordinary course, the Banks (as well as certain credit card processors) charge, and the Debtors pay, honor or allow the deduction from the appropriate account, certain service charges and other fees, costs and expenses. The Debtors are seeking authority to pay such service charges, fees, costs and expenses in the ordinary course of business.

29.     Absent authority enabling the Debtors to continue to operate their Cash Management System, I believe the Debtors' financial managers would be severely distracted rebuilding a workable cash management system, and the Debtors would be unable to effectively maintain their financial operations. This would severely harm the Debtors' businesses and their estates, creditors, and all parties in interest.

30.     Accordingly, I believe that the relief requested in the Cash Management Motion is in the best interests of the Debtors' estates, their creditors, and all parties in interest, and will enable the Debtors to continue to operate in the ordinary course without disruption. On behalf of the Debtors, I respectfully submit that the Cash Management Motion should be approved.

**F.     Debtors' Motion for Entry of Interim and Final Orders Authorizing the Debtors to Pay or Honor Prepetition and Postpetition Royalty Obligations, Working Interest Obligations and Other Obligations Related to Oil and Natural Gas Leases (the "Royalty Interests Motion")**

31.     The Debtors request entry of an order (i) authorizing the Debtors to pay or honor prepetition and post-petition royalty obligations, working interest obligations and other obligations related to oil and gas leases; (ii) authorizing and directing financial institutions to receive, process, honor and pay all related checks and electronic payment requests for payment of the related thereto; and (iii) scheduling a final hearing to consider entry of the Final Order, to the extent necessary. Pending a final hearing on this Motion, the Debtors are seeking authority to satisfy up to $7,041,203 in prepetition Obligations, $4,473,142 of which may become due and owing during the first twenty-one (21) days of these chapter 11 cases.

32.     The Debtors own interests in certain oil and gas Leases, which obligate the Debtors to remit Royalties to the Royalty Interest Owners for their share of the proceeds from the sale of hydrocarbon production from producing wells. Additionally, the Debtors are also obligated to pay monthly General Land Royalties to Office of Natural Resources and California State Land Commission on account of any interest the federal government and the state of California may have in the Leases. Additionally, certain assignments of the Leases create Overriding Royalty Interests, which obligate the Debtors to remit on a monthly basis the Overriding Royalty Interests due the Overriding Royalty Interest Owners.

33.     Furthermore, the Debtors are party to three joint operating agreements ("JOAs") under which a Working Interest Owner owns a working interest in wells operated by the Debtors. Pursuant to the JOAs, the Working Interest Owner reimburses the Debtors for its share of the well expenditures through joint-interest billings ("JIBs") while the Debtors pay the Working Interest Owner a share of the well's production revenues. The Debtors are requesting authority to pay all prepetition amounts due and owing under the JIBs and to continue to pay all amounts under the JIBs in the ordinary course of business. The Debtors estimate that amount outstanding JIB as of the petition date is approximately $1,608,885 and the amount payable within 21 days is $630,509.

34.     The Debtors also pay Gathering and Processing Charges (including transportation, gathering, dehydration, compression, processing and service charges) in connection with their monthly sales of oil and gas production. The Debtors estimate that approximately $460,000 in Gathering and Processing Charges is paid each month on account of the Debtors' oil and gas production.

35.     In addition, as of the Petition Date, the Debtors have accrued approximately $445,000 in Suspended Funds—amounts due and owing to Interest Owners that have not yet been paid for a variety of reasons, including: (a) unresolved or pending litigation, (b) unresolved title issues, (c) incorrect addresses for the Interest Owners, (d) pending division orders from the Interest Owners, (e) amounts less than $100 due to Interest Owners and therefore below the minimum check run, and (f) insufficient documentation. The Debtors estimate that, in the aggregate, $200,000 in Suspended Funds may be required to be released during the first 21 days of these Chapter 11 Cases.

