## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| Venoco, Inc., *et al.*, | |
| Debtors.[1] | Case No. 16-10655 (KG) |
| | (Joint Administration Requested) |

## DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING DEBTORS (A) TO OBTAIN POSTPETITION FINANCING PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363(b), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) AND 364(e) AND (B) TO UTILIZE CASH COLLATERAL PURSUANT TO 11 U.S.C. § 363, (II) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES PURSUANT TO 11 U.S.C. §§ 361, 362, 363, 364 AND 507(b) AND (III) SCHEDULING FINAL HEARING PURSUANT TO BANKRUPTCY RULES 4001(b) AND (c)

Venoco, Inc. ("Venoco") and its affiliated debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors") file this motion (this "Motion") pursuant to sections 105, 361, 362, 363(b), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e) of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 4001, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rules 2002-1, 4001-1, and 9014-1 of the Local Bankruptcy Rules of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), seeking entry of an interim order, substantially in the form attached hereto as **Exhibit A** (the "Interim Order"), and a final order (the "Final Order"[2]), (i) authorizing the Debtors to (a) to obtain postpetition financing (the "DIP Financing") pursuant

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Venoco, Inc. (5555); Denver Parent Corporation (1005); TexCal Energy (LP) LLC (0806); Whittier Pipeline Corporation (1560); TexCal Energy (GP) LLC (0808); Ellwood Pipeline, Inc. (5631); and TexCal Energy South Texas, L.P. (0812). The Debtors' main corporate and mailing address for purposes of these chapter 11 cases is: Venoco, Inc., 370 17th Street, Suite 3900, Denver, CO 80202-1370.

[2] The Debtors will file the form of Final Order prior to the Final Hearing (as defined herein).

to the terms and conditions set forth in the Superpriority Secured Debtor-in-Possession Credit Agreement substantially in the form attached to hereto as **Exhibit B** (as amended, supplemented or otherwise modified from time to time in accordance with the terms hereof and thereof, the "DIP Credit Agreement"[3] and, together with the schedules and exhibits attached thereto and all agreements, documents, instruments and/or amendments executed and delivered in connection therewith, including, without limitation, the Security Agreement, among the Borrower, the Guarantors and the DIP Agent (the "DIP Security Agreement"), the "DIP Documents") and (b) use Cash Collateral (as defined below), (ii) authorizing the Debtors to grant adequate protection to the Prepetition Secured Parties (as defined below), (iii) scheduling a hearing (the "Final Hearing") to consider entry of the Final Order and (iv) granting related relief. In support of this Motion, the Debtors submit the *Declaration of Timothy R. Coleman in Support of Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Debtors (A) To Obtain Postpetition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 363(b), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e) and (b) to Utilize Cash Collateral Pursuant to 11 U.S.C. § 363, (II) Granting Adequate Protection to Prepetition Secured Parties Pursuant to 11 U.S.C. §§ 361, 362, 363, 364 and 507(b) and (III) Scheduling Final Hearing Pursuant to Bankruptcy Rules 4001(b) and (c)* which is attached hereto as **Exhibit C** (the "Coleman Declaration"). In further support of this Motion, the Debtors respectfully represent as follows:

### Preliminary Statement

1.      As described in more detail in this Motion and the Coleman Declaration, the Debtors seek postpetition use of Cash Collateral from the Prepetition Secured Parties, and access to up to $35.0 million of postpetition financing on a priming and superpriority basis from the

---

[3] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the DIP Credit Agreement, the Interim Order, or the Coleman Declaration (as defined herein), as applicable.

DIP Lenders, which are funds managed by Apollo Capital Management L.P. ("Apollo") or its affiliates. Through use of Cash Collateral and proceeds from the DIP Financing, the Debtors will have access to the necessary funding to: (a) continue the day-to-day operation of their businesses; (b) fund the expenses necessary to preserve the value of their oil and gas assets; (c) pay adequate protection payments; and (d) fund these chapter 11 cases.

2.      The DIP Financing also serves a larger purpose for the Debtors. The additional standby liquidity made available under the DIP Financing signals to the Debtors' vendors, suppliers, customers and employees that the Debtors will continue to meet their commitments during these chapter 11 cases. Moreover, the Debtors believe the DIP Financing is in the best interest of the estates because it is the Debtors' best financing option and will allow the Debtors an opportunity to reorganize around their current operations.  Importantly, the DIP Lenders, the Debtors' other prepetition secured creditors, and the Debtors have agreed to support a value-maximizing plan of reorganization, as set forth in the *Declaration of Scott M. Pinsonnault, Chief Financial Officer and Chief Restructuring Officer of Venoco, Inc., in Support of Chapter 11 Petitions and First Day Pleadings* filed contemporaneously herewith.

3.      If the Debtors are unable to gain access to the DIP Facility and the Cash Collateral, the proposed path to a successful reorganization would be blocked and the Debtors' value as a whole could be materially and perhaps irreparably harmed. The Debtors have no significant unencumbered cash or other assets.  Absent the liquidity provided by the DIP Financing and use of Cash Collateral, the Debtors would, among other things, be unable to pay vendors and suppliers resulting in a cessation of their business operations.  The relief requested by this Motion is a necessary step to both preserving the Debtors' operations as well as a bridge to restructuring that maximizes value for the Debtors' estates and all of their stakeholders. On

this record, and as the Debtors are prepared to demonstrate at the hearing on this Motion, the relief requested herein represents a sound exercise of business judgment and should be approved.

### Jurisdiction

4.     The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

5.     Venue in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

6.     The statutory bases for the relief requested herein are sections 105, 361, 362, 363(b), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e) of the Bankruptcy Code, Bankruptcy Rules 2002, 4001 and 9014 and Rules 2002-1, 4001-1, 9013-1(f) and 9014-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules").

### Background

7.     The Debtors are independent exploration and production companies located in Denver, Colorado. The Debtors' operations are focused on the acquisition, exploration, development and exploitation of conventional and unconventional oil and natural gas resources. As of March 18, 2016 (the "Petition Date"), the Debtors own approximately 72,053 net acres in California and Texas, of which 48,856 net acres were developed as of that date. The Debtors' principal producing properties are located both onshore and offshore in Southern California and are heavily oil-weighted (approximately 95%).

8.     The Debtors, like many other E&P companies, have faced significant economic challenges as a result of the dramatic decline in global oil prices, the low price of natural gas, and general uncertainty in the energy markets. These macro-economic factors, coupled with the recent rupture of the third-party common carrier pipeline that forced the Debtors to halt all

production activities at one of the Debtors' offshore platforms, Platform Holly, negatively impacted the Debtors' operations, production volumes and associated revenue at a critical time. Faced with a heavy debt burden, the Debtors commenced these chapter 11 cases to effectuate a financial restructuring.

9.      On the Petition Date, the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. The Debtors continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee, examiner, or official committee of unsecured creditors has been appointed in the chapter 11 cases. By a motion filed on the Petition Date, the Debtors have requested that these chapter 11 cases be consolidated for procedural purposes only and administered jointly.

10.      A full description of the Debtors' business, corporate structure, prepetition indebtedness, and events leading to these chapter 11 cases is set forth in the *Declaration of Scott M. Pinsonnault, Chief Financial Officer and Chief Restructuring Officer of Venoco, Inc., in Support of Chapter 11 Petitions and First Day Pleadings*, filed contemporaneously herewith and fully incorporated by reference (the "First Day Declaration").

### **The Debtors' Capital Structure**

11.      As of the Petition Date, the Debtors' primary liabilities consist of: (a) First Lien Secured Notes (as defined below); (b) Second Lien Secured Notes (as defined below); (c) 8.875% senior notes issued by Venoco; and (d) PIK toggle notes issued by DPC.[4] In addition, the Debtors were generally paying undisputed trade creditors on a current basis prior to the filing

---

[4]   Venoco was previously party to a $75 million term loan facility for funding LLA-related transactions once the LLA is approved. That term loan was satisfied and then terminated around June 11, 2015, with the proceeds of a new term loan facility on better economic terms (the "Term Loan Facility"). The Term Loan Facility was fully drawn at closing, but the proceeds thereof were segregated pending approval of the LLA and satisfaction of certain other conditions. The Debtors' obligations under the Term Loan Facility were secured by a first priority lien on the segregated proceeds of the loan and were guaranteed by Venoco's subsidiaries that guarantee the First Lien Secured Notes and the Second Lien Secured Notes. The Term Loan Facility was repaid on March 16, 2016.

and the Debtors anticipate they have a limited amount of trade debt and royalty obligations that remain outstanding:

## A.    The First Lien Notes

12.    On April 2, 2015, Venoco issued $175 million in principal amount of 12% first-lien senior secured notes due 2019 (the "First Lien Secured Notes") in connection with a recapitalization transaction that retired the Debtors' then-outstanding reserve-based revolving loan, thereby avoiding any breach of the financial covenants or pending maturation therein that could have been trigged by the depressed state of the energy market. The First Lien Secured Notes also provided the Debtors with approximately $87 million of incremental net capital to fund operations. Venoco's obligations under the First Lien Secured Notes are guaranteed by all of its subsidiaries (other than Ellwood Pipeline, Inc.) and secured by first priority liens on substantially all of its and their assets. As of the Petition Date, $175 million in aggregate principal amount was outstanding under the First Lien Secured Notes.

## B.    The Second Lien Notes

13.    In connection with the recapitalization, Venoco also exchanged $194 million in principal and accrued interest of the unsecured Venoco 8.875% Senior Notes held by certain noteholders for $150.35 million in principal amount of Second Lien Secured Notes due 2019. The Second Lien Secured Notes bear interest at 8.875% if paid in cash or 12% if paid in kind, at Venoco's option, and provided Venoco with interest relief and reduced cash interest expense. Venoco's obligations under the Second Lien Secured Notes are guaranteed by all of its subsidiaries that guarantee the First Lien Secured Notes and are secured by a second priority lien on the assets securing the obligations under the First Lien Secured Notes. As of the Petition Date, $164.14 million in aggregate principal amount remained outstanding under the Second Lien Secured Notes.

## C.     Venoco 8.875% Senior Notes

14.     In February 2011, Venoco issued $500 million of 8.875% senior unsecured notes due 2019 (the "Venoco 8.875% Senior Notes") in connection with its "go private" transaction. Interest on the notes is payable semi-annually in arrears on February 15 and August 15 of each year. As of the Petition Date, approximately $308.2 million remained outstanding under the Venoco 8.875% Senior Notes.

## D.     Senior PIK Toggle Notes

15.     In August 2013, DPC issued $255 million principal amount of 12.25% / 13.00% senior unsecured PIK toggle notes due 2018 (the "Senior PIK Toggle Notes") at 97.304% of par. Interest on the notes is payable on February 15 and August 15 of each year and, other than the first scheduled interest payment, may be paid in cash or in kind at DPC's election, subject to certain conditions. DPC is dependent on dividends from Venoco to make its required payments under the Senior PIK Toggle Notes and has been paying its interest payments in kind throughout 2015. As of the Petition Date, there was approximately $303 million outstanding under the Senior PIK Toggle Notes.