36.     The Debtors' Interest Owner Payments (including Royalty Payments, Taxes, the Suspended Funds and the Gathering and Processing Charges) are calculated as the Debtors account for revenue from oil and gas production. The Debtors typically receive payments for sales of their hydrocarbon products thirty to sixty days after production and remit Interest Owner Payments in the calendar month following receipt of payment from the purchasers. As of the Petition Date, the Debtors have not yet remitted all Interest Owner Payments due and owing from the September, October and November production. The Debtors estimate that they owe approximately $563,371 to the Interest Owners on account of Interest Owner Payments relating to the prepetition period,[3] of which $363,061 is expected to come due and owing in the first 21 days of this case. To protect the Debtors' valuable leasehold interests, the Debtors are requesting authority to pay all prepetition Interest Owner Payments that are due and owing and to continue to make such payments in the ordinary course of business.

37.     The Debtors also incur numerous regulatory fees levied by local, state, and federal regulatory bodies in connection with the Debtors' LOEs, (collectively, the "LOE Regulatory Fees.") In 2014, the Debtors paid approximately $1,224,848 in LOE Regulatory Fees. In 2015, the Debtors paid approximately $76,235 in LOE Regulatory Fees. The Debtors assume the LOE Regulatory Fees incurred in 2016 will be similar to 2015. As of the Petition Date, the Debtors estimate that they owe approximately $76,235 related to the prepetition period. The Debtors anticipate that approximately $53,365 will come due and owing in the first 21 days of this case. The Debtors request authority to pay all LOE Regulatory Fees as they come due.

---

[3] These amounts exclude the amounts due and owing for Taxes.

38.  In connection with the Debtors' daily operation of the Leases, the Debtors incur numerous Lease Maintenance Costs to ensure that the Leases are held and operations continue in a timely manner. Specifically, the Debtors incur the following Lease Maintenance Costs:

a.  <u>Shut-In Payments:</u> Certain of the Debtors' wells are completed and capable of production but are not currently in production. Such completed wells are referred to as "shut-ins." Certain of the Debtors' Leases provide for compensation to the mineral or royalty owner during the period when hydrocarbons are not sold from the leased premises ("<u>Shut-In Payments</u>"). The Shut-In Payments are paid on a monthly or annual basis. The Debtors estimate that they do not have any Shut-In Payments due and owing as of the Petition Date. However, out of an abundance of caution, the Debtors request authority to continue to pay Shut-In Payments in the ordinary course of business as they come due.

b.  <u>Option Payments:</u> Many of the Debtors' Leases contain option clauses that provide the Debtors with an option to extend the Leases in return for a fee. The option payments are available by the end of the primary term of the leases and are paid prior to the end of such term. The Debtors estimate that they have no amounts in option payments due and owing as of the Petition Date. The Debtors request authority to pay option payments in the ordinary course of business as they come due.

c.  <u>Leasehold Payments:</u> Certain of the Debtors' Leases contain clauses providing for the payment of a stipulated amount to the Royalty Interest Owner regardless of production (a "<u>Minimum Royalty Payment</u>"). Additionally, the Debtors are party to surface use agreements that provide access to a landowner's property. Surface use payments are paid either annually or upon specific use of the property ("<u>Surface Use Payments</u>"). Surface Use Payments are restitution payments to a landowner for damages caused as a result of the Debtors' surface operations. Finally, the Debtors have annual payments to lessors to delay the lessor from granting leasing rights to another operator ("<u>Delay Rental Fees</u>"). Each month the Debtors pay approximately $145,000 in Leasehold Payments. The Debtors request authority to pay all Leasehold Payments in the ordinary course of business as they come due.

d.  <u>Saltwater Disposal:</u> The Debtors' operations require the disposal of saltwater—the flowback and produced water waste fluids returned to the surface during a well's completion and production phases. The Debtors have one Saltwater Disposal Well ("<u>SWD well</u>"), with an obligation to make payments to the surface owners of the SWD well for saltwater injected into the well. These disposal fees accrue monthly and are due 30 days in arrears. Annually, the Debtors estimate that they pay approximately $5,000 in saltwater disposal fees. The Debtors estimate that

they have no outstanding saltwater disposal fees as of the Petition Date. The saltwater disposal payments are paid separately from the Surface Use payments described above. The Debtors request authority to pay option payments in the ordinary course of business as they come due.