## Relief Requested

16.     For the reasons set forth herein, the Debtors seek the following relief:

a.      authorizing the Debtors to obtain the DIP Financing pursuant to the DIP Credit Agreement, by and among Venoco, as borrower, the other Debtors (except Ellwood Pipeline, Inc. ("Ellwood")), as guarantors (collectively, the "Guarantors"), Wilmington Trust Company as administrative agent (the "DIP Agent"), and the lenders named therein (the "Lenders");

b.      authorizing the Debtors to execute and deliver to the DIP Agent and the Lenders the DIP Credit Agreement and other documents, agreements and instruments delivered pursuant thereto or executed or filed in connection therewith, as amended, restated, amended and restated, supplemented or otherwise modified from time to time in accordance with the terms thereof and hereof, collectively, the "DIP Loan Documents");

c.      granting to the DIP Agent, for itself and for the benefit of the Lenders, first priority security interests in and liens on all of the Collateral (as defined below) to secure the DIP Financing and all obligations owing and outstanding thereunder and under the DIP Loan Documents, as applicable, and the Final Order, as applicable, subject only to the Carve-Out (defined below), and any Excluded Property and vehicles covered by a certificate of title law of any state (each as defined and further described in the security documents for to the Prepetition Secured Notes);

d.      granting allowed superpriority administrative expense claims to the DIP Agent and the Lenders;

e.      authorizing the Debtors to use Prepetition Cash Collateral as such term is defined in section 363 of the Bankruptcy Code (the "Cash Collateral") of the holders of the Prepetition Secured Notes;

f.      authorizing the Debtors to grant adequate protection to the holders of the Prepetition Secured Notes;

g.      scheduling a Final Hearing to consider entry of the Final Order; and

h.      waiving of any applicable stay and providing for the immediate effectiveness of the Interim Order.

## The Debtors' Liquidity Needs

17.     As further described in the Coleman Declaration, Debtors have faced a number of financial challenges that are straining their liquidity, including, among others, the Debtors' substantial debt burden, sustained depressed crude oil and natural gas prices and production interruption due to the shut in at Platform Holly as a result of the Plains All American California Pipeline Line 901 shut-in. The resulting operating losses have significantly impacted the Debtors' ability to satisfy their prepetition obligations while continuing to operate their businesses in the ordinary course.

18.     Anticipating an ongoing liquidity crunch, PJT Partners LP ("PJT") worked closely with the Debtors' management team and the Debtors' other advisors to analyze the incremental liquidity necessary to maintain operations in connection with the filing of these chapter 11 cases and bridge the Debtors to a going concern restructuring transaction.

19.     PJT has been working with Venoco since November 2014, has become well-acquainted with the Debtors' capital structure and business operations, and has worked closely with the Debtors and their other advisors to analyze the incremental liquidity that would be necessary to maintain operations in connection with the filing of these chapter 11 cases.

20.     As part of this process, PJT analyzed Venoco's near-term financial projections and developed a budget in conjunction with the Debtors' management team. The Budget takes into account anticipated cash receipts and disbursements during the projected chapter 11 period and considers a number of factors, including the impact of the chapter 11 filing on the operations of the business, fees and interest expenses associated with postpetition financing, professional fees, and required vendor payments.

21.     The Debtors' management team and PJT contemplated the use of cash on hand without additional financing to fund operations during these chapter 11 cases. Based on the Debtors' financial projections, the Debtors, in consultation with PJT, concluded that cash on hand may be insufficient to fund the Debtors' operations and the costs of these chapter 11 cases. Indeed, if the Debtors are unable to gain access to the DIP Facility and Cash Collateral as provided by this Motion, the Debtors' value as a whole could be materially and perhaps irreparably harmed.

22.     Among other things, while the Debtors do not seek to draw on the DIP Facility immediately, without access to the DIP Facility and Cash Collateral, the Debtors may have insufficient funds during these chapter 11 cases to pay their vendors, royalties and tax payments, professional fees, employee wages, benefits, and related obligations, resulting in attrition to the Debtors' highly trained workforce and negatively impacting morale among remaining employees. In addition, the Debtors would be unable to continue meeting obligations under their

supply contracts, likely resulting in an inability to retain significant customer and vendor relationships to the great detriment of the Debtors' future business prospects. The Debtors may also be unable to comply with their permitting and environmental regulatory requirements on a postpetition basis, which could result in the loss of necessary permits, resulting in significant remediation obligations. The Debtors may additionally be unable to complete additional projects – including, most importantly, the Ellwood Lease Line Adjustment – that will be value accretive in the near future. In sum, absent immediate access to Cash Collateral and the approval of the DIP Financing that the Debtors believe is necessary to support a successful restructuring, the Debtors could face a material diminution in value of their assets and operations and could be forced to conduct a value-destroying liquidation.

23.      Based on the Budget, PJT and the Debtors believe that access to up to $35.0 million (in addition to cash on hand) is necessary as a standby facility to support their ongoing operations. Without Court approval of the relief sought in this Motion, the Debtors may face significant liquidity constraints in the near term.

**The Debtors' Efforts to Obtain Postpetition Financing**

24.      As further described in the Coleman Declaration, the Debtors and PJT began actively pursuing postpetition financing in January 2016. Before reaching out to potential third party lenders, the Debtors and PJT solicited indications of interest from the Debtors' existing noteholders. In January 2016, the Debtors received a term sheet from Apollo and MAST Capital Management, LLC ("Mast"), which together hold 100% of the First Lien Secured Notes and Second Lien Secured Notes.

25.      In addition, PJT reached out to a number of alternative third-party financial investors to inquire whether such parties would be willing to extend financing to the Debtors on

a junior, unsecured, superpriority or even a priming basis. Specifically, the Debtors and PJT contacted an additional three parties that routinely provide DIP financings to gauge their interest in providing postpetition financing. Of the three parties, one showed interest and executed a confidentiality agreement and none submitted preliminary term sheets. Each of these parties confirmed that, in light of the facts and circumstances, including the Debtors' financial position and the sector in which they operate, they would have no interest in extending financing to the Debtors on a junior, unsecured, superpriority, or priming basis.

26.     In March 2016, Mast determined that it would no longer participate in the DIP financing, further illustrating the difficulty in obtaining DIP financing for the Debtors.

**The Debtors Selection of the Proposed DIP Financing**

27.     As further described in the Coleman Declaration, after a lengthy marketing process, there were multiple rounds of negotiation between Venoco, on the one hand, and Apollo on the other. Venoco and Apollo were represented by separate advisors during the negotiations, and the negotiations were conducted in good faith and at arm's-length. The Debtors' management team was intimately involved throughout this process, and Venoco's board was kept well informed. Ultimately, after numerous term sheets were exchanged over the course of approximately two months, and negotiations over terms and structure continued into the days leading up to the Petition Date, Apollo proposed the DIP Facility and Cash Collateral usage that is the subject of this Motion.

## Summary of Principal Terms of DIP Financing

28.    Pursuant to Bankruptcy Rule 4001(b), (c), and (d), the following is a concise statement and summary of the proposed material terms of the DIP Financing, as specified in the DIP Credit Agreement and the Final Order:[5]

| Material Provision | Summary Description of Material Provision |
|---|---|
| **DIP Credit Agreement Parties**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B)<br><br>DIP Credit Agreement Preamble | **Borrower**: Venoco.<br><br>**Guarantors**: The other Debtors (except Ellwood).<br><br>**Lenders**: The Apollo Lenders and any of their permitted assignees.<br><br>"**Apollo Lenders**" means the lenders to be listed under the heading "Apollo Lenders" in the DIP Loan Documents.<br><br>**Administrative Agent**: Wilmington Trust, National Association. |
| **Amount**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B)<br><br>DIP Credit Agreement § 2.1 | A senior secured superpriority non-amortizing delayed draw term loan facility in an aggregate principal amount of up to $35.0 million. |
| **Availability**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B)<br><br>DIP Credit Agreement §§ 2.1, 2.2 and 5.2(l) | 1. Subject to the terms and conditions contained herein, the Lenders will agree to provide to Venoco a delayed draw term loan facility of up to $35.0 million.<br><br>2. After entry of the Final Order, subject to the terms and conditions herein, the Borrower may borrow under the DIP Facility, provided that (w) each borrowing shall not exceed $10.0 million per borrowing, (x) no more than 4 borrowings shall be permitted for the term of DIP Facility, (y) the California State Lands Commission shall have approved the Ellwood LLA Permit Date (as defined in the First Lien Notes Indenture) if the aggregate amount of such borrowing and all prior borrowings shall exceed $20.0 million and (z) the proceeds of each such borrowing shall be used for the Approved Purposes. |

---

[5]  This summary is qualified, in its entirety by the provisions of the DIP Credit Agreement and the Final Order. Unless otherwise set forth in this summary, capitalized terms used within this summary shall have the meanings ascribed to them in the DIP Credit Agreement.

| Material Provision | Summary Description of Material Provision |
|---|---|
| | 3.  It shall be in Venoco's sole discretion as to whether to request any borrowing under the DIP Financing.<br><br>4.  Any request for a borrowing under the DIP Financing must be made not later than 30 days before the Scheduled Termination Date, with borrowing mechanics to be agreed.<br><br>5.  Venoco must give the Administrative Agent seven (7) business days' notice of any request for a drawing under the DIP Financing.<br><br>6.  Once repaid, the DIP Financing may not be re-borrowed.<br><br>Any conversion, dismissal or confirmation order entered in the Cases shall not discharge or otherwise affect in any way any of the obligations of the Debtors to the Lenders under the DIP Financing, other than after the full, final and indefeasible repayment of the obligations of the Loan Parties under the DIP Loan Documents in cash on or before the effective date of a plan of reorganization. |
| **Use of Proceeds**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B)<br><br>DIP Credit Agreement Recitals and § 7.13 | The proceeds of the DIP Financing and any Cash Collateral shall be used only for the following, in each case subject to the terms, conditions and amounts herein and the agreed Cash Flow Forecast from time to time (the "**Approved Purposes**"):<br><br>(a)  working capital and general corporate purposes in accordance with the Cash Flow Forecast; and<br><br>(b)  Bankruptcy Court approved administrative expenses for estate professionals and such other expenses to which the Lenders may consent in their sole direction. |
| **DIP Financing Termination Date**<br><br>Fed. R. Bankr. P. 4001(b)(1)(ii) and (c)(1)(B)<br><br>DIP Credit Agreement, § 1.1 | The "**DIP Financing Termination Date**" with respect to the DIP Financing shall be the earliest of (a) the Scheduled Termination Date (as defined below), (b) 45 days after the Petition Date (or such later date as the Lenders may reasonably agree if the Final Order has not been entered prior to such date), (c) the substantial consummation (as defined in Section 1101 of the Bankruptcy Code and which for purposes hereof shall be no later than the "effective date" thereof) of a plan of reorganization filed in the Cases that is confirmed pursuant to an order entered by the Bankruptcy Court, (d) the date on which all commitments under the DIP Facility have terminated and all obligations under the DIP Facility have been paid in full in cash and (e) the date on which the commitments under the DIP Facility have been terminated or all or any portion of the Term Loans have been accelerated in accordance with the DIP Loan Documents.<br><br>"**Scheduled Termination Date**" means December 31, 2016. |