39.     Many of the invoices for Lease Maintenance Costs will cover both prepetition and postpetition expenses. Given the number of such invoices and the Debtors' limited staff, separating the prepetition portions from the postpetition portions of each individual invoice would be unduly burdensome.

40.     Venoco also incurs numerous current lease operating expenses and other exploration and production costs from various third parties, including vendors, contractors, subcontractors and suppliers, who provide services, supplies and materials necessary to ensure that operations continue in a timely manner as well as certain capital expenditures (collectively, the "LOEs"). These costs vary from month to month. As of the Petition Date, the Debtors estimate that they owe approximately $3,739,733 related to the prepetition period. The Debtors anticipate, based on the average aggregate monthly cost of the LOEs, that approximately $2,617,813 will come due and owing in the first 21 days of this case. The Debtors request authority to pay all prepetition LOEs that are due and owing and to continue make such payments in the ordinary course of business.

41.     I believe that payment of the Obligations (including the Interest Owner Payments, Lease Operating Expenses, LOE Regulatory Fees, the Lease Maintenance Costs and the JIBs) is in the best interests of the Debtors' estates, their creditors and all other parties in interest. Furthermore, payment of the Obligations is necessary to maintain the Debtors' rights under the Leases and to ensure that their operations continue on an uninterrupted basis, as the related revenues represent substantially all of the Debtors' operating income. If the Debtors are unable to pay the Obligations as they come due, the Debtors' operations could be severely impacted—

including the Debtors incurring penalties and interest, turnover actions, conversion and constructive trust claims, litigation and, in some instances, potential forfeiture of interests in the well and removal as operator. Accordingly, on behalf of the Debtors, I respectfully submit that the Royalty Interests Motion should be approved.

G.    **Debtors' Motion for Entry of Interim and Final Orders (I) Determining Adequate Assurance of Payment for Future Utility Services, (II) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Utility Service and (III) Establishing Adequate Assurance Procedures (the "Utilities Motion")**

42.    The Debtors request the entry of interim and final orders: (a) determining that the Debtors' Utility Providers have been provided with adequate assurance of payment within the meaning of section 366 of the Bankruptcy Code; (b) approving the Debtors' proposed adequate assurance; (c) prohibiting the Utility Providers from altering, refusing, or discontinuing services on account of prepetition amounts outstanding or on account of any perceived inadequacy of the Debtors' proposed adequate assurance pending entry of a final order; (d) determining that the Debtors are not required to provide any additional adequate assurance beyond what is proposed by this Motion and the Adequate Assurance Procedures described in the exhibits to the motion; and (e) scheduling a final hearing to consider entry of the final order to the extent a final hearing is necessary.

43.    In the ordinary course of business, the Debtors use 16 different Utility Providers to provide electric, internet, waste management, water, telecommunications and other similar utility services. On average, the Debtors spend approximately $400,000 per month for utility services.[4]

---

[4] There is letter of credit in the amount of $800,000 currently held at Citibank in favor of one Utility Provider, as described in the Cash Management Motion. The Debtors assert there is no additional Adequate Assurance necessary for this Utility Provider.

44.     Uninterrupted utility services are essential to the Debtors' ongoing operations. Indeed, any interruption in utility services—even for a brief period of time—would negatively affect the Debtors' operations, customer relationships, revenues and profits, thereby impairing the Debtors' reorganization efforts and, ultimately, value and creditor recoveries. Thus, it is critical that utility services continue uninterrupted during these chapter 11 cases.