| Material Provision | Summary Description of Material Provision |
|---|---|
| | |
| **Interest Rate**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B)<br><br>DIP Credit Agreement § 2.7 | **Interest Rate**: Term Loans will bear interest, at the option of Venoco, at one of the following rates:<br><br>(i)    the Applicable Margin plus the Base Rate (each as defined below), payable monthly in arrears; or<br><br>(ii)    the Applicable Margin plus the current LIBO Rate as quoted by the Administrative Agent, adjusted for reserve requirements, if any, and subject to customary change of circumstance provisions, for interest periods of one, two, three or six months (the "**LIBO Rate**"), payable at the end of the relevant interest period, but in any event at least quarterly; provided that the LIBO Rate in respect of Term Loans shall be not less than 1.00% per annum.<br><br>"**Applicable Margin**" means  (1) 9.00 % per annum, in the case of Base Rate loans and (y) 10.00% per annum, in the case of LIBO Rate loans.<br><br>"**Base Rate**" means the highest of (i) the Administrative Agent's base rate, (ii) the Federal Funds Effective Rate plus 1/2 of 1% and (iii) the LIBO Rate for an interest period of one month plus 1.00%, provided that in no event shall the Base Rate be less than 2.00%.<br><br>Interest shall be calculated on the basis of the actual number of days elapsed in a 360-day year (or a 365/366-day year, in the case of Base Rate loans).<br><br>**Default Interest**: During the continuance of an event of default (as defined in the DIP Loan Documents), interest of an additional 2% *per annum*. |
| **Fees**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B)<br><br>DIP Credit Agreement § 2.8 | **Upfront Fee**: For the account of the Lenders, an upfront fee (which may take the form of original issue discount) equal to 1.00% of the Commitment, such fee to be earned and due and payable on the Closing Date.<br><br>**Ticking Fee**: From and after the Closing Date, a non-refundable unused commitment fee at the rate of 1.00% per annum will accrue on the undrawn portion of the DIP Financing, payable monthly in arrears and on the DIP Financing Termination Date.<br><br>**Backstop Fee**: A backstop fee equal to (i) 10% of the common equity of the Company or its reorganized or successor company, such fee to be earned and due and payable on effectiveness of any plan of reorganization, or (ii) in the event the RSA is terminated without the plan of reorganization having been consummated, such backstop fee shall be payable in cash on the later to occur of (x) the date the Term Loans are accelerated as provided in accordance with the DIP Loan Documents and (y) the date of termination of the RSA, in each case in |

| Material Provision | Summary Description of Material Provision |
|---|---|
| | an amount equal to 5.00% of the aggregate principal amount of Term Loans that have been funded.<br><br>**Administrative and Collateral Agency Fee**: As separately agreed to between Venoco and the DIP Agent. |
| **Prepayments**<br><br>DIP Credit Agreement §§ 2.5 and 2.6 | **Optional**: Venoco may, upon at least 3 business days' notice for LIBO Rate loans and same-day notice for Base Rate loans and at the end of any applicable interest period (or at other times with the payment of applicable breakage costs), prepay in full or in part, without premium or penalty (other than such breakage costs and except as provided below), the Term Loans; *provided* that each such partial prepayment shall be in a minimum aggregate amount to be agreed.<br><br>**Mandatory**: Mandatory prepayments of the Term Loans shall be required with 100.0% of the net cash proceeds exceeding the Threshold Amount (as defined below) from sales or other dispositions (including casualty events) of any Collateral (as defined below) (excluding dispositions in the ordinary course of business subject to other exceptions to be agreed, provided that the Borrower shall be permitted to reinvest net cash proceeds from casualty and condemnation events so long as (x) such reinvestment is consummated on or prior to the DIP Facility Scheduled Termination Date and (y) the aggregate principal amount of DIP Loans outstanding at such time of receipt shall be less than $10.0 million).<br><br>Additionally, the incurrence of indebtedness not permitted by the DIP Loan Documents shall require mandatory prepayment of the net cash proceeds thereof in a customary manner to be agreed.<br><br>"**Threshold Amount**" means $500,000 (individually) and $2,500,000 in the aggregate. |
| **Events of Default**<br><br>Fed. R. Bankr. P. 4001(b)(1)(B) and (c)(1)(B)(iii)<br><br>DIP Credit Agreement Art. IX | **Events of Default**: The DIP Loan Documents will contain customary events of default with, where appropriate, grace periods and exceptions, subject to the Documentation Principles, including the following:<br><br>    A.    Failure to pay principal, interest (for 3 business days) or any other amount (including any mandatory prepayments thereof) (for 3 business days) when due.<br><br>    B.    Representations and warranties incorrect in any material respect when made or deemed made.<br><br>    C.    Failure to comply with covenants, subject to customary grace periods in the case of certain affirmative covenants.<br><br>    D.    Cross-payment default and cross-acceleration to material post- |

| Material Provision | Summary Description of Material Provision |
|---|---|
| | petition or unstayed indebtedness of the Loan Parties and their subsidiaries. |
| | E.    Post-petition judgments exceeding a threshold to be agreed. |
| | F.    Bankruptcy or insolvency of any of Venoco's material subsidiaries that is not party to a Case, unless (i) prior to filing such subsidiary becomes a Loan Party, (ii) within 5 business days of filing, such subsidiary's chapter 11 case becomes jointly administered with that of Venoco, and (iii) each of the Interim Order (within 5 business days of filing) and Final Order (within 45 days of filing) are made applicable to such subsidiary. |
| | G.    The occurrence of certain ERISA events. |
| | H.    Actual or asserted (by any Loan Party or any affiliate thereof) invalidity or impairment of any DIP Loan Document (including the failure of any lien to remain perfected). |
| | I.    Change of ownership or control. |
| | J.    Loss, revocation or failure to maintain any material license, franchise or permit or imposition of any restraining order, escrow or suspension with respect to the foregoing, in each case, which would reasonably be expected to have a Material Adverse Effect. |
| | K. |
| | (i)    The entry of an order dismissing any of the Cases or converting any of the Cases to a case under chapter 7 of the Bankruptcy Code, or any filing by Venoco of a motion or other pleading seeking entry of such an order; |
| | (ii)    A trustee, responsible officer or an examiner having expanded powers (beyond those set forth under Sections 1106(a)(3) and (4) of the Bankruptcy Code) under Bankruptcy Code section 1104 (other than a fee examiner) is appointed or elected in Venoco's Case, Venoco applies for, consents to, or acquiesces in, any such appointment, or the Bankruptcy Court shall have entered an order providing for such appointment, in each case without the prior written consent of the Required Lenders in their sole discretion; |
| | (iii)    The entry of an order staying, reversing, vacating or otherwise modifying the Interim Order or the Final Order, in each case in a manner adverse in any material respect to the Administrative Agent or the Lenders, or the filing by Venoco of an application, motion or |

| Material Provision | Summary Description of Material Provision |
|---|---|
| | other pleading seeking entry of such an order; |
| | (iv) The entry of an order in any of the Cases denying or terminating use of cash collateral by the Loan Parties and the Debtors have not otherwise obtained authorization to use cash collateral with the prior written consent of the Required Lenders; |
| | (v) The entry of an order in any of the Cases granting relief from any stay of proceeding (including, without limitation, the automatic stay) so as to allow a third party to proceed against any material assets of the Loan Parties in excess of an amount to be mutually agreed; |
| | (vi) The entry of a final non-appealable order in the Cases charging any of the Collateral under Section 506(c) of the Bankruptcy Code against the Lenders or the commencement of any other actions by the Loan Parties (or any direct or indirect parent thereof) that challenges the rights and remedies of the Administrative Agent or the Lenders under the applicable DIP Financing in any of the Cases or that is inconsistent with the applicable DIP Loan Documents; |
| | (vii) Without the consent of the Required Lenders, the entry of an order in any of the Cases seeking authority to use cash collateral (other than with the prior written consent of the Required Lenders) or to obtain financing under Section 364 of the Bankruptcy Code (other than the DIP Financing); |
| | (viii) Without the consent of the Required Lenders, the entry of an order in any of the Cases granting adequate protection to any other person (which, for the avoidance of doubt, shall not apply to any payments made pursuant to "first day" or other orders reasonably acceptable to the Required Lenders); |
| | (ix) The filing or support of any pleading by any Loan Party (or any direct or indirect parent thereof) seeking, or otherwise consenting to, any of the matters set forth in clauses (i) through (viii) above; or |
| | (x) Termination or expiration of any exclusivity period for any Loan Party to file or solicit acceptances for a plan of reorganization. |
| | L. The commencement of any action, including the filing of any pleading, by any Loan Party or any direct or indirect subsidiary of any Loan Party against any of the prepetition secured parties with respect to any of the obligations or liens under or with respect to the Prepetition Notes Indentures. |
| | M. The making of any payments in respect of prepetition obligations |

| Material Provision | Summary Description of Material Provision |
|---|---|
| | other than (i) as permitted by the Interim Order or the Final Order, (ii) as permitted by any "first day" orders reasonably satisfactory to the Required Lenders, (iii) as permitted by any other order of the Bankruptcy Court in amounts reasonably satisfactory to the Required Lenders, (iv) as set forth in the Cash Flow Forecast or (v) as otherwise agreed to by the Required Lenders. |
| | N.  The California State Lands Commission shall have denied regulatory approval for the Ellwood LLA (as defined in the First Lien Notes Indenture). |
| | O.  An order of the Bankruptcy Court granting, other than in respect of the DIP Financing and the Carve-Out or as otherwise permitted under the applicable DIP Loan Documents, any claim entitled to superpriority administrative expense claim status in the Cases pursuant to Section 364(c)(1) of the Bankruptcy Code pari passu with or senior to the claims of the Administrative Agent and the Lenders under the DIP Financing, or the filing by Venoco of a motion or application seeking entry of such an order. |
| | P.  Other than with respect to the Carve-Out, the liens provided for in the DIP Financing and certain other permitted liens to be agreed, Venoco shall create, incur, or permit to exist any lien which is *pari passu* with or senior to any liens under the Prepetition Notes Indentures, the adequate protection liens and adequate protection obligations granted under the Interim Order. |
| | Q.  Noncompliance by any Loan Party or any of its subsidiaries with the terms of the Interim Order or the Final Order. |
| | R.  The Loan Parties or any of their subsidiaries, or any person claiming by or through any of the foregoing, shall obtain court authorization to commence, or shall commence, join in, assist or otherwise participate as an adverse party in any suit or other proceeding against the Administrative Agent or any of the Lenders regarding the DIP Financing, unless such suit or other proceeding is in connection with the enforcement of the DIP Loan Documents against the Administrative Agent or Lenders. |
| | S.  A plan of reorganization shall be confirmed in any of the Cases that is not an Acceptable Plan of Reorganization, or any order shall be entered which dismisses any of the Cases and which order does not provide for termination of the unused commitments under the DIP Financing and payment in full in cash of the Loan Parties' obligations under the DIP Financing and that is not otherwise reasonably |

| Material Provision | Summary Description of Material Provision |
|---|---|
| | satisfactory to the Required Lenders, or any of the Loan Parties or any of their subsidiaries shall file, propose, support, or fail to contest in good faith the filing or confirmation of such a plan or the entry of such an order. |
| | T.  Any Loan Party shall file any motion seeking authority to consummate the sale of assets of any Loan Party (other than any such sale that is permitted under the DIP Loan Documents) pursuant to Section 363 of the Bankruptcy Code, without the consent of the Required Lenders, or Venoco shall file (or fail to oppose) any motion seeking an order authorizing the sale of all or substantially all of the assets of the Loan Parties. |
| | U.  Any Debtor shall fail to comply with any of the Case Milestones. |
| | V.  Any Debtor shall have defaulted or otherwise breached any of its obligations under the RSA or the RSA shall have been modified in a manner adverse to the Lenders or terminated. |
| | **Remedies**: Upon the occurrence of an event of default, the Administrative Agent, on behalf of the Lenders, may (and at the direction of the Required Lenders, shall) (x) declare (i) the termination, reduction or restriction of any further commitment to the extent any such commitment remains, (ii) all obligations to be immediately due and payable, without presentment, demand, protest, or other notice of any kind, all of which are expressly waived by the Debtors, and (iii) the termination of the DIP Loan Documents as to any future liability or obligation of the Administrative Agent and the Lenders, but without affecting any of the DIP liens or the obligations of the Loan Parties thereunder and (y) upon the giving of five calendar days' notice to the Debtors (the "**Remedies Notice Period**"), (i) terminate the consensual use of cash collateral and (ii) exercise all other rights and remedies provided for in the DIP Loan Documents and applicable law.<br><br>Solely during the Remedies Notice Period, the Debtors may continue to use cash collateral in the ordinary course of business, consistent with the Cash Flow Forecast. During the Remedies Notice Period, any party in interest shall be entitled to seek an emergency hearing with the Bankruptcy Court, for the sole purpose of contesting whether an event of default has occurred and/or is continuing. |
| **Liens, Priorities and Adequate Protection**<br><br>Fed. R. Bankr. P. | **Collateral**: The obligations of Venoco under the DIP Facility and the obligations of each Guarantor in respect of its guarantee of all of the foregoing, shall, subject to the Carve-Out (as defined below), at all times:<br><br>(a)  pursuant to Section 364(c)(1) of the Bankruptcy Code, be entitled to superpriority administrative expense claim status in the Case of such |