45.     To provide additional assurance of payment for future services to the Utility Providers, the Debtors propose to deposit approximately $63,000 — an amount equal to the estimated aggregate cost for two weeks of utility service[5] (calculated as a historical average over the past twelve months)—into a segregated, interest-bearing account for the benefit of Utility Providers on or before the date that is 20 days after the Petition Date.

46.     If a Utility Provider is not satisfied with the Proposed Adequate Assurance, they may make Requests for additional or different adequate assurance of future payment pursuant to the Adequate Assurance Procedures, which set forth a streamlined process to enable Utility Providers to address potential concerns with respect to the Proposed Adequate Assurance, while at the same time allowing the Debtors to continue their business operations uninterrupted.

47.     I believe that the relief requested in the Utilities Motion is in the best interests of the Debtors' estates, their creditors and all other parties in interest, and will enable the Debtors to continue to operate in the ordinary course without disruption. Accordingly, on behalf of the Debtors, I respectfully submit that the Utilities Motion should be approved.

---

[5] This number does not include additional adequate assurance for Southern California Gas. There is letter of credit in the amount of $800,000 currently held at Citibank in favor of this Utility Provider, as described in the Cash Management Motion. The Debtors assert there is no additional Adequate Assurance necessary for this Utility Provider.

**H.    Debtors' Motion for Entry of Interim and Final Orders Authorizing, But Not Directing, the Debtors to (A) Pay Prepetition Employee Wages, Other Compensation, and Reimbursable Employee Expenses and (B) Continue Employee Benefits Programs (the "<u>Employee Wage Motion</u>")**

48.    The Debtors request entry of interim and final orders authorizing, but not directing, the Debtors, in a reasonable exercise of their business judgment, (a) to pay prepetition (i) wages, salaries and other compensation up to $12,475 per individual Employee and (ii) reimbursable Employee expenses, and (b) to continue the employee benefits programs and pay any amounts due thereunder.

**i.    The Debtors' Workforce**

49.    As of the Petition Date, the Debtors employ approximately 144 people across the Debtors' various operations. 45 Employees are salaried and 99 Employees are paid on an hourly basis. The Debtors provide compensation and a variety of benefits to their Employees, as more fully described in the employee wage motion.

50.    In addition, at any given time, the Debtors supplement their business needs and workforce with a variable number of temporary employees and Independent Contractors that provide services in a number of different business areas. Five independent contractors are paid directly by the Debtors through the Debtors' payroll system and others are engaged by a third party that bills the Debtors for their services.

51.    The Employees perform a variety of critical functions, including the acquisition, exploration, development, and production of onshore oil and gas, sales, customer service, purchasing, repair and maintenance, information and technology, and a variety of administrative, accounting, legal, finance, management, supervisory, personnel management, and other related tasks. Their skills, knowledge, and understanding with respect to the Debtors' operations,

customer relations, and infrastructure are essential to maintaining the Debtors' businesses during these chapter 11 cases.

ii.          **The Employee Obligations**

52.     Just as the Debtors depend on the Employees to operate their business on a daily basis, the Employees also depend on the Debtors. Indeed, the vast majority of these individuals rely exclusively on payments from the Debtors for their basic living necessities.

53.     The Debtors seek to minimize the personal hardship the Employees and Independent Contractors would suffer if prepetition Employee Obligations are not paid or remitted when due or as expected. By the Employee Wages Motion, the Debtors are seeking authority to honor certain prepetition claims and to continue their Employee Obligations on a postpetition basis, as applicable, relating to, among other things, Employee Compensation, Independent Contractor Compensation, Bonus Program compensation, Reimbursable Expenses and the Debtors' corporate credit card program, severance obligations, vacation time, sick time, medical benefits, workers' compensation, life, disability, accident insurance, AD&D, dental and other non-medical coverage, 401(k) contributions and employee retirement plans, the wellness program, and other benefits that the Debtors have historically directly or indirectly provided to the Employees and Independent Contractors in the ordinary course of business and as further described in the Employee Wages Motion. In addition, the Debtors seek authority to pay all costs incident and taxes related to the Employee Compensation and Employee Obligations. Pursuant to the relief requested in the proposed Interim and Final Orders, the aggregate of cash payments the Debtors seek will not exceed $12,475 per individual Employee or Independent Contractor as provided in Bankruptcy Code section 507(a)(4)-(5), the amount paid on account of prepetition