| Material Provision | Summary Description of Material Provision |
|---|---|
| 4001(c)(1)(B)(i), (ii)<br><br>DIP Credit Agreement § 2.16 | Loan Party (the "**DIP Superpriority Claims**");<br><br>(b) pursuant to Section 364(c)(2) of the Bankruptcy Code, be secured by a perfected first priority security interest and lien on the Collateral of each Loan Party;<br><br>to the extent such Collateral is not subject to valid, perfected and non-avoidable liens as of the Petition Date and excluding claims and causes of action under sections 502(d), 544, 545, 547, 548 and 550 of the Bankruptcy Code (collectively "**Avoidance Actions**") (it being understood that notwithstanding such exclusion of Avoidance Actions, upon entry of the Final Order, to the extent approved by the Bankruptcy Court, such lien shall attach to any proceeds of Avoidance Actions);<br><br>(c) except as otherwise provided in the immediately following clause (d), pursuant to Section 364(c)(3) of the Bankruptcy Code, be secured by a junior perfected security interest and lien on the Collateral of each Loan Party;<br><br>to the extent that such Collateral is subject to valid, perfected and unavoidable liens in favor of third parties that were in existence immediately prior to the Petition Date and permitted under the Prepetition Notes Indenture or to valid and unavoidable permitted liens in favor of third parties that were in existence immediately prior to the Petition Date that were perfected subsequent to the Petition Date as permitted by Section 546(b) of the Bankruptcy Code (other than the existing liens that secure obligations of the applicable Loan Party under or governed by (i) the First Lien Notes Indenture and (ii) the Second Lien Notes Indenture, which existing liens will be primed by the liens described in clause (d) below), subject as to priority to such liens in favor of such third parties; and<br><br>(d) pursuant to Section 364(d)(1) of the Bankruptcy Code, be secured by a perfected priming security interest and lien on the Collateral of each Loan Party (such lien and security interest, the "**Priming Liens**")to the extent that Collateral is subject to existing liens that secure the obligations of the applicable Loan Party under (i) the First Lien Notes Indenture and (ii) the Second Lien Notes Indenture (collectively, the "**Primed Liens**").<br><br>The Priming Liens (x) shall be senior in all respects to the interests in such property of (i) the holders of First Lien Notes and the other "Secured Parties" under the First Lien Notes Indenture and related security documents (the "**First Lien Notes Primed Parties**") and (ii) the holders of Second Lien Notes and the other "Secured Parties" under the Second Lien Notes Indentures and related |

| Material Provision | Summary Description of Material Provision |
|---|---|
| | security documents (the "**Second Lien Notes Primed Parties**") and (y) shall also be senior to any liens granted to provide adequate protection in respect of any of the Primed Liens.<br><br>All of the liens described above shall be effective and perfected upon entry of the Interim Order, and no further filing, notice or act will be required to effect such perfection. The Administrative Agent on behalf of the Lenders, shall be permitted, but not required, to make any filings, deliver any notices, make recordations, perform any searches or take any other acts as may be desirable under state law in order to reflect the security, perfection or priority of the Lenders' claims described herein; *provided* that the Administrative Agent will not file mortgages or other recordings requiring documentary or stamp taxes, fees or charges.<br><br>"**Collateral**" means all owned or hereafter acquired assets and property of the Loan Parties (including, without limitation, inventory, accounts receivable, property, plant, equipment, rights under leases and other contracts, patents, copyrights, trademarks, tradenames and other intellectual property and capital stock of subsidiaries), and the proceeds thereof, subject to exclusions to be agreed that are customary for facilities of this type.<br><br>The "**Carve-Out**" is an amount equal to the sum of (i) all fees required to be paid to the clerk of the Bankruptcy Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) fees and expenses of up to $50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); and (iii) allowed and unpaid claims for unpaid fees, costs, and expenses (the "**Professional Fees**") incurred by persons or firms retained by the Debtors or the official committee of unsecured creditors in the Cases (the "**Creditors' Committee**"), if any, whose retention is approved by the Bankruptcy Court pursuant to section 327 and 1103 of the Bankruptcy Code (collectively, the "**Professional Persons**"), to the extent such Professional Fees are allowed at any time by the Bankruptcy Court, that are incurred (A) at any time before delivery by the Administrative Agent of a Carve-Out Trigger Notice (as defined below), whether allowed by the Bankruptcy Court prior to or after delivery of a Carve-Out Trigger Notice, subject to any limits imposed by the Interim Order or Final Order or otherwise on Professional Fees permitted to be incurred in connection with any permitted investigations of claims and defenses against any prepetition secured parties; and (B) after the occurrence and during the continuance of an event of default and delivery of written notice (the "**Carve-Out Trigger Notice**") thereof (which may be by email) to the Debtors, the Debtors' counsel, the United States Trustee, and lead counsel for the Creditors' Committee, if any, in an aggregate amount not to exceed $1 million; *provided* that any success or transaction fees that may become due and payable to Professional Persons shall |

| Material Provision | Summary Description of Material Provision |
|---|---|
| | not be included in the Carve-Out cap test set forth in (B); *provided, further,* that nothing herein shall be construed to impair the ability of any party to object to the fees, expenses, reimbursement or compensation described in clauses (i), (ii), (iii)(A) or (iii)(B) above, on any grounds.<br><br>Notwithstanding the foregoing, the Carve-Out shall not include, apply to or be available for any fees or expenses incurred by any party in connection with (a) the investigation, initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation (i) against any of the Lenders, the Administrative Agent, or the holders of any indebtedness described in "Certain Prepetition Debt Facilities and Instruments" above (whether in such capacity or otherwise), or (ii) challenging the amount, validity, perfection, priority or enforceability of or asserting any defense, counterclaim or offset to, the obligations and the liens and security interests granted under the DIP Loan Documents or the indebtedness described in "Certain Prepetition Debt Facilities and Instruments" above (whether in such capacity or otherwise), including, in each case, without limitation, for lender liability or pursuant to section 105, 510, 544, 547, 548, 549, 550, or 552 of the Bankruptcy Code, applicable non-bankruptcy law or otherwise; (b) attempts to modify any of the rights granted to the Lenders or the Administrative Agent; (c) attempts to prevent, hinder or otherwise delay any of the Lenders' or the Administrative Agent's assertion, enforcement or realization upon any Collateral in accordance with the DIP Loan Documents and the Final Order other than to seek a determination that an event of default has not occurred or is not continuing or (d) paying any amount on account of any claims arising before the commencement of the Cases unless such payments are approved by an order of the Bankruptcy Court.<br><br>For the avoidance of doubt and notwithstanding anything to the contrary herein or in the DIP Loan Documents, the Carve-Out shall be senior to all liens and claims securing the DIP Loan Documents, any adequate protection liens, if any, and the superpriority claims, and any and all other liens or claims securing the DIP Financing. |
| **Representations and Warranties:**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B)<br><br>DIP Credit Agreement Art. IV | The DIP Loan Documents will contain customary representations and warranties, subject to the Documentation Principles, including the following: organization; existence; powers; corporate authorization; no contravention; enforceability; governmental approvals; financial statements and condition; no material adverse effect; ERISA compliance; margin regulations; title to properties; possession under leases; subsidiaries; litigation; compliance with laws; federal reserve regulations; Investment Company Act; OFAC; FCPA; use of proceeds; taxes; no material misstatements; employee benefit plans; environmental matters; security documents; locations of real property and leased premises; labor matters; insurance; no default; intellectual property; licenses; etc.; status as senior debt; oil and gas reserves; reserve report; gas imbalances; regulated entities; no burdensome restrictions; derivative contracts; Ellwood; |

| Material Provision | Summary Description of Material Provision |
|---|---|
| | existing indebtedness; full disclosure. |
| **Affirmative Covenants and Negative Covenants**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B)<br><br>DIP Credit Agreement Arts. VII and VIII | **Affirmative Covenants**: The DIP Loan Documents will contain customary affirmative covenants, subject to the Documentation Principles (subject to certain other exceptions, qualifications and carveouts to be agreed), including the following:<br><br>A.    Preservation and maintenance of existence, business and properties.<br><br>B.    Procurement and maintenance of certain insurance, insurance certificates and endorsements.<br><br>C.    Payment of obligations (including taxes and other claims).<br><br>D.    Financial statements, certificates, other production reserve information and other information<br><br>E.    Notices.<br><br>F.    Compliance with laws and regulations.<br><br>G.    Maintenance of records, access to properties and inspections.<br><br>H.    Use of proceeds.<br><br>I.    Compliance with environmental laws.<br><br>J.    Further assurances.<br><br>K.    "First day" orders, "second day" orders and all other Bankruptcy Court orders establishing procedures for administration for the Cases or approving significant transactions shall be reasonably acceptable to the Required Lenders and subject to affirmative covenants to be agreed.<br><br>L.    Certificates; other production, reserve information and other information.<br><br>M.    Compliance with ERISA.<br><br>N.    New subsidiary guarantors.<br><br>O.    Post-Closing matters including delivery of insurance endorsements naming the Administrative Agent, on behalf of the Lenders, as an additional insured and loss payee, as applicable, under all insurance policies required to be maintained with respect to the Collateral |

| Material Provision | Summary Description of Material Provision |
|---|---|
| | pursuant to the terms of the DIP Loan Documents, in each case, no later than 15 days after the Closing Date. <br><br> **Negative Covenants**: The DIP Loan Documents will contain customary negative covenants, subject to the Documentation Principles (subject to certain other exceptions, qualifications and carveouts to be agreed) (provided, that the negative covenants shall be tightened in a manner customary for facilities of this type), including the following: <br><br> A.    Limitations on indebtedness. <br><br> B.    Limitations on liens. <br><br> C.    Limitations on sale and leaseback transactions. <br><br> D.    Limitations on investments, loans and advances. <br><br> E.    Limitations on mergers, consolidations, sales of assets and acquisitions. <br><br> F.    Limitations on dividends and distributions. <br><br> G.    Limitations on transactions with affiliates. <br><br> H.    Limitations on changes in business. <br><br> I.    Limitations on the (i) payment and modification of prepetition debt and (ii) modification of certificate of incorporation, by-laws and certain other agreements, etc. <br><br> J.    Limitations on derivative contracts. <br><br> K.    Limitations on other "designated senior debt". <br><br> L.    Limitations on changes to fiscal year and accounting. <br><br> M.    Limitations on margin stock. <br><br> N.    Limitations on certain contracts; amendments and multiemployer plans. <br><br> O.    Limitations on forward sales and production payments. <br><br> P.    Limitations on use of proceeds. <br><br> Q.    Limitations on bank accounts. |