Employee Obligations within 21 days of the Petition Date will not exceed $1,270,088, and the aggregate payments on account of prepetition Employee Obligations will not exceed $3,288,288.

54.     I believe that paying prepetition amounts owed on account of the Employee Obligations is in the best interests of the Debtors' estates and their stakeholders and will allow the Debtors' businesses operations to continue without interruption. To maintain their operations and preserve the value of their estates, it is essential that the Debtors continue to operate, to the extent possible, in the ordinary course of their business. To achieve that result, the Debtors must retain the uninterrupted service and loyalty of their Employees. The maintenance and continuation of employee programs, as well as the payment of amounts owing in respect thereof, is essential to this goal. Accordingly, on behalf of the Debtors, I respectfully submit that the Employee Wages Motion should be approved.

    **I.**       **Debtors' Motion for Entry of Interim and Final Orders (I) Establishing Notice and Objection Procedures for Transfers of Common Stock and Worthless Stock Deductions with Respect to Common Stock and (II) Granting Related Relief (the "_Tax Attribute Motion_")**

55.     The Debtors request the entry of interim and final orders: (a) approving Procedures related to certain transfers of Beneficial Ownership of Common Stock and/or claims of Worthless Stock Deductions with respect to Common Stock, (b) directing that any purchase, sale, or other transfer of any Beneficial Ownership of Common Stock or claims of Worthless Stock Deductions with respect to any Common Stock or any interest therein, in each case in violation of the Procedures shall be null and void _ab initio_ and (c) granting certain related relief. The Tax Attribute Motion is narrowly tailored to preserving the Debtors' valuable Tax Attributes including their NOLs.

56.     The Debtors have certain Tax Attributes, which include, in addition to substantial depreciable and amortizable tax basis in their assets, a balance of approximately $570 million of

NOLs as of December 31, 2015. I understand that the ability of the Debtors to use their NOL balance and other Tax Attributes (or a portion thereof) to shelter future taxable income and hence reduce potential future cash tax liabilities (including during the pendency of these Chapter 11 Cases) is of potentially significant value to the Debtors. The value of the Tax Attributes including the NOLs will inure to the benefit of all of the Debtors' stakeholders.

57.     The relief sought will preserve the Debtors' ability to seek the necessary relief at the appropriate time if it appears that transfers of Common Stock or claims of Worthless Stock Deductions may jeopardize the Debtors' use of their Tax Attributes including their NOLs. The Procedures are the mechanism by which the Debtors propose that they will monitor, and if necessary, object to certain transfers of Beneficial Ownership of the Common Stock or claims of Worthless Stock Deductions by certain Beneficial Owners with respect to the Common Stock. I believe that the Procedures and other relief requested in the Tax Attribute Motion are narrowly tailored, critical for maximizing estate value and could help ensure a meaningful recovery for creditors.

58.     If no restrictions on transfers of the Common Stock or potential claims of Worthless Stock Deductions with respect to Common Stock are imposed as requested in the Tax Attribute Motion, the Debtors' valuable Tax Attributes including the NOLs could be severely limited or significantly diminished. I believe the potential loss of these valuable estate assets could lead to significant negative consequences for the Debtors, their estates, their stakeholders, and the overall reorganization process. Accordingly, on behalf of the Debtors, I respectfully submit the Court should grant the relief requested in the Tax Attribute Motion.