| Material Provision | Summary Description of Material Provision |
|---|---|
| | R.       Limitation on capital expenditures. |
| **Financial Covenant**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B)<br><br>DIP Credit Agreement § 8.12 | The DIP Financing will contain only the following financial covenants: compliance with the Cash Flow Forecast as more fully described under the heading "Budget". |
| **Financial Reporting Requirements**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B)<br><br>DIP Credit Agreement § 7.1 | Venoco shall provide the Administrative Agent and the Lenders with financial reporting customary for facilities of this size and nature. |
| **Other Reporting Requirements**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B)<br><br>DIP Credit Agreement § 7.15 | The Debtors will host bi-weekly conference calls for the Lenders to provide updates as to the status of the plan process and the Debtors' liquidity. |
| **Budget**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B)<br><br>DIP Credit Agreement § 8.12 | "**Cash Flow Forecast**" means the Initial Cash Flow Forecast and each updated 13 week cash flow forecast delivered under the DIP Loan Documents and approved by the Required Lenders.<br><br>On or before the last day of the fourth full calendar week following the Closing Date (or, if such day is not a business day, the next business day), the Company shall not permit the aggregate amounts (i) for each of (A) the "Operational Disbursements" line item in the Cash Flow Forecast, (B) the "G&A ex. Professional Fees" line item in the Cash Flow Forecast, and (C) the Restructuring Line Item (each, a "**Disbursement Line Item**" and collectively, the "**Aggregate Disbursement Line Items**") actually made by the Loan Parties in the Cash Flow Forecast during the four-week period ending on the Friday before such day (such date, the "**Initial Test Date**") to exceed, on a cumulative basis, the aggregate budgeted amounts set forth in the Cash Flow Forecast in effect for such applicable four-week period for such Disbursement Line Item by more than 20%, and (ii) for the Aggregate Disbursement Line Items in the Cash |

| Material Provision | Summary Description of Material Provision |
|---|---|
| | Flow Forecast actually made by the Loan Parties during such four-week period ending on the Initial Test Date to exceed, on a cumulative basis, the aggregate budgeted amounts set forth in the Cash Flow Forecast in effect for such four-week period for the Aggregate Disbursement Line Items by more than 15%. For purposes of the foregoing, an amount of up to $2,500,000 shall be excluded from the Disbursement Line Item and Aggregate Disbursement Line Items and the Cash Flow Forecast when calculating the foregoing to the extent that such amount has been paid by the Loan Parties to settle shareholder litigation on file as of the Closing Date.<br><br>On or before the last day of every other calendar week after the Initial Test Date (or, if such day is not a business day, the next business day), the Company shall not permit the aggregate amounts (i) for each Disbursement Line Item actually made by the Loan Parties in the Cash Flow Forecast during the six-week period ending on the Friday before such day (each such date, a "**Test Date**") to exceed, on a cumulative basis, the aggregate budgeted amounts set forth in the Cash Flow Forecast in effect for such applicable six-week period for such Disbursement Line Item by more than 20%, and (ii) for the Aggregate Disbursement Line Items in the Cash Flow Forecast actually made by the Loan Parties during the six-week period ending on the Test Date to exceed, on a cumulative basis, the aggregate budgeted amounts set forth in the Cash Flow Forecast in effect for such six-week period for the Aggregate Disbursement Line Items by more than 15% (the variances referred to in this paragraph and the immediately preceding paragraph, the "**Permitted Variance**").<br><br>For the purposes of the above calculations, it is agreed that to the extent that the Professional Fees incurred by counsel to the Apollo Lenders exceed the amounts for such line items in the Cash Flow Forecast, such excess amounts shall be disregarded when calculating the Permitted Variance. |
| **Case Milestones**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B)(vi)<br><br>DIP Credit Agreement § 7.17 | The DIP Loan Documents shall require compliance with the following milestones (the "**Case Milestones**") in accordance with the applicable timing referred to below (or such later dates as approved by the Lenders):<br><br>(a) no later than October 15, 2016, the Bankruptcy Court shall have entered the Disclosure Statement Order;<br><br>(b) no later than December 1, 2016 (the "**Confirmation Date**"), the Bankruptcy Court shall have entered the Confirmation Order; and<br><br>(c) no later than 14 days following the Confirmation Date, the Effective Date (as defined in the Plan) shall have occurred. |
| **Conditions Precedent to** | The effectiveness of the DIP Loan Documents (the "**Closing**"; the date on which the Closing occurs, the "**Closing Date**") shall be subject to the satisfaction (or |

| Material Provision | Summary Description of Material Provision |
|---|---|
| **Closing**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B)<br><br>DIP Credit Agreement § 5.1 | waiver) of the following conditions precedent (and the conditions set forth under "Conditions Precedent to Borrowings" below):<br><br>A.   The DIP Loan Documents (x) shall reflect the terms and provisions set forth in this Term Sheet and shall otherwise be acceptable to the Lenders, and (y) shall have been executed and delivered by each party thereto.<br><br>B.   The Petition Date shall have occurred, and each Loan Party shall be a debtor and a debtor-in-possession. All "first day orders" in the Cases shall be reasonably satisfactory in form and substance to the Lenders.<br><br>C.   Not later than 5 days following the Petition Date (or such later date as the Lenders may reasonably agree), the Lenders shall have received a signed copy of the Interim Order authorizing the use of Cash Collateral and containing provisions granting the adequate protection liens described under "Adequate Protection" above and related adequate protection claims, which Interim Order shall not have been vacated, reversed, modified, amended or stayed without the consent of the Required Lenders.<br><br>D.   Not later than 45 days following the Petition Date (or such later date as the Lenders may reasonably agree), the Lenders shall have received a signed copy of the Final Order, authorizing and approving the making of the Term Loans in the amounts consistent with those set forth in the "DIP Financing" section above, and the granting of the superpriority claims and liens and other liens referred to above under the heading "Security and Priority", which Final Order shall not have been vacated, reversed, modified, amended or stayed without the consent of the Required Lenders. The Final Order shall contain provisions providing that the adequate protection liens described under "Adequate Protection" above and related adequate protection claims are in each case junior to the liens and claims granted to secure the DIP Financing.<br><br>E.   No trustee or examiner having expanded powers shall have been appointed with respect to the Loan Parties, any of their subsidiaries or their respective properties.<br><br>F.   All reasonable and documented out-of-pocket costs, fees, expenses (including, without limitation, reasonable and documented legal fees and expenses) and other compensation contemplated by the DIP Loan Documents or otherwise required to be paid to the Administrative Agent and the Lenders on or before the Closing shall have been paid.<br><br>G.   The Lenders shall have received and be reasonably satisfied with (i) a |

| Material Provision | Summary Description of Material Provision |
|---|---|
| | nine-month budget and (ii) a cash flow forecast for the 13-week period ending after the Closing Date dated as of a date not more than 3 business days prior to the Closing Date (the "**Initial Cash Flow Forecast**"). |

H.   The Lenders shall be satisfied in their reasonable judgment that there shall not occur as a result of, and after giving effect to, the initial extension of credit under the DIP Financing (other than resulting from the filing of the Cases), a default (or any event which with the giving of notice or lapse of time or both would be a default) under any of the Loan Parties' or their respective subsidiaries' material debt instruments and other material agreements which (i) in the case of the Loan Parties' material debt instruments and other material agreements, would permit the counterparty thereto to exercise remedies thereunder on a post-petition basis or (ii) in the case of any other subsidiary, would, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect (as defined below).

I.   The Administrative Agent shall have received customary closing deliverables consistent with the Precedent Credit Agreement and the Prepetition Notes Indentures.

J.   Since September 30, 2015, there shall not have occurred or there shall not exist any event, condition, circumstance or contingency (other than as disclosed to the Lenders or as customarily occurs as a result of events leading up to and following the commencement of a proceeding under chapter 11 of the Bankruptcy Code by the Loan Parties or that, individually or in the aggregate, has had or could reasonably be expected to have, (a) a material adverse change in or a material adverse effect, as applicable, upon the operations, business, properties or financial condition of Venoco and its Subsidiaries, taken as a whole; (b) a material impairment of the ability of Venoco or any Subsidiary to perform under any material DIP Loan Document and to avoid any default; or (c) a material adverse effect upon the legality, validity, binding effect or enforceability against Venoco or any Subsidiary of  any material DIP Loan Document (any of the foregoing being a "**Material Adverse Effect**").

K.   There shall exist no unstayed action, suit, investigation, litigation or proceeding pending or (to the knowledge of the Loan Parties) threatened in any court or before any arbitrator or governmental instrumentality (other than the Cases) that could reasonably be expected to have a Material Adverse Effect.

L.   All necessary governmental and third party consents and approvals

| Material Provision | Summary Description of Material Provision |
|---|---|
| | necessary in connection with the DIP Financing and the transactions contemplated thereby shall have been obtained (without the imposition of any adverse conditions that are not reasonably acceptable to the Lenders); and no law or regulation shall be applicable in the judgment of the Lenders that restrains, prevents or imposes materially adverse conditions upon the DIP Financing or the transactions contemplated thereby. |
| | M.    Each Lender who has requested the same at least five (5) business days prior to the Closing Date shall have received "know your customer" and similar information at least two (2) business days prior to the Closing Date. |
| | N.    The Administrative Agent, for the benefit of the Lenders, shall have the valid and perfected liens on the security interests in the Collateral of the Loan Parties contemplated by the "*Security and Priority*" section above. |
| | O.    The Term Loan Facility shall have been repaid in full, all guarantees and liens securing such facility shall have been terminated and all related agreements shall have been terminated, and the Administrative Agent shall have received reasonably satisfactory evidence of each of the foregoing. |
| | P.    The Administrative Agent shall have received reasonably satisfactory evidence of the termination of certain derivative contracts identified to the Debtors prior to the Closing Date. |
| | Q.    The Administrative Agent shall have received the Debtors' executed counterparts of the Restructuring Support Agreement, which shall be in form and substance satisfactory to the Lenders. |
| | R.    The Debtors shall have filed a plan of reorganization (an "**Acceptable Plan of Reorganization**") and disclosure statement that is consistent in all material respects with the Restructuring Support Agreement, in each case, within the required time periods. |
| **Conditions Precedent to Borrowings**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B)<br><br>DIP Credit Agreement § 5.2 | The availability of the DIP Financing is subject to the satisfaction of customary conditions for DIP financings, including, but not limited to the following conditions precedent:<br><br>(a) entry of the Final Order within 45 days after the Petition Date (or such later date as the Lenders may reasonably agree);<br><br>(b) the Final Order shall be in full force and effect, unstayed, and shall not have been reversed, modified, amended, or vacated, in the case of any |

| Material Provision | Summary Description of Material Provision |
|---|---|
| | modification or amendment, in a manner, or relating to a matter, that is adverse to the interests of the Lenders; |
| | (c) the Debtors' use of the Cash Collateral has been, and proposed use of such borrowing will be, consistent with the Approved Purposes and the Cash Flow Forecast and any agreed upon variance; |
| | (d) receipt of an officer's certificate from an authorized officer of Venoco on behalf of Venoco and each Guarantor (i) confirming the absence of an event of default, (i) certifying that such borrowing is required to fund the Cash Flow Forecast after giving effect to the use of the Cash Collateral and (iii) certifying as to the matters set forth in clause (h) below; |
| | (e) the representations and warranties of the Loan Parties therein shall be true and correct in all material respects (or in the case of representations and warranties with a "materiality" qualifier, true and correct in all respects) immediately prior to, and after giving effect to such funding; |
| | (f) the making of such borrowing shall not violate any requirement of law and shall not be enjoined, temporarily, preliminarily or permanently; |
| | (g) the making of such borrowing shall not result in the aggregate outstanding under the DIP Financing exceeding the amount authorized by the Final Order; |
| | (h) after giving effect to such borrowing, the cash and cash equivalents of Venoco and its subsidiaries shall not exceed $15,000,000; |
| | (i) the California State Lands Commission shall have approved the Ellwood LLA if the aggregate amount of such borrowing and all prior borrowings shall exceed $20.0 million; |
| | (j) the Borrower shall be in pro forma compliance with the Cash Flow Forecast; and |
| | (k) no default shall have occurred and be continuing. |
| **Expenses and Indemnification:**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B)(vi)<br><br>DIP Credit Agreement §§ 11.4 and 11.5 | Venoco and each Guarantor shall jointly and severally pay or reimburse the Administrative Agent and the Lenders for all reasonable and documented out-of-pocket costs and expenses incurred by the Administrative Agent and the Lenders (including reasonable and documented attorneys' fees and expenses of one counsel and one local counsel for the Administrative Agent and one counsel and one local counsel in each relevant jurisdiction for the Lenders as a whole, provided that the foregoing limitation on the number of counsel shall not be applicable to fees and expenses of counsel retained by the Apollo Lenders and identified to the Company) in connection with (i) the preparation, negotiation and execution of the DIP Loan Documents; (ii) the funding of the Term Loans; |

| Material Provision | Summary Description of Material Provision |
|---|---|
| | (iii) the creation, perfection or protection of the liens under the DIP Loan Documents (including all search, filing and recording fees) to the extent set forth herein and in the DIP Loan Documents; and (iv) the on-going administration of the DIP Loan Documents (including the preparation, negotiation and execution of any amendments, consents, waivers, assignments, restatements or supplements thereto). |
| | Each of Venoco and each Guarantor further agrees to jointly and severally pay or reimburse the Administrative Agent and each of the Lenders for all reasonable and documented out-of-pocket costs and expenses, including reasonable and documented attorneys' fees and expenses, incurred by the Administrative Agent or such Lender in connection with (i) the enforcement of the DIP Loan Documents; (ii) any refinancing or restructuring of the DIP Financing in the nature of a "work-out"; and (iii) any legal proceeding relating to or arising out of the DIP Financing or the other transactions contemplated by the DIP Loan Documents. |
| | The DIP Loan Documents will contain customary indemnification provisions (including coverage of environmental liabilities) by Venoco and each Guarantor (jointly and severally) in favor of the Administrative Agent, each Lender and each of their respective affiliates and the respective officers, directors, employees, agents, advisors, attorneys and representatives of each of them, in each case consistent with the Prepetition Notes Indentures. |
| **Assignments and Participations:**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B)(vi)<br><br>DIP Credit Agreement § 11.8 | Assignments must be in a minimum amount of $1.0 million (or, if less, the remaining commitments and/or Term Loans of any assigning Lender) and are subject to the consent of the Administrative Agent and, so long as no event of default has occurred and is continuing, the Company (which consent shall not be unreasonably withheld, conditioned or delayed, provided that the Company shall be deemed to have consented to any assignment unless it shall object thereto by written notice to the Administrative Agent within ten (10) Business Days after having received notice thereof), except, with respect to any assignment to a Lender, an affiliate of such a Lender or a fund engaged in investing in commercial loans that is advised or managed by such a Lender. No participation shall include voting rights, other than for matters requiring consent of all affected Lenders. |
| **Required Lenders:**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B)(vi)<br><br>DIP Credit Agreement § 1.1 | The Apollo Lenders so long as such Lenders continue to hold in the aggregate more than 50.0% of the outstanding commitments and/or exposure under the DIP Financing or (y) if the Apollo Lenders no longer hold in the aggregate more than 50.0% of the outstanding commitments and/or exposure under the DIP Financing, Lenders holding greater than 50.0% of the outstanding commitments and/or exposure under the DIP Financing (the "**Required Lenders**"). |

**Basis for Relief**

29.     Section 364 of the Bankruptcy Code distinguishes among (a) obtaining unsecured credit in the ordinary course of business, (b) obtaining unsecured credit out of the ordinary course of business, and (c) obtaining credit with specialized priority or with security. If a debtor in possession cannot obtain postpetition credit on an unsecured basis, pursuant to section 364(c) of the Bankruptcy Code, a court may authorize the obtaining of credit or the incurring of debt, repayment of which is entitled to superpriority administrative expense status or is secured by a senior lien on unencumbered property or a junior lien on encumbered property, or a combination of the foregoing. Because the Debtors propose to obtain financing under the DIP Financing that primes any liens that may exist on the Collateral, the approval of the DIP Financing is governed by sections 364(c) and 364(d) of the Bankruptcy Code.

**A.      Financing Under Section 364(c)**

30.     Section 364 of the Bankruptcy Code authorizes a debtor to obtain, in certain circumstances, postpetition financing on a secured or superpriority basis, or both. Specifically, section 364(c) of the Bankruptcy Code provides, in pertinent part, that the Court, after notice and a hearing, may authorize a debtor that is unable to obtain credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code to obtain credit or incur debt:

- with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of the Bankruptcy Code;

- secured by a lien on property of the estate that is not otherwise subject to a lien; or

- secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c). Thus, pursuant to section 364(c) of the Bankruptcy Code, a debtor may, in the exercise of its business judgment, incur secured debt if the debtor has been unable to obtain

adequate unsecured credit, and the proposed borrowing is in the best interests of its estate. *See, e.g., In re Ames Dept. Stores*, 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990) (with respect to postpetition credit, courts "permit debtors in possession to exercise their basic business judgment consistent with their fiduciary duties"); *In re Simasko Production Co.*, 47 B.R. 444, 448-9 (D. Colo. 1985) (authorizing interim financing where debtor's best business judgment indicated financing was necessary and reasonable for benefit of estate); *Richmond Leasing Co. v. Capital Bank, NA.*, 762 F.2d 1303, 1311 (5th Cir. 1985) (Indeed, "more exacting scrutiny [of the debtor's business decisions] would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially"); *see also* 3 Collier on Bankruptcy ¶ 364.03, at 364-7-18 (16th ed. rev.).

31.     The statutory requirement for obtaining postpetition credit under section 364(c) of the Bankruptcy Code is a finding, made after notice and hearing, that the debtor in possession is "unable to obtain unsecured credit allowable under § 503(b)(l) of [the Bankruptcy Code] as an administrative expense." *See Ames Dep't Stores*, 115 B.R. at 37-39 (a debtor must show it has made a reasonable effort to seek other sources of financing under Bankruptcy Code §§ 364(a) and (b)); *In re Crouse Group, Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987), *modified on other grounds*, 75 B.R. 553 (Bankr. E.D. Pa. 1987) (debtor seeking secured credit under Bankruptcy Code § 364(c) must prove it was unable to obtain unsecured credit pursuant to Bankruptcy Code § 364(b)); *In re McKenzie Energy Corp.*, 228 B.R. 854, 874 (S.D. Tex. 1998): (The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if—(A) the trustee is unable to obtain such credit otherwise […]".)

32.     Courts have articulated a three-part test to determine whether a debtor may obtain financing under section 364(c):

- the debtor is unable to obtain unsecured credit solely under section 364(b) (i.e., by granting a lender administrative expense priority);

- the credit transaction is necessary to preserve the assets of the estate; and

- the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and the proposed lender.

*In re Aqua Assocs.*, 123 B.R. 192, 195-96 (Bankr. E.D. Pa. 1991) (applying the above test and holding that "[o]btaining credit should be permitted not only because it is not available elsewhere, which could suggest the unsoundness of the basis for the use of the funds generated by credit, but also because the credit acquired is of significant benefit to the debtor's estate and the terms of the proposed loan are within the bounds of reason, irrespective of the inability of the debtor to obtain comparable credit elsewhere"); *Ames Dep't Stores*, 115 B.R. at 37-39.

33.     To show financing required is not obtainable on an unsecured basis, a debtor need only demonstrate "by a good faith effort that credit was not available without" the protections of section 364(c). *Bray v. Shenandoah Fed. Savs. & Loan Ass'n* (*In re Snowshoe Co.*), 789 F.2d 1085, 1088 (4th Cir. 1986). "The statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." *Id.*; *see also Pearl-Phil GMT (Far East) Ltd v. Caldor Corp.*, 266 B.R. 575, 584 (S.D.N.Y. 2001) (superpriority administrative expenses authorized where debtors could not obtain credit as an administrative expense). When few lenders are likely to be able and willing to extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom., Anchor Savs. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); *see also Ames*

*Dep't Stores*, 115 B.R. at 40 (approving financing facility and holding the debtor made reasonable efforts to satisfy the standards of section 364(c) where it approached four lending institutions, was rejected by two, and selected the most favorable of the two offers it received).

34.    The Debtors attempted to secure financing on terms other than a secured superpriority basis, but given the Debtors' asset base and balance sheet, they were unable to do so. The Debtors have been unable to obtain (a) adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense; (b) credit for money borrowed secured solely by a lien on property of the estate that is not otherwise subject to a lien; or (c) credit for money borrowed secured by a junior lien on property of the estate which is subject to a lien, in each case, on more favorable terms and conditions than those provided in the DIP Financing. In addition, the Debtors are unable to obtain credit for borrowed money without granting priming liens on the collateral securing the Prepetition Notes. Indeed, as set forth in the Coleman Declaration, no other sophisticated third-party lender was willing to extend financing (other than perhaps a very limited amount) on anything less than a priming basis. Therefore, the Debtors believe entering a DIP Financing with superpriority administrative claims, priming liens on encumbered property, and first priority liens on the Debtors' unencumbered property is appropriate under the circumstances of these chapter 11 cases.

35.    For these reasons, the Debtors submit entry into the DIP Financing is in the best interest of the Debtors' estates, is necessary to preserve the value of estate assets and is an exercise of the Debtors' sound and reasonable business judgment. The Debtors respectfully request the Court to authorize the Debtors to provide the Lenders a superpriority administrative expense status for any obligations arising under the DIP Credit Agreement as provided for in section 364(c)(1) of the Bankruptcy Code.

**B.     Financing and Adequate Protection Under Section 364(d)(l)**

36.     In addition to authorizing financing under section 364(c) of the Bankruptcy Code, courts also may authorize a debtor to obtain postpetition credit secured by a lien that is senior or equal in priority to existing liens on the encumbered property, without the consent of the existing lien holders, if the debtor cannot otherwise obtain such credit and the interests of existing lien holders are adequately protected. *See* 11 U.S.C. § 364(d)(1). The Debtors seek approval of the DIP Financing under section 364(d)(l) of the Bankruptcy Code.

37.     When determining whether to authorize a debtor to obtain credit secured by a "priming" lien as authorized by section 364(d) of the Bankruptcy Code, courts focus on whether the transaction will enhance the value of the debtor's assets. Courts consider a number of factors, including, without limitation:

- whether the party subject to a priming lien has consented to such treatment;

- whether alternative financing is available on any other basis (i.e., whether any better offers, bids or timely proposals are before the court);

- whether the proposed financing is necessary to preserve estate assets and is necessary, essential, and appropriate for continued operation of the debtor's business;

- whether the terms of the proposed financing are reasonable and adequate given the circumstances of both the debtor and proposed lender(s); and

- whether the proposed financing agreement was negotiated in good faith and at arm's length and entry therein is an exercise of sound and reasonable business judgment and in the best interest of the debtor's estate and its creditors.

*See, e.g.*, *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 37-39 (Bankr. S.D.N.Y. 1990); *Bland v. Farmworker Creditors*, 308 B.R. 109, 113-14 (S.D. Ga. 2003); *Barbara K. Enter.*, No. 08-11474, 2008 WL 2439649 at *13 (Bankr. S.D.N.Y. Jun. 16, 2008); *see also* 3 Collier on Bankruptcy ¶ 364.05 (Alan N. Resnick & Henry J. Sommer eds. 16th ed.). The Debtors

respectfully submit the DIP Financing is appropriate under this analysis and the facts of these chapter 11 cases.

38.    First, the Debtors and their advisors explored a variety of possible financing sources, and ultimately determined the Lenders offered the best option for obtaining the postpetition financing the Debtors require. The Debtors and the Lenders negotiated the DIP Financing in good faith and at arms-length, and the DIP Financing reflects the most favorable terms on which the Lenders were willing to offer financing.

39.    Second, the Debtors require access to the DIP Financing to provide adequate liquidity for the operation and maintenance of the Debtors' assets and to preserve and enhance the value of their estates for the benefit of all creditors and other parties in interest. Absent the DIP Financing, the Debtors could suffer material and irreparable harm and a liquidity crisis. Accordingly, value will be lost and the Debtors' ability to effectuate a going concern transaction will be significantly threatened. Conversely, the Debtors' access to liquidity will benefit all stakeholders—including the holders of the Prepetition Notes being primed—by facilitating the Debtors' efforts to preserve and enhance the value of the Debtors' assets.

40.    Third, the DIP Financing will provide access to up to $35.0 million in incremental liquidity, which the Debtors have determined is sufficient and necessary to allow the Debtors to maintain their operations notwithstanding the commencement of these chapter 11 cases and to continue the approved capital projects that are critical to the Debtors' short term ability to generate increased cash flow, maintain and ultimately increase the value of their assets, and to their long term ability to reorganize. Accordingly, the terms of the DIP Financing are reasonable and adequate to support the Debtors' operations and restructuring activities through the pendency of these chapter 11 cases.

41.     <u>Fourth</u>, and as discussed more fully below, the Debtors will provide Adequate Protection to the holders of the Prepetition Notes that will be subject to priming liens arising under the DIP Financing.

*(ii)      Requirement under Section 364(d) of Providing Adequate Protection*

42.     A debtor may obtain postpetition credit "secured by a senior or equal lien on property of the estate that is subject to a lien only if "the debtor, among other things, provides "adequate protection" to those parties whose liens are primed. *See* 11 U.S.C. § 364(d)(1)(B). What constitutes adequate protection is decided on a case-by-case basis, and adequate protection may be provided in various forms, including payment of adequate protection fees, payment of interest, or granting of replacement liens or administrative claims. *See, e.g.*, *In re Mosello*, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996) ("The determination of adequate protection is a fact-specific inquiry . . . left to the vagaries of each case . . . ."); *In re Realty Sw. Assocs.*, 140 B.R. 360 (Bankr. S.D.N.Y. 1992); *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986) (the application of adequate protection "is left to the vagaries of each case, but its focus is protection of the secured creditor from diminution in the value of its collateral during the reorganization process" (citations omitted)). The DIP Financing will provide adequate protection to the holders of the Prepetition Notes in several critical ways.

43.     <u>First</u>, the DIP Financing will provide funds for capital expenditures necessary to continue development of the oil and gas properties, which preserves leases and protects from the risk of lease forfeiture for non-development.

44.     <u>Second</u>, the DIP Financing will create a net increase in asset value to the Debtors, which increase in value will serve to further adequately protect the holders of the Prepetition Notes' interests in the assets, by affording the Debtors liquidity for ongoing maintenance and capital expenditures.

45.  Third, the DIP Financing will permit the Debtors to pay the holders of the Prepetition Notes the Adequate Protection payments during the pendency of these chapter 11 cases. Upon entry of the Final Order, the holders of First Lien Notes will receive payment of postpetition interest in the ordinary course at the non-default rate under the Prepetition First Lien indenture (including payment of all prepetition accrued and unpaid interest under the facility), as well payment of professional fees. Holders of the Second Lien Notes will also receive payment of professional fees.

46.  Finally, the DIP Financing requires certain financial reporting and other reporting for the benefit of the Lenders. The Debtors submit the foregoing adequate protection satisfies the requirements of section 362 of the Bankruptcy Code, and the Court should approve the DIP Financing as a sound and reasonable exercise of the Debtors' business judgment.

### (iii)     The DIP Financing is Necessary to Preserve the Assets of the Estates

47.  It is essential for the Debtors to obtain financing necessary to continue, among other things, the orderly operation of the Debtors' businesses and the chapter 11 cases, and to otherwise satisfy their working capital requirements. The DIP Financing will allow continued development of oil and gas leases, which protects from lease forfeiture and penalties. Without immediate approval of a new source of future liquidity, the Debtors' business operations and the chapter 11 cases in general could be seriously jeopardized. The new liquidity offered by the proposed DIP Financing will ensure the Debtors can maintain and ultimately increase the value of their assets and administer the chapter 11 cases through the bankruptcy process. Thus, approval of the DIP Financing is crucial to maximizing the value of the Debtors' estates.

### (iv)     The Terms of the DIP Financing Are Fair, Reasonable, and Appropriate

48.  The proposed DIP Financing provides generally that the security interests and superpriority administrative expense claims granted to the Lenders are subject to the Carve-Out

described above. In *Ames Department Stores*, the bankruptcy court found that such "carve-outs" are not only reasonable but are necessary to insure the debtors' estates are adequately assisted by counsel and other professionals. *Ames*, 115 B.R. at 40.

49.     Likewise, the Debtors believe the fees and other charges required by the Lenders under the DIP Financing are reasonable and appropriate under the circumstances. The proposed fees under the DIP Financing are within the parameters of market fee structures for similar postpetition financing. Indeed, courts routinely authorize similar lender incentives beyond the explicit liens and other rights specified in section 364 of the Bankruptcy Code. *See In re Defender Drug Stores, Inc.*, 145 B.R. 312, 316 (B.A.P. 9th Cir. 1992) (approving a debtor in possession financing facility that included a lender "enhancement fee"); *In re Korea Chosun Daily Times, Inc.*, 337 B.R. 773, 783 (Bankr. E.D.N.Y. 2005) (postpetition financing arrangements under 364 "may include the payment of a loan commitment fee and reimbursement of reasonable fees and expenses in the event that the financing arrangement is not consummated."); *In re Mayco Plastics Inc.*, 379 B.R. 691, 698-99 (Bankr. E.D. Mich. 2008) (section 364 provides "certain incentives that a trustee or debtor in possession may offer, with court approval, to induce potential lenders to undertake the risks involved in providing post-petition financing to a bankruptcy estate….The greater the debtor's inability to obtain the necessary post-petition financing, the greater the inducements the debtor may offer to obtain such debt. Similarly, the greater the risk undertaken by the post-petition lender, the more heightened its need becomes to obtain the additional inducements that §§ 364(c) and (d) permit the Court to authorize a debtor to offer.").

50.     The Debtors are unable to obtain alternate credit sources, the terms of the DIP Financing have been negotiated at arms-length and are not principally for the benefit of a

creditor to the detriment of other parties in interest, and the Debtors' believe, in their business judgment, the DIP Financing is in the best interest of all parties involved. The terms of the DIP Financing are in the realm of the incentives contemplated by section 364 to induce potential lenders to undertake the risks involved in providing postpetition financing to a bankruptcy estate, and should be approved.

### (v)    Application of the Business Judgment Standard

51.    Section 364 of the Bankruptcy Code authorizes a debtor to obtain secured or superpriority financing under the circumstances specified therein. Provided that an agreement to obtain secured credit does not undermine the policies underlying the Bankruptcy Code, courts grant a debtor considerable deference in the exercise of its sound business judgment in obtaining such credit. *See, e.g.*, *In re Ames Dept. Stores, Inc.*, 115 B.R. at 40 ("[C]ases consistently reflect that the court's discretion under section 364 [of the Bankruptcy Code] is to be utilized on grounds that permit [a debtor's] reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest."); *In re Farmland Indus., Inc.*, 294 B.R. at 881 (noting that approval of postpetition financing requires, *inter alia*, an exercise of "sound and reasonable business judgment"); *In re YL W. 87th Holdings I, LLC*, 423 B.R. 421, 441 (Bankr. S.D.N.Y. 2010) ("Courts have generally deferred to a debtor's business judgment in granting section 364 financing."); *Trans World Airlines, Inc. v. Travelers Int'l AG (In re Trans World Airlines, Inc.)*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving postpetition loan and receivables facility because such facility "reflect[ed] sound and prudent business judgment"). Thus, the "normal function in reviewing requests for post-petition financing is to defer to a debtor's own business judgment so long as a request for financing does not leverage the bankruptcy process and unfairly cede control of the reorganization to one party

in interest." *In re Barbara K Enters., Inc.*, No. 08-11474, 2008 WL 2439649, at *14 (Bankr. S.D.N.Y. June 16, 2008).

52.     To determine whether this standard is met, the Court is "required to examine whether a reasonable business person would make a similar decision under similar circumstances." *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006); *see also In re Curlew Valley Assocs.*, 14 B.R. 506, 513-14 (Bankr. D. Utah 1981) (noting courts should not second guess a debtor's business decision when the decision involves "a business judgment made in good faith, upon a reasonable basis, and within the scope of [the debtor's] authority under the [Bankruptcy] Code") (internal citation omitted).

53.     And, in exercising its business judgment, courts recognize a debtor is entitled (if not required) to consider non-economic benefits offered by a proposed postpetition facility:

> Although all parties, including the Debtors and the Committee, are naturally motivated to obtain financing on the best possible terms, a business decision to obtain credit from a particular lender is almost never based purely on economic terms. Relevant features of the financing must be evaluated, including noneconomic elements such as the timing and certainty of closing, the impact on creditor constituencies and the likelihood of a successful reorganization.

*In re ION Media Networks, Inc.*, No. 09-13125, 2009 WL 2902568, at *4 (Bankr. S.D.N.Y. Jul. 6, 2009).

54.     As described above, after appropriate investigation and analysis, the Debtors' have concluded the DIP Financing provides the best alternative available under the circumstances of these chapter 11 cases. Bankruptcy courts routinely defer to a debtor's business judgment on most business decisions, including the decision to borrow money, unless such decision is arbitrary and capricious. *See In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (noting the interim loan, receivables facility, and asset-based facility were

approved because they "reflect[ed] sound and prudent business judgment on the part of TWA . . . [were] reasonable under the circumstances and in the best interest of TWA and its creditors"). In fact, "[m]ore exacting scrutiny would slow the administration of the Debtor's estate and increase its costs, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially."); *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985).

55.      The Debtors' determination to move forward with the DIP Financing is an exercise of their sound business judgment and should be approved. Specifically, the Debtors and their advisors undertook an analysis of the Debtors' projected financing needs and determined the Debtors would require significant postpetition financing to support their operational and restructuring activities. Accordingly, the Debtors negotiated the DIP Credit Agreement with the Lenders in good faith, at arm's-length, and with the assistance of their advisors. The DIP Financing provides the Debtors with the capital necessary to meet their working capital needs and the costs of these chapter 11 cases. This determination reflects the quintessential exercise of business judgment and is entitled to deference from the Court. *See In re Trans World Airlines, Inc.*, 163 B.R. at 974 (finding the debtor's entry into the financing that served as the "framework" and "cornerstone" for the debtor's plan of reorganization reflected exercise of the debtor's "sound and prudent business judgment").

56.      Indeed, the Debtors negotiated the DIP Financing in conjunction with their overall efforts to determine a path forward for these chapter 11 cases. There can be no reasonable dispute that the DIP Financing is an important step toward achieving this goal: the DIP Financing will support not only the Debtors' near term liquidity needs, but will also provide the funding necessary for the Debtors to effectuate a plan of reorganization, supported by their

prepetition secured creditors, that offers value to creditors up and down the capital structure. Accordingly, the DIP Financing reflects an exercise of sound business judgment that should be approved. *See ION Media*, 2009 WL 2902568, at *4 ("[C]ooperation and establishing alliances with creditor groups can be a vital part of building support for a restructuring that ultimately may lead to a confirmable reorganization plan.").

## C.      The Scope of the Carve-Out is Appropriate

57.      The proposed DIP Financing subjects the security interests and administrative expense claims of the Lenders to the Carve-Out. Such carve-outs for professional fees have been found to be reasonable and necessary to ensure that a debtor's estate and any statutory committee can obtain appropriate assistance from counsel and other professionals. *See, e.g.*, *Ames*, 115 B.R. at 40; *In re United Retail*, Case No. 12-10405 (Bankr. S.D.N.Y. Feb. 1, 2012); *In re Eastman Kodak Co.*, Case No. 12-10202 (Bankr. S.D.N.Y. Jan. 19, 2012); *In re Gen. Maritime Corp.*, Case No. 11-15285 (Bankr. S.D.N.Y. Nov. 17, 2011). The Carve-Out protects against administrative insolvency during the course of these chapter 11 cases by ensuring assets remain for the payment of U.S. Trustee fees and professional fees notwithstanding the grant of superpriority and administrative liens and claims under the DIP Financing.

## D.      The Lender Should Be Deemed a Good Faith Lender Under Section 364(e)

58.      Section 364(e) of the Bankruptcy Code protects a good faith lender's right to collect on loans extended to a debtor, and its rights in any lien or security interest securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal. Section 364(e) provides as follows:

> The reversal or modification on appeal of an authorization under this Section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this Section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).

59.    As explained in detail herein, the DIP Financing is the result of the Debtors' reasonable and informed determination that the Lenders offered the most favorable terms on which to obtain needed postpetition financing, and of extended arm's length, good faith negotiations between and among the Debtors and the Lenders. The terms and conditions of the DIP Financing are fair and reasonable, and the proceeds of the DIP Financing will be used only for purposes that are permissible under the Bankruptcy Code and pursuant to the Budget. Further, no consideration is being provided to any party to the DIP Financing other than as described herein. Accordingly, the Court should find the Lenders are "good faith" lenders within the meaning of section 364(e) of the Bankruptcy Code, and are entitled to all of the protections afforded thereby.

**E.    Request for Modification of the Automatic Stay**

60.    Bankruptcy Code section 362 provides for an automatic stay upon the filing of a bankruptcy petition. The proposed Interim Order contemplates the modification of the automatic stay (to the extent applicable) to the extent necessary to implement the terms of the Interim Order. Stay modification provisions of this sort are ordinary and usual features of DIP Financing facilities and, in the Debtors' business judgment, are reasonable under the present circumstances. Accordingly, the Debtors respectfully request the Court to authorize the modification of the

automatic stay in accordance with the terms set forth in the Interim Order and DIP Credit Agreement.

**F.      The Debtors Should Be Authorized to Use Cash Collateral**

61.      In connection with their need for DIP Financing, the Debtors also require the use of Cash Collateral. Pursuant to section 363(c)(2) of the Bankruptcy Code, a debtor may use cash collateral as long as "(A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section." 11 U.S.C. § 363(c)(2). Section 363(e) of the Bankruptcy Code provides for adequate protection of interests in property when a debtor uses cash collateral. Further, section 362(d)(1) of the Bankruptcy Code provides for adequate protection of interests in property due to the imposition of the automatic stay. *See In re Cont'l Airlines*, 91 F.3d 553, 556 (3d Cir. 1996).

62.      The Debtors have satisfied the requirements of sections 363(c)(2) and (e), and should be authorized to use the Cash Collateral. First, as noted above, the Lenders, who hold 100% of the Prepetition Notes, supports the Debtors' use of the Cash Collateral subject to the conditions set forth in the DIP Loan Documents. Second, the holders of the Prepetition Notes' interests in the Cash Collateral are adequately protected. As described above, the Debtors are providing such creditors with the Adequate Protection payments and other protection which is fair and reasonable and adequately protects such creditors' interests in the Debtors' prepetition collateral from diminution. Accordingly, the Court should authorize the Debtors to use the Cash Collateral under section 363(c)(2) and (e) of the Bankruptcy Code.

**G.      The Debtors Require Immediate Access to the Cash Collateral**

63.      The Debtors are seeking immediate access to Cash Collateral pursuant to the terms of the Interim Order. This Court may grant interim relief in respect of a motion filed

pursuant to section 363(c) of the Bankruptcy Code where, as here, interim relief is "necessary to avoid immediate and irreparable harm to the estate pending a final hearing." Fed. R. Bankr. P. 4001(b)(2), (c)(2).

64.     Bankruptcy Rule 4001(c)(2) governs the procedures for obtaining authorization to obtain postpetition financing and provides, in relevant part:

> The court may commence a final hearing on a motion for authority to obtain credit no earlier than 14 days after service of the motion. If the motion so requests, the court may conduct a hearing before such 14 day period expires, but the court may authorize the obtaining of credit only to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing.

The Debtors have an immediate postpetition need to access the funds provided through postpetition use of Cash Collateral. The Debtors' prepetition secured creditors are consenting to the use of their Cash Collateral, provided that the Debtors obtain simultaneous approval of the DIP Financing. As described in greater detail in the Coleman Declaration, the Debtors cannot maintain the value of their estates during the pendency of these chapter 11 cases without access to cash. The Debtors will be unable to operate their business as a going concern in the near term without the ability to access to use Cash Collateral, and will suffer immediate and irreparable harm to the detriment of all creditors and other parties in interest. On the other hand, the Debtors will use liquidity obtained through use of Cash Collateral to, among other things, procure goods and services from vendors, complete existing drilling projects and begin new ones, pay their employees, and satisfy other working capital needs during these chapter 11 cases. In short, the Debtors' ability to finance their operations and the availability of sufficient working capital and liquidity to the Debtors through the use of the Cash Collateral is vital to the preservation and maintenance of the going concern value of the Debtors' estates.

65.     The Debtors, therefore, seek immediate authority to access to use of Cash Collateral on an interim basis and as set forth in this Motion and in the Interim Order to prevent immediate and irreparable harm to their estates pending the Final Hearing pursuant to Bankruptcy Rules 4001(b) and 4001(c). Accordingly, the Debtors respectfully submit they have satisfied the requirements of Bankruptcy Rule 4001 to support an expedited preliminary hearing and immediate Cash Collateral availability on an interim basis.

66.     The importance of a debtor's ability to use Cash Collateral to prevent immediate and irreparable harm to its estate has been repeatedly recognized in this District. *See, e.g.*, *In re Trump Entertainment Resorts Inc.*, Case No. 14-12103 (KG) (Bankr. D. Del. Oct. 23, 2014) (D.I. 342); *In re Entegra Power Group LLC,* Case No. 14-11859 (PJW) (Bankr. D. Del. Sept. 3, 2014) (D.I. 106); *In re Energy Future Holdings Corp.,* Case No. 14-10979 (CSS) (Bankr. D. Del. May 2, 2014) (D.I. 324); *In re Green Field Energy Services, Inc.,* Case No. 13-12783 (KG) (Bankr. D. Del. Mar. 3, 2014) (D.I. 712); *In re Security National Properties Funding III, LLC,* Case No. 11-13277 (KG) (Bankr. D. Del. Oct. 18, 2011) (D.I. 28).

### Request For Final Hearing

67.     Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request the Court set a date for the Final Hearing as soon as practicable and fix the date and time prior to the Final Hearing for parties to file objections to the relief requested by this Motion.

### Wavier of Bankruptcy Rules Regarding Notice of Stay of an Order

68.     To implement the foregoing successfully, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and any stay of an order granting the relief requested herein pursuant to Bankruptcy Rule 6004(h), 7062, 9014 or otherwise for all of the reasons described above.

## Notice

69.     The Debtors have provided notice of this Motion to: (a) the Office of the United States Trustee for the District of Delaware; (b) the entities listed on the Consolidated List of Creditors Holding the 30 Largest Unsecured Claims filed pursuant to Bankruptcy Rule 1007(d); (c) the Indenture Trustee and counsel to the Indenture Trustee for the First Lien Secured Notes and Second Lien Secured Notes; (d) the Indenture Trustee for the Venoco 8.875% Senior Notes; (e) the Indenture Trustee for the Senior PIK Toggle Notes; (f) counsel to (i) the lenders under the Debtors' proposed postpetition secured debtor in possession financing and (ii) the Consenting First Lien Noteholders and Consenting Second Lien Noteholders under the RSA; (g) the Delaware Secretary of State; (h) the Delaware Secretary of Treasury; (i) the Office of the United States Attorney General for the State of Delaware; and (j) the Internal Revenue Service. As this Motion is seeking "first day" relief, within two business days of the hearing on this Motion, the Debtors will serve copies of this Motion and any order entered in respect to this Motion as required by Local Rule 9013-1(m). In light of the nature of the relief requested in this Motion, the Debtors respectfully submit that no further notice is necessary.

## No Prior Request

70.     No prior motion for the relief requested herein has been made to this or any other court.

*[Remainder of Page Intentionally Left Blank]*

WHEREFORE, the Debtors respectfully request the Court grant the relief requested herein and such other and further relief as is just and proper.

Dated: March 18, 2016
Wilmington, Delaware

**MORRIS, NICHOLS, ARSHT & TUNNELL LLP**

*/s/ Erin R. Fay*
Robert J. Dehney (No. 3578)
Andrew R. Remming (No. 5120)
Erin R. Fay (No. 5268)
1201 North Market Street, 16th Floor
P.O. Box 1347
Wilmington, Delaware 19899
Telephone: (302) 658-9200
Facsimile: (302) 658-3989
rdehney@mnat.com
aremming@mnat.com
efay@mnat.com

-and-

**BRACEWELL LLP**
Robert G. Burns (*pro hac vice* pending)
Robin J. Miles (*pro hac vice* pending)
Rebekah T. Scherr (*pro hac vice* pending)
1251 Avenue of Americas, 49th Floor
New York, New York 10020-1104
Telephone: (212) 508-6100
Facsimile: (800) 404-3970
Robert.Burns@bracewelllaw.com
Robin.Miles@bracewelllaw.com
Rebekah.Scherr@bracewelllaw.com
-and-
Mark E. Dendinger (*pro hac vice* pending)
CityPlace I, 34th Floor
185 Asylum Street
Hartford, Connecticut 06103
Telephone: (860) 947-9000
Facsimile: (800) 404-3970
Mark.Dendinger@bracewelllaw.com

*Proposed Counsel for Debtors and Debtors in Possession*