## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| Venoco, Inc., *et al.*, | Case No. 16-10655 (KG) |
| Debtors.[1] | (Jointly Administered) |

## JOINT PLAN OF REORGANIZATION
## UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

**BRACEWELL LLP**

Robert G. Burns (admitted *pro hac vice*)
Robin J. Miles (admitted *pro hac vice*)
Rebekah T. Scherr (admitted *pro hac vice*)
1251 Avenue of Americas, 49th Floor
New York, New York 10020-1104
Telephone: (212) 508-6100
Facsimile: (800) 404-3970
Robert.Burns@bracewelllaw.com
Robin.Miles@bracewelllaw.com
Rebekah.Scherr@bracewelllaw.com

-and-

Mark E. Dendinger (admitted *pro hac vice*)
CityPlace I, 34th Floor
185 Asylum Street
Hartford, Connecticut 06103
Telephone: (860) 947-9000
Facsimile: (800) 404-3970
Mark.Dendinger@bracewelllaw.com

**MORRIS, NICHOLS, ARSHT & TUNNELL LLP**

Robert J. Dehney (No. 3578)
Andrew R. Remming (No. 5120)
Erin R. Fay (No. 5268)
1201 North Market Street, 16th Floor
P.O. Box 1347
Wilmington, Delaware 19899
Telephone: (302) 658-9200
Facsimile: (302) 658-3989
rdehney@mnat.com
aremming@mnat.com
efay@mnat.com

*Proposed Counsel for Debtors and Debtors in Possession*

Dated: April 8, 2016

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtors' federal tax identification number, are: Venoco, Inc. (5555); Denver Parent Corporation (1005); TexCal Energy (LP) LLC (0806); Whittier Pipeline Corporation (1560); TexCal Energy (GP) LLC (0808); Ellwood Pipeline, Inc. (5631); and TexCal Energy South Texas, L.P. (0812). The Debtors' main corporate and mailing address for purposes of these chapter 11 cases is: Venoco, Inc., 370 17th Street, Suite 3900, Denver, CO 80202-1370.

## TABLE OF CONTENTS

**ARTICLE I DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, GOVERNING LAW AND OTHER REFERENCES**..........................................................................................1
    Section 1.01. Defined Terms ....................................................................1
    Section 1.02. Rules of Interpretation .......................................................16
    Section 1.03. Computation of Time ..........................................................16
    Section 1.04. Governing Law ...................................................................16
    Section 1.05. Reference to Monetary Figures ...........................................17
    Section 1.06. Severability of Plan Provisions ..........................................17
    Section 1.07. No Substantive Consolidation.............................................17

**ARTICLE II TREATMENT OF UNCLASSIFIED CLAIMS**................................................17
    Section 2.01. Administrative Claims ........................................................17
    Section 2.02. Priority Tax Claims ............................................................19

**ARTICLE III CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS** ................................................................................20
    Section 3.01. Classification......................................................................20
    Section 3.02. Claims Against and Equity Interests in DPC........................21
    Section 3.03. Claims Against and Equity Interests in Venoco and Venoco Subs ............23

**ARTICLE IV REALLOCATION PROCEDURES** .....................................................27
    Section 4.01. Reallocation Procedures......................................................27

**ARTICLE V ACCEPTANCE OR REJECTION OF THE PLAN** ............................................30
    Section 5.01. Acceptance by an Impaired Class ........................................30
    Section 5.02. Nonconsensual Confirmation..............................................30

**ARTICLE VI IMPLEMENTATION OF THE PLAN**......................................................30
    Section 6.01. Operations between Confirmation Date and Effective Date......................31
    Section 6.02. Exit Facility........................................................................31
    Section 6.03. LLA Override......................................................................31
    Section 6.04. Sources of Cash for Plan Distributions.................................31
    Section 6.05. Issuance of New Common Stock, New Warrants and Unsecured LLA Override Shares ...................................................31
    Section 6.06. Organizational Documents...................................................32
    Section 6.07. Intercompany Equity Interests ............................................33
    Section 6.08. Dissolution of DPC.............................................................33
    Section 6.09. Continued Corporate Existence and Vesting of Assets ...........33
    Section 6.10. Management of the Reorganized Debtors...............................33
    Section 6.11. Existing Benefits Agreements and Retiree Benefits.................34
    Section 6.12. Management Incentive Plan.................................................34
    Section 6.13. Employment Agreements.....................................................34
    Section 6.14. Causes of Action ................................................................34
    Section 6.15. Restructuring Transactions ..................................................35

## TABLE OF CONTENTS (CONT'D)

Section 6.16. Determination of Tax Filings and Taxes of the DPC Group ......................35
Section 6.17. New Shareholders Agreement ..................................................37

**ARTICLE VII TREATMENT OF EXECUTORY CONTRACTS AND LEASES ..............38**
Section 7.01. Treatment of Executory Contracts and Unexpired Leases .........................38
Section 7.02. Cure Costs...................................................................38
Section 7.03. Assumed Executory Contracts and Unexpired Leases ..............................40
Section 7.04. Insurance Policies ...........................................................40
Section 7.05. Officers' and Directors' Indemnification Rights ...........................41
Section 7.06. Claims Based on Rejection of Executory Contracts and Unexpired
             Leases........................................................................41
Section 7.07. Reservation of Rights........................................................41
Section 7.08. Assignment ...................................................................41
Section 7.09. Nonoccurrence of the Effective Date..........................................42

**ARTICLE VIII PROVISIONS GOVERNING DISTRIBUTIONS .........................................42**
Section 8.01. Amount of Distributions ......................................................42
Section 8.02. Method of Distributions ......................................................42
Section 8.03. Delivery of Distributions ....................................................43
Section 8.04. No Fractional or De Minimis Distributions ...................................43
Section 8.05. Undeliverable Distributions ..................................................43
Section 8.06. Tax Withholding From Distributions............................................44
Section 8.07. Allocations ..................................................................45
Section 8.08. Time Bar to Cash Payments ....................................................45
Section 8.09. Means of Cash Payments .......................................................45
Section 8.10. Foreign Currency Exchange Rates..............................................45
Section 8.11. Setoffs   45
Section 8.12. Claims Paid or Payable by Third Parties ......................................46

**ARTICLE IX PROCEDURES FOR RESOLVING DISPUTED CLAIMS...........................46**
Section 9.01. Prosecution of Objections to Claims...........................................46
Section 9.02. Estimation of Claims..........................................................46
Section 9.03. No Distributions on Disputed Claims ..........................................47

**ARTICLE X CONDITIONS PRECEDENT TO CONFIRMATION AND
        CONSUMMATION OF THIS PLAN ....................................................47**
Section 10.01. Conditions Precedent to Confirmation.........................................47
Section 10.02. Conditions Precedent to the Effective Date ..................................47
Section 10.03. Effect of Non-Occurrence of Conditions to Confirmation or
              Conditions Precedent to the Effective Date ..................................48
Section 10.04. Waiver of Conditions Precedent ..............................................48

**ARTICLE XI EFFECT OF CONFIRMATION OF THIS PLAN ...........................................48**
Section 11.01. Discharge of Claims Against and Equity Interests in the Debtors............48
Section 11.02. Certain Releases by the Debtors .............................................49

## TABLE OF CONTENTS (CONT'D)

Section 11.03. Certain Voluntary Releases by Holders of Claims and Equity Interests ....................................................................................................50
Section 11.04. Exculpation ........................................................................................51
Section 11.05. Injunction ...........................................................................................52
Section 11.06. Protection Against Discriminatory Treatment ...................................52
Section 11.07. Release of Liens .................................................................................53
Section 11.08. Cancellation of Securities and Notes Against the Debtors ................53

**ARTICLE XII MODIFICATION, REVOCATION OR WITHDRAWAL OF THIS PLAN** ................................................................................................................**54**
Section 12.01. Modification of the Plan ....................................................................54
Section 12.02. Revocation or Withdrawal of the Plan ...............................................54

**ARTICLE XIII RETENTION OF JURISDICTION** .................................................**55**
**ARTICLE XIV MISCELLANEOUS PROVISIONS** ..................................................**56**
Section 14.01. General Settlement of Claims ............................................................56
Section 14.02. Preservation of Causes of Action Not Expressly Released ................56
Section 14.03. Section 1146(a) Exemption ...............................................................58
Section 14.04. Elimination of Vacant Classes ...........................................................58
Section 14.05. Intercompany Claims .........................................................................58
Section 14.06. Additional Documents .......................................................................58
Section 14.07. Successors and Assigns......................................................................58
Section 14.08. Reservation of Rights.........................................................................59
Section 14.09. Notices ...............................................................................................59
Section 14.10. Term of Injunctions or Stay ..............................................................59
Section 14.11. Entire Agreement ...............................................................................59
Section 14.12. Plan Supplement Exhibits ..................................................................60
Section 14.13. Severability ........................................................................................60
Section 14.14. Substantial Consummation ................................................................60

Venoco, Inc., Denver Parent Corporation, TexCal Energy (LP) LLC, Whittier Pipeline Corporation, TexCal Energy (GP) LLC, Ellwood Pipeline, Inc., and TexCal Energy South Texas, L.P. (each a "<u>Debtor</u>" and collectively, the "<u>Debtors</u>") hereby respectfully propose the following joint plan of reorganization. Reference is made to the Disclosure Statement for a discussion of the Debtors' history, business, properties and operations, projections, risk factors, a summary and analysis of this Plan, and certain related matters. There are other agreements and documents, which have been or will be filed with the Bankruptcy Court that are referenced in this Plan or the Disclosure Statement as exhibits, the Plan Supplement or otherwise. All such agreements, documents, exhibits and the Plan Supplement are incorporated into and are made a part herein as if fully set forth herein.

> **ALL HOLDERS OF CLAIMS ARE ENCOURAGED TO READ THIS PLAN AND THE DISCLOSURE STATEMENT CAREFULLY AND IN THEIR ENTIRETY BEFORE VOTING ON THIS PLAN.**

## ARTICLE I

## DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, GOVERNING LAW AND OTHER REFERENCES

**Section 1.01.  Defined Terms**

Unless the context otherwise requires, the following terms shall have the following meanings when used in capitalized form in this Plan:

"<u>8.875% Senior Notes</u>" or "<u>8.875% Senior Notes Claims</u>" means those 8.875% senior unsecured notes due in February 2019 issued by Venoco under the Senior Notes Indenture and all Claims related thereto, which Claims shall be deemed Allowed for purposes of the Plan in the amount specified in Section 3.03(e) of this Plan.

"<u>8.875% Senior Notes Indenture</u>" means the Indenture dated as of February 5, 2011 pursuant to which the 8.875% Senior Notes were issued among Venoco, the Guarantors, and the 8.875% Senior Notes Trustee.

"<u>8.875% Senior Notes Trustee</u>" means Wilmington Savings Fund Society, FSB, as successor indenture trustee under the 8.875% Senior Notes Indenture or any duly appointed successor thereto.

"<u>Administrative Claim</u>" means a Claim under section 503(b) of the Bankruptcy Code, and referred to in section 507(a)(2) of the Bankruptcy Code, including, without limitation, (a) Claim(s) under section 503(b)(9) of the Bankruptcy Code, (b) any actual and necessary costs and expenses of preserving the Estate(s), (c) any actual and necessary costs and expenses of operating the Debtors' businesses after the Petition Date, (d) all Professional Claims, (e) any fees or charges assessed against the Estates under section 1930 of chapter 123 of title 28 of the United States Code, (f) all postpetition taxes of the Debtors, (g) the DIP Facility Claims, (h) the DIP Backstop Fee Claims and (i) all other Claim(s) entitled to administrative expense status pursuant to a Final Order of the Bankruptcy Court, including any claims under section 507(b) of the

Bankruptcy Code, in each case relating to the period from the Petition Date through and including the Effective Date but not beyond (but excluding any Intercompany Claims); provided, however, that the DIP Facility Claims and the DIP Backstop Fee Claims are superpriority administrative claims under the Final DIP Order pursuant to section 364(c)(1) of the Bankruptcy Code.

"Administrative Claims Bar Date" means the first Business Day that is thirty (30) days after the Effective Date (or such date(s) otherwise ordered by the Bankruptcy Court) for Administrative Claims arising on the Petition Date through and including the Effective Date. For the avoidance of doubt, holders of the DIP Facility Claims, DIP Backstop Fee Claims and Professional Claims shall not be subject to the Administrative Claims Bar Date.

"Affiliate" (and, with a correlative meaning "affiliated") means, with respect to any Person, any Person who would be an "affiliate" pursuant to section 101(2) of the Bankruptcy Code, as well as any direct or indirect subsidiary of such Person, and any other Person that directly, or indirectly through one or more intermediaries, controls or is controlled by or is under common control with such first Person. As used in this definition, "control" (including with correlative meanings, "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person (whether through ownership of securities or partnership or other ownership interests, by contract or otherwise).

"Allowed" means, a Claim or Equity Interest, or applicable portion thereof, (a) that has been listed in the Schedules (and thereafter continues to be listed in any subsequently filed amended versions of such Schedules) as liquidated in amount and not Disputed or contingent and for which no contrary Proof of Claim or proof of Equity Interest has been filed, (b) where a Proof of Claim or proof of Equity Interest was timely and properly filed by the applicable deadline under the Bar Date Order as to which (i) such Claim or Equity Interest is not Disputed, or (ii) an objection has been interposed and such Claim or Equity Interest has been allowed, in whole or in part, by a Final Order and/or by the agreement of the holder of such Claim or Equity Interest, on the one hand, and the Debtors or the Reorganized Debtors, as applicable, on the other, or (c) that has been allowed under the Final DIP Order, any other Final Order, or the Plan whether or not such Claim or Equity Interest was scheduled or is the subject of a filed Proof of Claim or proof of Equity Interest; provided, however, that any Claims allowed solely for the purpose of voting to accept or reject this Plan pursuant to an order of the Bankruptcy Court shall not be considered "Allowed" hereunder. Unless otherwise specified herein or pursuant to a Final Order of the Bankruptcy Court, "Allowed" shall not include interest, fees, or charges for the period on and after the Petition Date. When used in this Plan or Disclosure Statement with respect to the timing of distributions, "Allowed" means on the date a Claim or Equity Interest allowed has been allowed or as soon as reasonably practicable thereafter.

"Assets" means all tangible and intangible assets of every kind and nature of the Debtors and their respective Estates, including, without limitation, all Causes of Action (except those released by this Plan, the Final DIP Order, the Confirmation Order or other Final Order) and all proceeds thereof, existing as of the Effective Date.

"Assumed Contract Schedule" is defined in Section 7.01 of this Plan.

"<u>Assumption Dispute</u>" is defined in Section 7.02 of this Plan.

"<u>Avoidance Actions</u>" means any and all Causes of Action that may be brought by or on behalf of the Debtors or their Estates or other authorized parties in interest under Chapter 5 of the Bankruptcy Code, including under sections 502, 510, 542, 544, 545, and 547 through and including 553 of the Bankruptcy Code, or similar avoidance or fraudulent transfer actions under applicable non-bankruptcy law.

"<u>Backstoppers</u>" means those certain DIP Lenders that have agreed to backstop the loans available to the Debtors pursuant to, and in accordance with, the DIP Credit Agreement up to their respective commitment amounts. For the avoidance of doubt, unless expressly specified otherwise, the term "DIP Lenders" shall include the Backstoppers.

"<u>Ballot</u>" means each of the ballots distributed to each holder of an Impaired Claim that is entitled to vote to accept or reject Plan and on which such holder is to indicate, among other things, acceptance or rejection of the Plan.

"<u>Bankruptcy Code</u>" means the Bankruptcy Reform Act of 1978, as codified in title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as in effect on the Petition Date, together with all amendments and modifications thereto that are subsequently made applicable to the Chapter 11 Cases.

"<u>Bankruptcy Court</u>" means the United States Bankruptcy Court for the District of Delaware or such other court having jurisdiction over the Chapter 11 Cases.

"<u>Bankruptcy Rules</u>" means: (a) the Federal Rules of Bankruptcy Procedure and the Official Bankruptcy Forms, as amended and promulgated under section 2075 of title 28 of the United States Code; (b) the applicable Local Rules of Bankruptcy Practice and Procedure of the Bankruptcy Court; and (c) any general or specific chamber rules or procedures, or standing orders governing practice and procedure issued by the Bankruptcy Court, each as in effect on the Petition Date, and each of the foregoing together with all amendments and modifications thereto that are subsequently made and as applicable to the Chapter 11 Cases or proceedings therein, as the case may be.

"<u>Bar Date(s)</u>" means the applicable date(s) designated by the Bankruptcy Court as the last date for filing Proofs of Claims in these Chapter 11 Cases

"<u>Bar Date Order</u>" means that order entered [•], 2016 setting the applicable Bar Dates for: (a) Claims that arose against the Debtors prior to the Petition Date; (b) Claims of governmental units that arose against the Debtors prior to the Petition Date; (c) Claims related to orders rejecting certain executory contracts and unexpired leases; and (d) Claims arising from amendments (if any) to the Debtors' Schedules.

"<u>Business Day</u>" means any day, other than a Saturday, Sunday, or a legal holiday, as defined in Bankruptcy Rule 9006(a).

"<u>Cash</u>" means the legal tender of the U.S. or the equivalent thereof, including bank deposits and checks.

"Causes of Action" means any and all claims, actions, causes of action, suits, debts, damages, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, judgments, remedies, rights of set-off, third-party claims, subrogation claims, contribution claims, reimbursement claims, indemnity claims, counterclaims, and crossclaims of the Debtors and their Estates, whether known or unknown, liquidated or unliquidated, fixed or contingent, matured or unmatured, Disputed or undisputed, against any Entity, based in law or equity, including under the Bankruptcy Code, whether direct, indirect, derivative, or otherwise and whether asserted or unasserted as of the date of entry of the Confirmation Order, unless otherwise waived or released pursuant to this Plan, the Confirmation Order, the Final DIP Order, any other Final Order or by the Debtors. For the avoidance of doubt, on the Effective Date of the Plan any and all Avoidance Actions relating to the Debtors shall be deemed waived and released pursuant to Section 6.10 of this Plan.

"Certificate" means any instrument evidencing a Claim or an Equity Interest.

"Chapter 11 Case(s)" means the chapter 11 cases of the Debtors pending before the Bankruptcy Court as Case Nos. 16-10655-KG, 16-10656-KG, 16-10657-KG, 16-10658-KG, 16-10659-KG, 16-10660-KG and 16-10661-KG, jointly administered for procedural purposes only under the lead Case No. 16-10655-KG.

"Claim" means any "claim" against the Debtors as set forth in section 101(5) of the Bankruptcy Code.

"Claims and Solicitation Agent" means BMC Group.

"Claims Objection Deadline" means the last day for filing objections to Claims, other than Administrative Claims and Professional Claims, which day shall be: (a) the later of (i) ninety (90) days after the Effective Date or (ii) ninety (90) days after the filing of a Proof of Claim for, or request for payment of, such Claim; or (b) such other date as the Bankruptcy Court may order. The filing of a motion to extend the Claims Objection Deadline shall automatically extend the Claims Objection Deadline until a Final Order is entered on such motion. In the event that such motion to extend the Claims Objection Deadline is denied, the Claims Objection Deadline shall be the later of the then-current Claims Objection Deadline (as previously extended, if applicable) or thirty (30) days after the Bankruptcy Court's entry of an order denying the motion to extend the Claims Objection Deadline.

"Claims Register" means the official register of Claims maintained by the Claims and Solicitation Agent.

"Class" means a category of holders of Claims or Equity Interests under section 1122(a) of the Bankruptcy Code.

"Collateral" means any property or interest in property of the Estate subject to a Lien, not otherwise subject to avoidance under the Bankruptcy Code, to secure the payment or performance of a Claim.

4

"Confirmation" or "Confirmation Date" means the date on which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases within the meaning of Bankruptcy Rules 5003 and 9021.

"Confirmation Hearing" means the hearing(s) before the Bankruptcy Court, regarding the Confirmation of this Plan, under section 1128 of the Bankruptcy Code, as it may be adjourned or continued from time to time.

"Confirmation Order" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code in form and substance acceptable to the Requisite Majority Consenting Secured Noteholders.

"Consenting Secured Noteholders" means the beneficial holders of First Lien Notes and Second Lien Notes identified on the signature pages of the RSA, or that become a party to the RSA by executing and delivering a Joinder (as defined in the RSA) thereto.

"Consenting Unsecured Noteholders" means Candlewood Investment Group, LP, on behalf of certain funds it manages or advises, and any other beneficial holders of the 8.875% Senior Notes Claims that become party to the RSA by executing and delivering a Joinder (as defined in the RSA) thereto.

"Consummation" means the occurrence of the Effective Date.

"Creditor" has the meaning set forth in section 101(10) of the Bankruptcy Code.

"Cure Cost Objection Deadline" is defined in Section 7.02 of this Plan.

"Cure Costs" means any and all amounts, costs or expenses that must be paid or actions that must be performed pursuant to sections 365 and 1123 of the Bankruptcy Code in connection with the assumption and/or assignment of each of the Executory Contracts and Unexpired Leases pursuant to the Confirmation Order.

"Debtors" means, collectively, DPC, Venoco, Ellwood Pipeline and the Guarantors.

"Default Distribution" has the meaning set forth in Section 4.01 of this Plan.

"Delaware Litigation" means all claims alleged in the matter "*In re Venoco, Inc. Shareholder Litigation*" Consolidated Case C.A. 6825-VCG, currently pending before the Court of Chancery for the State of Delaware.

"Delaware Litigation Settlement Agreement" means the Settlement Agreement dated March 16, 2016 between the parties to the Delaware Litigation.

"DIP Agent" means Wilmington Trust Company.

"DIP Backstop Fee" means the irrevocable fee granted to the Backstoppers under the DIP Loan Documents and the DIP Orders in the aggregate amount of 10% of the New Common Stock issued on the Effective Date. The DIP Backstop Fee is an Allowed Administrative Claim.

"DIP Backstop Fee Claims" means the Allowed Administrative Claims held by each Backstopper arising under or related to the DIP Credit Agreement on account of the DIP Backstop Fee.

"DIP Credit Agreement" means that certain $35,000,000 Superpriority Secured Debtor-in-Possession Credit Agreement dated as of March 22, 2016 by and among Venoco, the guarantors party thereto, the DIP Lenders and the DIP Agent.

"DIP Facility" means that certain $35.0 million postpetition debtor in possession loan facility provided pursuant to the DIP Loan Documents and the DIP Orders.

"DIP Facility Claims" means any and all of the first-priority senior secured, superpriority Administrative Claims, pursuant to sections 364(c) and (d) of the Bankruptcy Code, held by the DIP Agent and the DIP Lenders arising under or in connection with the DIP Facility, but excluding the DIP Backstop Fee Claims.

"DIP Guaranty Agreement" means that certain Guaranty Agreement dated as of March 22, 2016 by and among Whittier Pipeline Corporation, TexCal Energy (LP) LLC, TexCal Energy (GP) LLC and TexCal Energy South Texas L.P.

"DIP Lenders" means the lenders under the DIP Facility.

"DIP Loan Documents" means the (a) DIP Credit Agreement, (b) DIP Security Agreement and (c) DIP Guaranty Agreement (such agreements, collectively, together with such ancillary documents contemplated thereunder), as may be amended, restated, supplemented or otherwise modified from time to time in accordance with the terms therein or the DIP Orders.

"DIP Orders" means, together, the Interim DIP Order and the Final DIP Order.

"DIP Security Agreement" means that certain Security Agreement dated as of March 22, 2016 by and among Venoco, the DIP Agent and each grantor party thereto.

"Disclosure Statement" means the *Debtors' Disclosure Statement for the Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code*, dated [•], 2016, including all exhibits and schedules thereto, as the same may be altered, amended, modified or supplemented from time to time, as approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code.

"Disclosure Statement Order" means the *Order (A) Approving the Disclosure Statement, (B) Approving the Solicitation Procedures, (C) Approving the Form of Ballots and Notices in Connection Therewith, (D) Establishing the Plan Confirmation Schedule and (E) Granting Related Relief*, entered by the Bankruptcy Court on [•], 2016.

"Disputed" means any Claim, or any portion thereof, that: (a) is listed on the Schedules as unliquidated, Disputed, or contingent, which dispute has not been withdrawn, resolved or overruled by a Final Order; (b) is the subject of an objection or request for estimation filed in the Bankruptcy Court and which objection or request for estimation has not been withdrawn, resolved or overruled by a Final Order of the Bankruptcy Court; or (c) is otherwise Disputed by

the Debtors or the Reorganized Debtors, as applicable, in accordance with applicable law; provided, however, that for purposes of determining the status (i.e., Allowed or Disputed) of a particular Claim prior to the Claims Objection Deadline, any such Claim that has not been previously allowed or disallowed by Final Order of the Bankruptcy Court or the Plan shall be deemed a Disputed Claim unless such Claim is specifically identified by the Debtors or the Reorganized Debtors, as applicable, as being an Allowed Claim.

"Distribution Agent" means the Reorganized Debtors, as applicable, or any Entity(ies) chosen by the Reorganized Debtors, as applicable, which Entity(ies) may include the Claims and Solicitation Agent, to make or to facilitate distributions required by the Plan.

"Distribution Record Date" means the record date for purposes of making distributions under this Plan on account of Allowed Claims, which date shall be the Confirmation Date or such other date designated in the Confirmation Order.

"Divestment Letter Agreements" means, together, the Management Divestment Letter Agreement and the Unsecured Notes Divestment Letter Agreement.

"DPC" means Denver Parent Corporation, a Delaware corporation.

"DPC Residual Value" means the value of any assets of DPC that were not subject to valid, perfected and non-avoidable Liens in favor of the Prepetition Secured Parties or any holders of Other Secured Claims immediately prior to the Effective Date, after satisfaction of all Allowed DIP Facility Claims, Allowed Administrative Claims, Allowed Priority Tax Claims, DIP Backstop Fee Claims and all Allowed Claims in classes D1 and D2 against DPC in the manner provided for the treatment of such Claims under this Plan.

"Electing Cash Recipient" has the meaning set forth in Section 4.01 of this Plan.

"Electing Cash Recipient Election" has the meaning set forth in Section 4.01 of this Plan.

"Electing New Common Stock Recipient" has the meaning set forth in Section 4.01 of this Plan.

"Electing New Common Stock Recipient Election" has the meaning set forth in Section 4.01 of this Plan.

"Electing Recipient" means an Electing Unsecured LLA Override Recipient, Electing Common Stock Recipient or Electing Cash Recipient, as applicable.

"Electing Unsecured LLA Override Recipient" has the meaning set forth in Section 4.01 of this Plan.

"Electing Unsecured LLA Override Recipient Election" has the meaning set forth in Section 4.01 of this Plan.

"Effective Date" means the date on which all conditions precedent to the occurrence of the Effective Date set forth in Section 10.02 of this Plan have been satisfied or waived in

accordance with Section 10.03 of this Plan. When used in this Plan or Disclosure Statement with respect to the timing of distributions, "Effective Date" means "on the Effective Date or as soon as reasonably practicable thereafter."

"Ellwood Pipeline" means Ellwood Pipeline, Inc., a Delaware corporation.

"Employee Stock Ownership Plan" means the employee stock ownership plan adopted by Venoco and DPC on December 31, 2012.

"Employment Agreement" means the contract between the Reorganized Debtors and TMM governing the terms and conditions of employment, which shall be in form and substance acceptable to the Requisite Majority Consenting Secured Noteholders, substantially in the form included in the Plan Supplement.

"Entity" means a natural person, corporation, limited liability company, association, partnership (whether general or limited), joint venture, proprietorship, estate, trust, Governmental Unit or any other individual or entity, whether acting in an individual, fiduciary, representative or other capacity, including the U.S. Trustee, within the meaning of section 101(15) of the Bankruptcy Code.

"Equity Interest" means all issued, unissued, authorized, or outstanding shares of stock, membership interests, and other ownership interests of an Entity, together with any warrants, options, or contract rights to purchase or acquire such interests at any time.

"Estate(s)" means the bankruptcy estate(s) of the Debtors created under sections 301 and 541 of the Bankruptcy Code on the Petition Date.

"Exit Facility" means that certain financing arrangement to be entered into by Reorganized Venoco on the Effective Date, which shall be in form and substance acceptable to the Debtors and the Requisite Majority Consenting Secured Noteholders.

"Exit Facility Documentation" means, collectively, the Exit Facility and each other agreement, security agreement, pledge agreement, collateral assignment, mortgage, control agreement, guarantee, certificate, document or instrument executed and/or delivered in connection with the foregoing, whether or not specifically mentioned herein or therein, as the same may be modified, supplemented or replaced from time to time, and which shall be in form and substance acceptable to the Debtors and the Requisite Majority Consenting Secured Noteholders.

"Exit Facility Lenders" means any lenders party to the Exit Facility on the Effective Date.

"Exculpated Claim" means a Claim arising out of or related to any act or omission in connection with or relating to: (a) the formulation, preparation, solicitation, dissemination, negotiation, or filing of this Plan, the Plan Supplement, the Disclosure Statement, the New Warrants, the New Common Stock, or any contract, instrument, release, or other agreement or document created or entered into in connection with any of the foregoing; (b) the Chapter 11 Cases; (c) the pursuit of Confirmation of a Plan; (d) the pursuit of Consummation of a Plan;

(e) the administration and implementation of a Plan; (f) the distribution of property under a Plan; and/or (g) any other prepetition or postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtors.

"Exculpated Parties" means the Released Parties.

"Executory Contract" means a contract to which one or more of the Debtors are party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

"Existing Benefits Agreement" means with the exception of the existing employment agreement with TMM, all employment, retirement, severance, indemnification, and similar or related agreements, and policies with the members of the Debtors' management team or directors as of the Petition Date.

"Final Decree" means the decree contemplated under Bankruptcy Rule 3022.

"Final DIP Order" means the *Final Order (I) Authorizing Debtors (A) to Obtain Postpetition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 363(b), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e) and (B) to Utilize Cash Collateral Pursuant to 11 U.S.C. § 363, and (II) Granting Adequate Protection to Prepetition Secured Parties Pursuant to 11 U.S.C. §§ 361, 362, 363, 364 and 507(b)*, entered by the Bankruptcy Court, and any amendment, modification or supplement of such order in form and substance acceptable to the Debtors, the DIP Lenders and the Consenting Secured Noteholders and approved by the Bankruptcy Court.

"Final Order" means an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction, which has been entered on the docket, and that has not been stayed, reversed, modified or amended and as to which the time to file an appeal, a motion for re-hearing, re-argument or reconsideration or a petition for writ of certiorari has expired or been waived by the Debtors or the Reorganized Debtors, as applicable, and as to which no appeal, petition for certiorari, or other proceedings for re-argument, reconsideration or re-hearing are then pending or as to which an appeal, petition for certiorari, or a motion for re-argument, reconsideration or rehearing has been filed or sought and such order shall not have been stayed; provided, however, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or analogous rule under the Bankruptcy Rules, may be filed with respect to such order shall not preclude such order from being or becoming a Final Order."

"First Lien Notes" or "First Lien Notes Claim" means those 12.00% first lien senior secured notes issued by Venoco pursuant to the First Lien Notes Indenture, and all Claims related thereto, including, without limitation, all principal, accrued but unpaid interest and all prepayment premium and make-whole amounts, which Claims shall be deemed Allowed for purposes of the Plan in the amount set forth in Section 3.03(c) of this Plan.

"First Lien Notes Indenture" means the indenture dated as of April 2, 2015, among Venoco, the Guarantors and the First Lien Notes Trustee.

"First Lien Notes Trustee" means U.S. Bank National Association, in its capacity as indenture trustee under the First Lien Notes Indenture.

"General Unsecured Claim" means a Claim that is not an Administrative Claim, Other Priority Claim, Priority Tax Claim, Secured Claim, Senior PIK Toggle Note Claim, Subordinated Securities Claim or 8.875% Senior Notes Claims. For the avoidance of doubt, General Unsecured Claims include any deficiency claims of the Prepetition Secured Parties.

"Governmental Unit" has the meaning set forth in section 101(27) of the Bankruptcy Code.

"Guarantors" means TexCal Energy (LP) LLC; Whittier Pipeline Corporation; TexCal Energy (GP) LLC, and TexCal Energy South Texas, L.P.

"Impaired" means, with respect to any Class of Claims or Equity Interests, a Claim or an Equity Interest that is "impaired" within the meaning of section 1124 of the Bankruptcy Code.

"Intercompany Claim" means any Claim(s) held by a Debtor against any other Debtor.

"Intercompany Equity Interests" means the Equity Interests of the Debtors, other than the Equity Interests of DPC.

"Interim DIP Order" means the *Interim Order (I) Authorizing Debtors (A) to Obtain Postpetition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 363(b), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e) and (B) to Utilize Cash Collateral Pursuant to 11 U.S.C. § 363, (II) Granting Adequate Protection to Prepetition Secured Parties Pursuant to 11 U.S.C. §§ 361, 362, 363, 364 and 507(b) and (III) Scheduling Final Hearing Pursuant to Bankruptcy Rules 4001(b) and (c)*, entered by the Bankruptcy Court on March 21, 2016 [D.I. 64], and any amendment, modification or supplement of such order in form and substance acceptable to the Debtors, DIP Lenders and the Consenting Secured Noteholders and approved by the Bankruptcy Court.

"Lien" has the meaning set forth in section 101(37) of the Bankruptcy Code.

"LLA" means the portion of California State Lease PRC 3242.1, which is to be expanded as described in Venoco's submission to the California State Lands Commission on June 30, 2014.

"LLA Override" means an overriding royalty interest in and to the oil, gas and other minerals produced and saved from the LLA, the amount of which and other attributes, limitations, terms and conditions of which are more particularly described in the Form of Assignment of Overriding Royalty Interest attached as an exhibit to the Management Divestment Letter Agreement, and which Assignment of Overriding Royalty Interest shall be substantially in the form of such exhibit.

"Management Divestment Letter Agreement" means the divestment letter agreement, including all exhibits, substantially in the form attached as Exhibit B to the RSA.

"Management Incentive Plan" means the management incentive plan to be adopted by Reorganized Venoco pursuant to Section 6.12 of this Plan on or after the Effective Date of the Plan.

"New Common Stock" means the shares of common stock in Reorganized Venoco authorized and issued pursuant to this Plan and Reorganized Venoco's certificate of incorporation (subject to dilution by any shares issuable upon exercise of the New Warrants).

"New Shareholders Agreement" means the shareholder agreement governing the terms of the New Common Stock, which shall be substantially the form included in the Plan Supplement.

"New DPC Warrants" means the 2% warrants at a strike price of $691,411,000 on the terms and conditions set forth in the New Warrant Agreement.

"New MIP Warrants" means the 5% warrants on the terms and conditions set forth in the New Warrant Agreement.

"New Second Lien Warrants" means 10% warrants at a strike price of $195,183,000 on the terms and conditions set forth in the New Warrant Agreement.

"New Warrants" means, collectively, the New DPC Warrants, the New MIP Warrants and the New Second Lien Warrants.

"New Warrant Agreement" means the warrant agreement governing the terms of the New Warrants, which shall be in substantially the form included in the Plan Supplement.

"Noteholder HoldCo" means a corporation, limited liability company, association, partnership (whether general or limited), joint venture, proprietorship, estate, trust, or any other entity to be formed on the Effective Date to hold the Unsecured LLA Override Shares. The Noteholder Holdco shall be identified in the Plan Supplement and shall be in form and substance acceptable to the Debtors and the Requisite Majority Consenting Unsecured Noteholders.

"Organizational Documents" means the new company governance documents related to the Reorganized Debtors, including, but not limited to, articles of organization, limited liability company agreements, operating agreements, shareholder agreements (including the New Shareholders Agreement), or other organizational documents, which shall be consistent with the provisions of this Plan, the RSA and the Bankruptcy Code, and shall include, among other things (and only to the extent required by section 1123(a)(6) of the Bankruptcy Code), provisions prohibiting the issuance of non-voting equity securities. The Organizational Documents shall be in substantially the form included in the Plan Supplement and shall be in form and substance acceptable to the Requisite Majority Consenting Secured Noteholders.

"Other Priority Claim" means a Claim entitled to priority in right of payment under section 507(a) of the Bankruptcy Code (other than an Administrative Claim or a Priority Tax Claim).

"Other Secured Claim" means a Secured Claim other than a DIP Facility Claim, First Lien Notes Claim or Second Lien Notes Claim.

"Person" has the meaning set forth in section 101(41) of the Bankruptcy Code.

"Petition Date" means March 18, 2016.

"Plan" means this *Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code* (as it may be altered, amended, modified or supplemented from time to time with the consent of the Requisite Majority Consenting Secured Noteholders and, to the extent required under the RSA, the Requisite Majority Consenting Unsecured Noteholders).

"Plan Supplement" means the compilation of documents and forms of documents, agreements (including, but not limited to, the New Shareholders Agreement), schedules, and exhibits to this Plan, which shall be in form and substance acceptable to the Debtors and the Requisite Majority Consenting Secured Noteholders, and which shall be filed in the Chapter 11 Cases no later than ten (10) days prior to the Voting Deadline or such later date as may be approved by the Bankruptcy Court on notice to parties in interest, as may be amended or supplemented by additional documents filed in the Chapter 11 Cases prior to the Effective Date as amendments to the Plan Supplement.

"Prepetition Secured Parties" means, collectively, the First Lien Notes Trustee, the holders of the First Lien Notes, the Second Lien Notes Trustee and the holders of the Second Lien Notes, and additionally any successor-in-interest to either of the foregoing.

"Priority Tax Claim" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

"Pro Rata" means, unless indicated otherwise, the proportion that an Allowed Claim in a particular Class bears to the aggregate amount of Allowed Claims in that respective Class, or the proportion that Allowed Claims in a particular Class bear to the aggregate amount of Allowed Claims in a particular Class and other Classes entitled to share in the same recovery as such Allowed Claim under the Plan. The definition of Pro Rata shall apply to Allowed DIP Backstop Fee Claims to the same extent and in the same manner as if DIP Backstop Fee Claims were classified in a Class under the Plan.

"Professional" means a professional Person, as that term is used in sections 327 and 1103 of the Bankruptcy Code.

"Professional Claim" means a Claim by a Professional seeking an award by the Bankruptcy Court of compensation and reimbursement of expenses incurred from the Petition Date through and including the Effective Date, under sections 327, 328, 330, 331, 503(b) (other than 503(b)(4)), 1103 or 1129(a)(4) of the Bankruptcy Code.

"Proof of Claim" means a proof of Claim filed in the Chapter 11 Cases in a manner consistent with the Bar Date Order.

"Reallocation Liquidity Pool" means the pool composed of the Cash, New Common Stock and Unsecured LLA Override contributed by Electing Cash Recipients, Electing New Common Stock Recipients and Electing Unsecured LLA Override Recipients pursuant to Section 4.01 of this Plan.

"Reallocation Procedures" means the reallocation procedures set forth in Section 4.01 of this Plan.

"Reinstatement" means, with respect to an Allowed Claim, (a) in accordance with section 1124(1) of the Bankruptcy Code, being treated such that the legal, equitable, and contractual rights to which such Claim entitles its holder are left unaltered, or (b) if applicable under section 1124 of the Bankruptcy Code: (i) having all prepetition and postpetition defaults with respect thereto other than defaults relating to the insolvency or financial condition of the Debtors or their status as debtors under the Bankruptcy Code cured, (ii) having its maturity date reinstated, (iii) compensating the holder of such Claim for damages incurred as a result of its reasonable reliance on a provision allowing the Claim's acceleration, and (iv) not otherwise altering the legal, equitable and contractual rights to which the Claim entitles the holder thereof.

"Rejected Contract Schedule" is defined in Section 7.01 of this Plan.

"Rejection Damages Claim" means a Claim for damages arising from the rejection by any Debtor of any Executory Contract or Unexpired Lease pursuant to sections 365 or 1123 of the Bankruptcy Code.

"Released Parties" means each of: (a) the Debtors and Reorganized Debtors; (b) the DIP Agent; (c) the DIP Lenders; (d) the Restructuring Support Parties; (e) the Prepetition Secured Parties; (f) the 8.875% Senior Notes Trustee; (g) with respect to each of the foregoing Entities in clauses (a) through (e), such Entity's predecessors, successors and assigns, affiliates, subsidiaries, funds, portfolio companies, management companies, and (h) with respect to each of the foregoing Entities in clauses (a) through (f) each of their respective current and former directors, officers, members, employees, partners, managers, independent contractors, agents, representatives, principals, Professionals, consultants, financial advisors, attorneys, accountants, investment bankers, and other professional advisors (with respect to clause (g), each solely in their capacity as such).

"Releasing Parties" means each holder of a Claim against or Equity Interest in the Debtors that (a) is Unimpaired pursuant to the Plan and therefore is deemed to accept the Plan pursuant to section 1126(f) of the Bankruptcy Code, (b) holders of the Subordinated Securities Claims who provide a written consensual release in favor of the Released Parties that is identical in substance to the releases set forth herein, or (c) any Person that receives and returns a Ballot indicating that such Person elects not to opt out of the Plan releases provided in in Section 11.03 of this Plan.

"Reorganized Debtors" means, on and after the Effective Date, collectively, all of the Debtors that are reorganized under and pursuant to the Plan.

"Reorganized Venoco" means DPC or any successor thereto by merger, consolidation, or otherwise, on and after the Effective Date.

"Requisite Majority Consenting Secured Noteholders" has the meaning set forth in the RSA.

"Restructuring Support Parties" means the Consenting Secured Noteholders and the Consenting Unsecured Noteholders.

"Restructuring Transactions" means one or more transactions pursuant to section 1123(a)(5)(D) of the Bankruptcy Code to occur on or before the Effective Date or as soon as reasonably practicable thereafter, that may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate this Plan, as further described in Section 6.15 of this Plan.

"RSA" means the Amended and Restated Restructuring Support Agreement dated April 8, 2016, between the Restructuring Support Parties and the Debtors, which incorporates by reference this Plan and certain related agreements among the Debtors and the Restructuring Support Parties.

"RSA Approval Order" means the *Order Authorizing the Debtors to Assume the Restructuring Support Agreement*, entered by the Bankruptcy Court on [•], 2016.

"Schedules" means, collectively, the schedules of assets and liabilities, the list of holders of Equity Interests and the statements of financial affairs and such other documents filed by the Debtors under section 521 of the Bankruptcy Code and Bankruptcy Rule 1007, and all amendments pursuant to Bankruptcy Rule 1009 and modifications thereto through the Confirmation Date.

"Second Lien Notes" or "Second Lien Notes Claim" means those 8.875% second lien senior secured notes issued by Venoco pursuant to the Second Lien Notes Indenture, and all Claims related thereto, including, without limitation, all principal, accrued but unpaid interest and all prepayment premium and make-whole amounts, which Claims shall be deemed Allowed for purposes of the Plan in the amount specified in Section 3.03(d) of this Plan.

"Second Lien Notes Indenture" means the indenture dated as of April 2, 2015, among Venoco, the Guarantors and U.S. Bank National Association as trustee.

"Second Lien Notes Trustee" means U.S. Bank National Association, in its capacity as indenture trustee under the Second Lien Notes Indenture.

"Secured Claim" means a Claim: (a) secured by a Lien on property of an Estate to the extent of the value of such property; or (b) subject to a valid right of setoff to the extent of the amount subject to valid setoff pursuant to section 553 of the Bankruptcy Code.

"Securities Act" means the Securities Act of 1933, 15 U.S.C. §§ 77a–77aa, as amended, or any similar federal, state or local law.

"Securities Exchange Act" means the Securities Exchange Act of 1934, 15 U.S.C. §§ 78a–78nn, as amended.

"Senior PIK Toggle Notes" means those 12.25%/13.00% senior unsecured PIK toggle notes due August 2018 issued by DPC under the indenture dated as of August 15, 2013 between DPC and U.S. Bank National Association, as trustee.

"Subordinated Securities Claims" means any claims or causes of action, whether asserted or not, against any Debtor subordinated pursuant to section 510(b) of the Bankruptcy Code,

arising from the purchase or sale of any equity security or damages arising from the purchase or sale of an equity security. Subordinated Securities Claims includes but is not limited to claims brought in the Delaware Litigation.

"TMM" means Timothy M. Marquez.

"U.S." means the United States of America.

"U.S. Trustee" means the United States Trustee for the District of Delaware.

"Undeliverable Distribution" means any distribution under this Plan on account of an Allowed Claim to a holder that has not: (a) accepted a particular distribution or, in the case of distributions made by check, negotiated such check; (b) given notice to the Distribution Agent of an intent to accept a particular distribution; (c) responded to the Distribution Agent's requests for information necessary to facilitate a particular distribution; or (d) taken any other action necessary to facilitate such distribution.

"Unexpired Lease" means an unexpired lease to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

"Unsecured Notes Divestment Letter Agreement" means the divestment letter agreement, including all exhibits, substantially in the form attached as Exhibit C to the RSA.

"Unimpaired" means a Class of Claims or Equity Interests in a Debtor that is not impaired within the meaning of section 1124 of the Bankruptcy Code.

"Unsecured LLA Override" means an overriding royalty interest in and to the oil, gas and other minerals produced and saved from the LLA, the amount of which and other attributes, limitations, terms and conditions of which are more particularly described in the Form of Assignment of Overriding Royalty Interest attached to the Unsecured Notes Divestment Letter Agreement, and shall be substantially in the form attached as Exhibit C to the RSA.

"Unsecured LLA Override Shares" means shares or other Equity Interest in Noteholder Holdco issued to correspond with the Applicable ORRI % (as defined in the Unsecured Notes Divestment Letter Agreement) in the Unsecured LLA Override.

"V6 Cash" means Cash equal to the lesser amount of (a) $1,000,000 or (b) an amount sufficient to satisfy all Allowed Class V6 General Unsecured Claims in full.

"Venoco" means Venoco, Inc., a Delaware corporation.

"Venoco Residual Value" means the value of any assets of Venoco or each Venoco Sub, as applicable, that were not subject to valid, perfected and non-avoidable Liens in favor of the Prepetition Secured Parties or any holders of Other Secured Claims immediately prior to the Effective Date, after satisfaction of all Allowed DIP Facility Claims, Allowed Administrative Claims, Allowed Priority Tax Claims, DIP Backstop Fee Claims, and Allowed Claims in classes

V1, V2, V3, V4, and V5 against Venoco or each Venoco Sub, as applicable in the manner provided for the treatment of such Claims under this Plan.

"<u>Venoco Subs</u>" means TexCal Energy (LP) LLC; Whittier Pipeline Corporation; TexCal Energy (GP) LLC; Ellwood Pipeline; and TexCal Energy South Texas, L.P.

"<u>Voting Deadline</u>" means [•] at 4:00 p.m. ET, or such other date approved by the Bankruptcy Court.

## Section 1.02.  Rules of Interpretation

For purposes herein, the following rules of interpretation apply: (a) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and the neuter gender; (b) unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; (c) unless otherwise specified, any reference herein to an existing document, schedule, or exhibit, shall mean such document, schedule, or exhibit, as it may have been or may be amended, modified, or supplemented; (d) unless otherwise specified, all references herein to "Articles" and "Sections" are references to Articles and Sections herein or hereto; (e) the words "herein" and "hereto" refer to this Plan in its entirety rather than to any particular portion of this Plan; (f) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of, or to affect, the interpretation herein; (g) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; and (h) any term used in capitalized form herein that is not otherwise defined but that is defined in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to such term in the Bankruptcy Code or the Bankruptcy Rules, as applicable.

## Section 1.03.  Computation of Time

Bankruptcy Rule 9006(a) applies in computing any period of time prescribed or allowed herein. If the date on which a transaction may occur, or be required to be done, shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.

## Section 1.04.  Governing Law

Except to the extent the Bankruptcy Code or Bankruptcy Rules apply, and subject to the provisions of any contract, lease, instrument, release, indenture, or other agreement or document entered into expressly in connection herewith, the rights and obligations arising hereunder shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to conflict-of-laws principles; <u>provided</u> that the corporate, limited or general partnership, or limited liability company governance matters shall be governed by the laws of the state of incorporation or formation of the applicable Entity.

**Section 1.05.   Reference to Monetary Figures**

All references in this Plan to monetary figures refer to currency of the U.S., unless otherwise expressly provided.

**Section 1.06.   Severability of Plan Provisions**

Although styled as a "joint" plan, this Plan consists of separate plans for each of the Debtors, and each Debtor is a proponent herein within the meaning of section 1129 of the Bankruptcy Code in its respective Chapter 11 Case. If any plan is not confirmed, then the Debtors reserve the right to either (a) request that the other plans be confirmed or (b) withdraw one or more of the plans. The Debtors' inability to confirm, or election to withdraw, any plan shall not impair the Confirmation of the other plans.

**Section 1.07.   No Substantive Consolidation**

The Estates of the Debtors have not been substantively consolidated for administrative purposes. Nothing in this Plan shall constitute or be deemed to constitute an admission that one Debtor is subject to or liable for any Claim against any other Debtor. Claims against the Debtors will be treated as separate Claims with respect to each applicable Debtor's Estate for all purposes (including, but not limited to, distributions and voting), and such Claims shall be administered as provided in this Plan; provided, however, that no Creditor shall be entitled to recover more than 100% of the value of its Allowed Claim.

## ARTICLE II
## TREATMENT OF UNCLASSIFIED CLAIMS

In accordance with section 1123(a)(l) of the Bankruptcy Code, DIP Facility Claims, DIP Backstop Fee Claims, Administrative Claims (including Professional Claims) and Priority Tax Claims have not been classified and thus are excluded from the Classes of Claims set forth in ARTICLE III of this Plan. The following designation and treatment of unclassified Claims applies:

**Section 2.01.   Administrative Claims**

(a)    Administrative Claims Other than DIP Facility Claims, DIP Backstop Fee Claims, Professional Claims or U.S. Trustee Fees

Each holder of an Administrative Claim must file with the Bankruptcy Court and serve on the Debtors or Reorganized Debtors (as the case may be), the Claims and Noticing Agent, and the U.S. Trustee proof of such Administrative Claims, except for the following Administrative Claims (if any): (i) a DIP Facility Claim; (ii) a DIP Backstop Fee Claim; (iii) a Professional Fee Claim; (iv) any Claims for fees payable to the clerk of the Bankruptcy Court; (v) any fees payable to the U.S. Trustee under 28 U.S.C. § 1930(a)(6) or accrued interest thereon arising under 31 U.S.C. § 3717; (vi) an Administrative Claim that has been Allowed on or before the Effective Date; (vii) an Administrative Claim of a governmental unit (as defined in section 101(27) of the Bankruptcy Code) not required to be filed pursuant to section 503(b)(1)(D) of the

Bankruptcy Code; (viii) an Administrative Claim on account of fees and expenses incurred on or after the Petition Date by ordinary course professionals retained by the Debtors pursuant to an order of the Bankruptcy Court; (ix) an Administrative Claim arising, in the ordinary course of business, out of the employment by one or more Debtors of an individual from and after the Petition Date, but only to the extent that such Administrative Claim is solely for outstanding wages, commissions, or reimbursement of business expenses; (x) an Administrative Claim that (x) has been previously paid by any Debtor in the ordinary course of business or otherwise, or (y) have otherwise been satisfied; or (xi) an Administrative Claim previously filed with the Claims and Solicitation Agent or the Bankruptcy Court. Such proof of Administrative Claim must include at a minimum: (A) the name of the applicable Debtor that is purported to be liable for the Administrative Claim and if the Administrative Claim is asserted against more than one Debtor, the exact amount asserted to be owed by each such Debtor; (B) the name of the holder of the Administrative Claim; (C) the amount of the Administrative Claim; (D) the basis of the Administrative Claim; and (E) supporting documentation for the Administrative Claim. FAILURE TO FILE AND SERVE SUCH PROOF OF ADMINISTRATIVE CLAIM TIMELY AND PROPERLY SHALL RESULT IN THE ADMINISTRATIVE CLAIM BEING FOREVER BARRED AND DISCHARGED WITHOUT THE NEED FOR FURTHER ACTION, ORDER OR APPROVAL OF, OR NOTICE TO, THE BANKRUPTCY COURT.

Each holder of an Allowed Administrative Claim (other than an Administrative Claim that is a DIP Facility Claim, DIP Backstop Fee Claim or Professional Fee Claim) as of the Effective Date shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Administrative Claim, (i) Cash in an amount equal to the amount of such Allowed Administrative Claim as soon as reasonably practicable after either (a) the Effective Date, if such Administrative Claim is Allowed as of the Effective Date, (b) thirty days after the date such Administrative Claim becomes an Allowed Administrative Claim, if such Administrative Claim is Disputed as of, or following, the Effective Date, or (c) the date such Allowed Administrative Claim becomes due and payable in the ordinary course of business in accordance with the terms, and subject to the conditions, of any agreements governing, instruments evidencing, or other documents relating to, the applicable transaction giving rise to such Allowed Administrative Claim, if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business; or (ii) such other treatment as the Debtors or the Reorganized Debtors and such holder shall have agreed in writing.

(b)   DIP Facility Claims and DIP Backstop Fee Claims

Consistent with the DIP Orders, all DIP Facility Claims are and shall be deemed Allowed Claims against each Debtor. On the Effective Date, the holders of the Allowed DIP Facility Claims shall receive, in full and final satisfaction of such Claims, an amount of Cash equal to the amount of such Claims (including, without limitation, all outstanding principal and accrued but unpaid interest, costs, fees and expenses owing as of the Effective Date, or any other amounts due and owing under the DIP Facility) to the extent not previously paid during the Chapter 11 Cases.

Consistent with the DIP Orders, all DIP Backstop Fee Claims are and shall be deemed Allowed against each Debtor. On the Effective Date, each holder of an Allowed DIP Backstop

Fee Claim shall receive, in full and final satisfaction of such Claim, its Pro Rata share of the DIP Backstop Fee.

      (c)      Professional Claims

The Bankruptcy Court shall determine the Allowed amounts of Professional Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Code. The Reorganized Debtors shall pay Professional Claims in Cash in the amount Allowed by the Bankruptcy Court. Holders of Professional Claims shall file and serve on the Reorganized Debtors any request for allowance and payment of such Professional Claims no later than forty-five (45) days after the Effective Date, unless otherwise agreed by the Reorganized Debtors, or otherwise be forever barred, estopped, and enjoined from asserting such Claims against the Debtors or the Reorganized Debtors (as applicable), their respective Estates and property, a Distribution Agent, or otherwise, and such Professional Claims shall be deemed discharged as of the Effective Date. Objections to any Professional Claims must be filed and served on the Reorganized Debtors, counsel to the Reorganized Debtors, and the requesting party no later than thirty (30) days after the filing of the final applications for compensation or reimbursement (unless otherwise agreed by the party requesting compensation of a Professional Claim). If no objections are timely filed and properly served as to a given request, or all timely objections are subsequently resolved, such Professionals shall submit to the Bankruptcy Court for consideration a proposed order approving the Professional Claim as an Allowed Administrative Claim in the amount requested (or otherwise agreed), and the order may be entered without a hearing or further notice to any party. The Allowed amounts of any Professional Claims subject to unresolved timely objections shall be determined by the Bankruptcy Court at a hearing to be held no later than thirty (30) days after the objection deadline. Distributions on account of Allowed Professional Claims shall be made as soon as reasonably practicable after such Professional Claims become Allowed or in accordance with any other Order.

From and after the Effective Date, the Reorganized Debtors shall pay in Cash the legal fees and expenses incurred by the Reorganized Debtors' professionals incurred in the ordinary course of business and without any further notice to or action, order or approval of, the Bankruptcy Court. For the avoidance of doubt, following the Effective Date any requirement that a professional comply with sections 327 through 331 of the Bankruptcy Code in seeking compensation for services rendered after such date shall terminate.

      (d)      U.S. Trustee Fees

All fees payable pursuant to 28 U.S.C. § 1930(a) shall be paid by the applicable Debtor or Reorganized Debtor, as applicable, for each quarter (including any fraction therein) until the Chapter 11 Cases are converted, dismissed, or a Final Decree is issued, whichever occurs first.

**Section 2.02.  Priority Tax Claims**

To the extent not previously paid during the Chapter 11 Cases, each holder of an Allowed Priority Tax Claim, on or as soon as practicable after the Effective Date, shall receive from their respective Debtor, in full satisfaction, release, and discharge thereof, (i) payment in full in Cash,

(ii) other treatment consistent with sections 1129(a)(9)(C) or 1129(a)(9)(D) of the Bankruptcy Code, or (iii) such other terms as agreed to among the Debtors and the holders thereof.

## ARTICLE III
## CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS

Notwithstanding any other provision of this Plan, for obligations on which the Debtors are jointly and severally liable, a distribution on account of any Allowed Claim by a Debtor shall not operate as a discharge, release and/or satisfaction of such Allowed Claim asserted against any other Debtor(s) unless and until such time that such Allowed Claim is paid in full. In the event no holder of a Claim with respect to a specific Class for a particular Debtor timely submits a Ballot that complies with the Disclosure Statement Order indicating acceptance or rejection of this Plan, such Class will be deemed to have accepted this Plan (including for purposes of satisfying section 1129(a)(10) of the Bankruptcy Code).

**Section 3.01.  Classification**

This Plan constitutes a separate plan with respect to each Debtor. The categories of Claims and Equity Interests listed below classify Claims and Equity Interests for all purposes, including voting, confirmation and distribution pursuant to each plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code. A Claim or Equity Interest shall be deemed classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Equity Interest qualifies within the description of such different Class. A Claim or Equity Interest is in a particular Class only to the extent that such Claim or Equity Interest is Allowed in that Class and has not been paid or otherwise settled prior to the Effective Date.

Claims (other than those listed in ARTICLE II of this Plan, which are not required to be classified pursuant to section 1123(a)(1) of the Bankruptcy Code) and Equity Interests in each of the Debtors are classified as follows:

(a)   DPC

| Class | Claim or Equity Interest | Status | Voting Rights |
|-------|--------------------------|--------|---------------|
| D1 | Other Priority Claims | Unimpaired | Deemed to Accept |
| D2 | Other Secured Claims | Unimpaired | Deemed to Accept |
| D3 | Senior PIK Toggle Note Claims | Impaired | Entitled to Vote |
| D4 | General Unsecured Claims | Impaired | Entitled to Vote |
| D5 | Subordinated Securities Claims | Impaired | Deemed to Reject |
| D6 | Equity Interests | Impaired | Deemed to Reject |

(b)   Venoco and Venoco Subs

| Class | Claim or Equity Interest | Status | Voting Rights |
|-------|--------------------------|--------|---------------|
| V1 | Other Priority Claims | Unimpaired | Deemed to Accept |

| Class | Claim or Equity Interest | Status | Voting Rights |
|-------|--------------------------|--------|---------------|
| V2 | Other Secured Claims | Unimpaired | Deemed to Accept |
| V3 | First Lien Notes Claims | Impaired | Entitled to Vote |
| V4 | Second Lien Notes Claims | Impaired | Entitled to Vote |
| V5 | 8.875% Senior Notes Claims | Impaired | Entitled to Vote |
| V6 | General Unsecured Claims | Impaired | Entitled to Vote |
| V7 | Subordinated Securities Claims | Impaired | Deemed to Reject |
| V8 | Equity Interests in Venoco | Impaired | Deemed to Reject |
| V9 | Equity Interests in Each Venoco Sub | Unimpaired | Deemed to Accept |

All Claims against Venoco and each Venoco Sub are placed in classes (as designated by subclasses for Venoco and each Venoco Sub, as applicable), as follows: Venoco (subclass a), TexCal Energy (LP) LLC (subclass b); Whittier Pipeline Corporation (subclass c); TexCal Energy (GP) LLC (subclass d); Ellwood Pipeline (subclass e); and TexCal Energy South Texas, L.P. (subclass f).

**Section 3.02.   Claims Against and Equity Interests in DPC**

    (a)    <u>Class D1—Other Priority Claims</u>

        (i)    *Treatment*: Unless the holder agrees to a different treatment, each holder of an Allowed Class D1 Other Priority Claim against DPC shall receive, in full and final satisfaction, release, settlement and discharge of, and in exchange for, its Allowed Claim, Cash equal to the amount of such Allowed Claim plus interest thereon, on or as soon as practicable after the later of: (x) the Effective Date; or (y) the date such Claim becomes due and Allowed or as otherwise ordered by the Bankruptcy Court.

        (ii)    *Voting*: Class D1 is Unimpaired. The holders of Class D1 Other Priority Claims against DPC are conclusively deemed to accept the Plan pursuant to section 1126(f) of the Bankruptcy Code, and are not entitled to vote to accept or reject the Plan.

    (b)    <u>Class D2—Other Secured Claims</u>

        (i)    *Treatment*: Unless the holder agrees to a different treatment, each holder of an Allowed Class D2 Other Secured Claim shall receive, in DPC's sole discretion and in full and final satisfaction, release, settlement and discharge of, and in exchange for, such holder's Allowed Other Secured Claim against DPC, on or as soon as practicable after the later of: (x) the Effective Date; or (y) the date such Claim becomes due and Allowed or as otherwise ordered by the Bankruptcy Court:

            a.    Cash equal to the amount of such Allowed Other Secured Claim plus interest required to be paid under section 506(b) of the Bankruptcy Code (if any);

b. Reinstatement of the legal, equitable and contractual rights of the holder of such Allowed Other Secured Claim, subject to the provisions of this Plan; or

c. such other treatment as necessary to satisfy the requirements of section 1124(2) of the Bankruptcy Code for such Allowed Other Secured Claim to be rendered Unimpaired.

(ii) *Voting*: Class D2 is Unimpaired. The holders of Class D2 Other Secured Claims against DPC are conclusively deemed to accept the Plan pursuant to section 1126(f) of the Bankruptcy Code, and are not entitled to vote to accept or reject the Plan.

(c)     <u>Class D3—Senior PIK Toggle Note Claims</u>

(i) *Treatment*:

a. If the holders of Class D3 Senior PIK Toggle Note Claims vote as a Class to accept the Plan, unless the holder agrees to a different treatment, each holder of an Allowed Class D3 Senior PIK Toggle Note Claim against DPC shall receive, in full and final satisfaction, release, settlement and discharge of, and in exchange for, its Allowed Claim its Pro Rata share of (i) the New DPC Warrants and (ii) DPC Residual Value.

b. If the holders of Class D3 Senior PIK Toggle Note Claims vote as a Class to reject the Plan, each holder of an Allowed Class D3 Senior PIK Toggle Note Claim against DPC shall receive its Pro Rata share of DPC Residual Value.

(ii) *Voting*: Class D3 is Impaired. The holders of Class D3 Claims against DPC are entitled to vote to accept or reject the Plan.

(d)     <u>Class D4—General Unsecured Claims</u>

(i) *Treatment*:

a. If the holders of Class D4 General Unsecured Claims vote as a Class to accept the Plan, unless the holder agrees to a different treatment, each holder of an Allowed Class D4 General Unsecured Claim against DPC shall receive, in full and final satisfaction, release, settlement and discharge of, and in exchange for, its Allowed Claim, its Pro Rata share of (i) the New DPC Warrants and (ii) the DPC Residual Value.

b. If the holders of Class D4 General Unsecured Claims vote as a Class to reject the Plan, each holder of an Allowed Class D4 General Unsecured Claim against DPC shall receive its Pro Rata share of DPC Residual Value.

(ii)     *Voting*: Class D4 is Impaired. The holders of Class D4 Claims against DPC are entitled to vote to accept or reject the Plan.

(e)     Class D5—Subordinated Securities Claims

(i)     *Treatment*: On the Effective Date, all Subordinated Securities Claims against DPC shall be subordinated in payment to all other Allowed General Unsecured Claims under section 510(b) of the Bankruptcy Code, and each holder of an Allowed Class D5 Subordinated Securities Claim against DPC: (x) shall be enjoined from pursuing any Class D5 Subordinated Securities Claim against any of the Debtors; and (y) shall not receive or retain any distribution on account of its Class D5 Subordinated Securities Claim against DPC.

(ii)     *Voting*: Class D5 is Impaired. The holders of Class D5 Subordinated Securities Claims against DPC are conclusively deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code, and are not entitled to vote to accept or reject the Plan.

(f)     Class D6—Equity Interests

(i)     *Treatment*: On the Effective Date, all existing Equity Interests of DPC shall be cancelled, extinguished and discharged, and the owners thereof shall receive no distribution on account of such Equity Interests.

(ii)     *Voting*: Class D6 is Impaired. The holders of Class D6 Equity Interests in DPC are conclusively deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code, and are not entitled to vote to accept or reject the Plan.

**Section 3.03.   Claims Against and Equity Interests in Venoco and Venoco Subs**

(a)     Class V1—Other Priority Claims

(i)     *Treatment*: Unless the holder agrees to a different treatment, each holder of an Allowed Class V1 Other Priority Claim against Venoco and each Venoco Sub shall receive, in full and final satisfaction, release, settlement and discharge of, and in exchange for, its Allowed Claim, Cash equal to the amount of such Allowed Claim plus interest thereon, on or as soon as practicable after the later of: (x) the Effective Date; or (y) the date such Claim becomes due and Allowed or as otherwise ordered by the Bankruptcy Court.

(ii)     *Voting*: Class V1 is Unimpaired. The holders of Class V1 Other Priority Claims against Venoco and each Venoco Sub are conclusively deemed to accept the Plan pursuant to section 1126(f) of the Bankruptcy Code, and are not entitled to vote to accept or reject the Plan.

(b)     Class V2—Other Secured Claims

   (i)     *Treatment*: Unless the holder agrees to a different treatment, each holder of an Allowed Class V2 Other Secured Claim shall receive, in Venoco's and each Venoco Sub's sole discretion and in full and final satisfaction, release, settlement and discharge of, and in exchange for, such holder's Allowed Other Secured Claim against Venoco and each Venoco Sub, on or as soon as practicable after the later of: (x) the Effective Date; or (y) the date such Claim becomes due and Allowed or as otherwise ordered by the Bankruptcy Court:

   a.   Cash equal to the amount of such Allowed Other Secured Claim plus interest required to be paid under section 506(b) of the Bankruptcy Code (if any);

   b.   Reinstatement of the legal, equitable and contractual rights of the holder of such Allowed Other Secured Claim, subject to the provisions of this Plan; or

   c.   such other treatment as necessary to satisfy the requirements of section 1124(2) of the Bankruptcy Code for such Allowed Other Secured Claim to be rendered Unimpaired.

   (ii)    *Voting*: Class V2 is Unimpaired. The holders of Class V2 Other Secured Claims against Venoco and each Venoco Sub are conclusively deemed to accept the Plan pursuant to section 1126(f) of the Bankruptcy Code, and are not entitled to vote to accept or reject the Plan.

(c)     Class V3—First Lien Notes Claims

   (i)     *Allowance*: The First Lien Notes Claims against Venoco and each Guarantor shall be deemed Allowed in the amount of $195,183,333.33 million under the First Lien Notes Indenture.

   (ii)    *Treatment*: Unless the holder agrees to a different treatment, each holder of an Allowed Class V3 First Lien Notes Claim against Venoco and each Guarantor shall receive, in full and final satisfaction, release, settlement and discharge of, and in exchange for, its Allowed First Lien Notes Claim, its Pro Rata share of 90% of New Common Stock issued on the Effective Date.

   (iii)   *Voting*: Class V3 is Impaired. The holders of First Lien Notes Claims in Class V3 are entitled to vote to accept or reject the Plan.

24

(d)    Class V4—Second Lien Notes Claims

    (i)    *Allowance*: The Second Lien Notes Claims against Venoco and each Guarantor shall be deemed Allowed in the amount of $171,897,136.56 million due under the Second Lien Notes Indenture.

    (ii)    *Treatment*: Unless the holder agrees to a different treatment, each holder of an Allowed Second Lien Secured Claim in Class V4 shall receive, in full and final satisfaction, release, settlement and discharge of, and in exchange for, its Allowed Claim, its Pro Rata share of the New Second Lien Warrants.

    (iii)    *Voting*: Class V4 is Impaired. The holders of Second Lien Notes Claims in Class V4 are entitled to vote to accept or reject the Plan.

(e)    Class V5—8.875% Senior Notes Claims

    (i)    *Allowance*:  The 8.875% Senior Notes Claims against Venoco and each Guarantor thereof shall be deemed Allowed in the amount of $324,330,880.36 due under the 8.875% Senior Notes Indenture.

    (ii)    *Treatment*:   Subject to the Reallocation Procedures, in full and final satisfaction, release, settlement, and discharge of, and in exchange for all Allowed 8.875% Senior Notes Claims, the following property shall be distributed Pro Rata to or on behalf of the holders of Allowed 8.875% Senior Notes Claims: (i) $6,500,000 in Cash; and (ii) 2.6% of the New Common Stock to be effectuated as a transfer by the Backstoppers out of the DIP Backstop Fee. In addition, subject to the Reallocation Procedures the Unsecured LLA Override Shares shall be issued to the Noteholder HoldCo for Pro Rata distribution to holders of Allowed 8.875% Senior Notes Claims.

    (iii)    *Voting*. Class V5 is Impaired. The holders of Allowed 8.875% Claims in Class V5 are entitled to vote to accept or reject the Plan.

(f)    Class V6—General Unsecured Claims

    (i)    *Treatment*:

        a.    If the holders of Class V6 General Unsecured Claims vote as a Class to accept the Plan, unless the holder agrees to a different treatment, each holder of an Allowed Class V6 General Unsecured Claim against Venoco or any Venoco Sub shall receive, in full and final satisfaction, release, settlement and discharge of, and in exchange for, its Allowed Claim, its Pro Rata share of the V6 Cash.

        b.    If the holders of Class V6 General Unsecured Claims vote as a Class to reject the Plan, each holder of an Allowed Class V6 General

Unsecured Claim against Venoco or any Venoco Sub shall receive its Pro Rata share of Venoco Residual Value, if any.

c. The Prepetition Secured Parties shall be entitled to vote in Class V6 to the extent of their deficiency claims, but shall not be entitled to any distribution under this Section 3.03 on account of such claims.

(ii) *Voting*: Class V6 is Impaired. The holders of Class V6 Claims against Venoco or any Venoco Sub are entitled to vote to accept or reject the Plan.

(g)   Class V7—Subordinated Securities Claims

(i) *Treatment*: On the Effective Date, all Subordinated Securities Claims against Venoco and each Venoco Sub shall be subordinated in payment to all other Allowed General Unsecured Claims under section 510(b) of the Bankruptcy Code, and each holder of an Class V7 Subordinated Securities Claim against Venoco and each Venoco Sub: (x) shall be enjoined from pursuing any Class V7 Subordinated Securities Claim against any of the Debtors; and (y) shall not receive or retain any distribution on account of its Class V7 Subordinated Securities Claim against Venoco and each Venoco Sub.

(ii) *Voting*: Class V7 is Impaired. The holders of Class V7 Subordinated Securities Claims against Venoco and each Venoco Sub are conclusively deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code, and are not entitled to vote to accept or reject the Plan.

(h)   Class V8—Equity Interests in Venoco

(i) *Treatment*: On the Effective Date, all existing Equity Interests of Venoco shall be cancelled, extinguished and discharged, and the owners thereof shall receive no distribution on account of such Equity Interests.

(ii) *Voting*: Class V8 is Impaired. The holders of Class V8 Equity Interests in Venoco are conclusively deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code, and are not entitled to vote to accept or reject the Plan.

(i)   Class V9—Equity Interests in each Venoco Sub

(i) *Treatment*: On the Effective Date, all existing Equity Interests in each Venoco Sub shall be reinstated and rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code.

(ii) *Voting*: Class V9 is Unimpaired. The holders of Class V9 Equity Interests in each Venoco Sub are conclusively deemed to accept the Plan pursuant to section 1126(f) of the Bankruptcy Code, and are not entitled to vote to accept or reject the Plan.

26

## ARTICLE IV
## REALLOCATION PROCEDURES

**Section 4.01.  Reallocation Procedures**

(a)      Each holder of 8.875% Senior Notes Claims will have the option of electing prior to the Effective Date to be (i) an Electing New Common Stock Recipient, (ii) an Electing Unsecured LLA Override Recipient, and/or (iii) an Electing Cash Recipient. Such election may be made irrespective of whether such holder has voted in favor of the Plan. If a holder of 8.875% Senior Notes Claims does not make an election, then the reallocation procedures in this Section 4.01 will not apply, and such holder shall be entitled to receive the Pro Rata distributions it is entitled to receive in respect of its Allowed Claims in Class V5 under Section 3.03(e) of this Plan (such distribution, the "Default Distribution").

(b)      Electing Unsecured LLA Override Recipient Election. Each holder of 8.875% Senior Notes Claims may make an election (an "Electing Unsecured LLA Override Recipient Election") on its Ballot to receive a specified percentage of additional Unsecured LLA Override Shares (at a price specified by such holder) in exchange for a specified percentage of the Cash and/or the New Common Stock (at a price specified by such holder) that such holder would otherwise receive under its Default Distribution. Such electing holder (an "Electing Unsecured LLA Override Recipient") thereby agrees to reduce its initial allocation of Cash and/or New Common Stock, as applicable, and increase its initial allocation of Unsecured LLA Override Shares in accordance with the procedures set forth in this Section 4.01.

(c)      Electing New Common Stock Recipient Election.[2] Each holder of 8.875% Senior Notes Claims may make an election (an "Electing New Common Stock Recipient Election") on its Ballot to receive a specified percentage of additional New Common Stock (at a price specified by such holder) in exchange for a specified percentage of the Cash and/or Unsecured LLA Override Shares (at a price specified by such holder) that such holder would otherwise receive under its Default Distribution. Such electing holder (an "Electing New Common Stock Recipient") thereby agrees to reduce its initial allocation of Cash and/or Unsecured LLA Override Shares, as applicable, and increase its initial allocation of New Common Stock in accordance with the procedures set forth in this Section 4.01.

(d)      Electing Cash Recipient Election. Each holder of 8.875% Senior Notes Claims may make an election (an "Electing Cash Recipient Election") on its Ballot to receive a specified amount of additional Cash in exchange for a specified percentage of the Unsecured LLA Override Shares (at a price specified by such holder) and/or the New Common Stock (at a price specified by such holder) that such holder would otherwise receive under the Default Distribution. Such electing holder (an "Electing Cash Recipient") thereby agrees to reduce its initial allocation of Unsecured LLA Override Shares and/or New Common Stock, as applicable, and increase its initial allocation of Cash in accordance with the procedures set forth in this Section 4.01.

---

[2] The Reallocation Procedures relating to the New Common Stock are subject, in their entirety, to the ultimate equity holders being qualified institutional buyers (QIBs) or accredited investors, as defined in SEC Rule 501 of Regulation D, as well as Reorganized Venoco not losing its status as a private company that is not subject to registration with the SEC.

(e)    <u>Reallocation Administration. The Debtors will administer the reallocation as follows:</u>

    (i)    Each participating Electing Unsecured LLA Override Recipient declares on its Ballot a price at which it would elect to receive a specified percentage of additional Unsecured LLA Override Shares from participating Electing New Common Stock Recipients and/or participating Electing Cash Recipients, as applicable, as well as the amount of New Common Stock (and at what price) and/or Cash, as applicable, that such Electing Unsecured LLA Override Recipient would contribute for such Unsecured LLA Override Shares.

    (ii)    Each participating Electing New Common Stock Recipient declares on its Ballot a price at which it would elect to receive a specified amount of additional New Common Stock from participating Electing Unsecured LLA Override Recipients and/or participating Electing Cash Recipients, as applicable, as well as the amount of Unsecured LLA Override (and at what price) and/or Cash, as applicable, that such Electing New Common Stock Recipient would contribute for such New Common Stock.

    (iii)    Each participating Electing Cash Recipient declares on its Ballot the amount of Unsecured LLA Override Shares and/or New Common Stock (and at what prices) it would elect to "sell" to the Electing Unsecured LLA Override Recipients or Electing New Common Stock Recipients, as applicable.

    (iv)    The Electing Unsecured LLA Override Recipients, the Electing New Common Stock Recipients and the Electing Cash Recipients contribute the specified amounts of Unsecured LLA Override Shares, New Common Stock and/or Cash, as applicable, to the Reallocation Liquidity Pool.

    (v)    The holders of the 8.875% Senior Notes Claims receive their distributions, subject to the provisions of subparagraph (f) hereof:

        a.    For the Electing Unsecured LLA Override Recipients, the recovery is the Default Distribution, *minus* the New Common Stock and/or Cash contributed to the Reallocation Pool, *plus* the additional Unsecured LLA Override Shares specified by the Electing Unsecured LLA Override Recipients on their Ballots.

        b.    For the Electing New Common Stock Recipients, the recovery is the Default Distribution, *minus* the Unsecured LLA Override Shares and/or Cash contributed to the Reallocation Pool, *plus* the additional Unsecured LLA Override Shares specified by the Electing New Common Stock Recipients on their Ballots.

        c.    For the Electing Cash Recipients, the recovery is the Default Distribution, *minus* the Unsecured LLA Override Shares and/or New

Common Stock contributed to the Reallocation Pool, *plus* the Cash specified by the Electing Cash Recipients on their Ballots.

    d.  For the avoidance of doubt, the Electing Unsecured LLA Override Recipients, the Electing New Common Stock Recipients and/or the Electing Cash Recipients may not receive any, or the full, recovery they elect if there is insufficient Unsecured LLA Override Shares, New Common Stock and/or Cash as applicable, in the Reallocation Liquidity Pool.

  (vi)  The Debtors shall be authorized to adopt such additional detailed procedures, not inconsistent with the foregoing, to efficiently administer the reallocation, after consultation with the Consenting Unsecured Noteholders.

  (f)    The Reallocation Procedure set forth above is completely voluntary, and no holder of 8.875% Senior Notes Claims can be required or compelled to take part in the Reallocation Procedure. Holders who do not make any such election on their Ballot will not participate in the Reallocation Procedure, and will receive the Default Distribution to which they are otherwise entitled pursuant to the distribution provisions of the Plan. The Reallocation Procedures will not have any impact or effect on the distribution made to holders of Allowed Claims who do not take part in the Reallocation Procedure. In addition, the following apply to the Reallocation Procedure:

  (i)  The Reallocation Procedure is set up so that Persons who are willing to give up Cash will pay the lowest possible price for the Unsecured LLA Override Shares and/or New Common Stock that is offered for exchange. In the event that either (A) the prices offered to be paid by Electing Cash Recipients, Electing New Common Stock Recipients or Electing Unsecured LLA Override Recipients seeking to purchase such interests are equal to or less than the prices offered by the Electing Cash Recipients, Electing New Common Stock Recipients or Electing Unsecured LLA Recipients seeking to sell such interests or (B) the Electing Cash Recipients, Electing Unsecured LLA Override Recipients or Electing New Common Stock Recipients desire to sell or purchase a different number or percentage of each such form of consideration, then only such Unsecured LLA Override Shares, shares of New Common Stock and Unsecured LLA Override Shares shall be contributed to the Reallocation Liquidity Pool as to which there is a mutual agreement as to price and volume. To the extent that the Reallocation Liquidity Pool contains less of a specific form of Plan consideration than there are Electing Recipients who desire to acquire such consideration at the specified price or a higher price, such Electing Recipients shall receive a pro rata allocation of such form of Plan consideration from the Reallocation Pool based on their respective beneficial holdings of the 8.875% Senior Notes.

  (ii)  The reallocation elections will occur simultaneously with the solicitation.

(iii)     The elections will not be made public.

(iv)     Except as otherwise expressly provided under Sections 8.03 and 11.08 in respect to the Cash, all of the Unsecured LLA Override Shares, New Common Stock and Cash to be distributed to the 8.875% Senior Notes Trustee pursuant to Section 3.03(e) of this Plan will be distributed on the Effective Date.

## ARTICLE V
## ACCEPTANCE OR REJECTION OF THE PLAN

**Section 5.01.   Acceptance by an Impaired Class**

(a)     In accordance with section 1126(c) of the Bankruptcy Code and except as provided in section 1126(e) of the Bankruptcy Code, Impaired Classes entitled to vote under this Plan shall have accepted the Plan if it is accepted by the holders of at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the Allowed Claims that have timely and properly voted to accept or reject the Plan or if no holder of a Claim with respect to a specific Class for a particular Debtor timely submits a Ballot that complies with the Disclosure Statement Order indicating acceptance or rejection of this Plan.

(b)     Except for holders of Claims in Classes that are deemed or presumed to have accepted or rejected this Plan pursuant to the terms of this Plan other than this Section 5.01(b), if holders of Claims in a particular Impaired Class of Claims were given the opportunity to vote to accept or reject this Plan and notified that a failure of any holders of Claims in such Impaired Class of Claims to vote to accept or reject this Plan would result in such Impaired Class of Claims being deemed to have accepted this Plan, but no holders of Claims in such Impaired Class of Claims voted to accept or reject this Plan, then such Class of Claims shall be deemed to have accepted this Plan.

**Section 5.02.   Nonconsensual Confirmation**

The Debtors may request confirmation under section 1129(b) of the Bankruptcy Code with respect to (a) any Impaired Class of Claims and Equity Interests that have not accepted the Plan in accordance with sections 1126 and 1129(a)(8) of the Bankruptcy Code and (b) any Class that is deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code or the terms of the Plan or otherwise. The Debtors reserve the right to amend or modify the Plan in accordance with Section 12.01 of this Plan to the extent, if any, that Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code requires such amendment or modification.

## ARTICLE VI
## IMPLEMENTATION OF THE PLAN

The transactions required to implement the Plan shall be implemented in accordance with this ARTICLE VI.

**Section 6.01.   Operations between Confirmation Date and Effective Date**

During the period from the Confirmation Date through and until the Effective Date, the Debtors may continue to operate their businesses as debtors in possession, subject to all applicable orders of the Bankruptcy Court, the Bankruptcy Code, and any limitations set forth herein, in the RSA or in the Confirmation Order.

**Section 6.02.   Exit Facility**

On or before the Effective Date, the Reorganized Debtors shall enter into the Exit Credit Facilities, and, subject to the satisfaction of the DIP Facility Claims and the DIP Backstop Fee Claims in accordance herewith, grant the Liens and security interests provided for therein. The Reorganized Debtors that are the guarantors under the Exit Credit Facilities shall issue the guarantees and grant the Liens and security interests as provided therein. The Exit Credit Facilities shall be on terms and conditions substantially as set forth in the Plan Supplement.

**Section 6.03.   LLA Override**

Reorganized Venoco will, upon LLA approval, transfer the LLA Override and the Unsecured LLA Override pursuant to the Divestment Letter Agreements.

**Section 6.04.   Sources of Cash for Plan Distributions**

Except as otherwise specifically provided herein or in the Confirmation Order, all Cash required for the payments to be made hereunder shall be obtained from the Reorganized Debtors or the Exit Facility, as applicable. For the avoidance of doubt, all of the Debtors' Cash was subject to valid, perfected and unavoidable Liens in favor of the Prepetition Secured Parties as of the Petition Date.

**Section 6.05.   Issuance of New Common Stock, New Warrants and Unsecured LLA Override Shares**

(a)      Issuance of Securities. On the Effective Date: (i) the existing Equity Interests in DPC and Venoco will be cancelled, extinguished and discharged; (ii) the New Common Stock and New Warrants will be issued and, as soon as practicable thereafter, distributed, as provided for in ARTICLE II and ARTICLE III of this Plan, as provided in the Reorganized Venoco Organizational Documents; and (iii) the Unsecured LLA Override Shares will be issued and, as soon as practicable thereafter, distributed, as provided for in Section 3.03(e) of this Plan. The issuance by Reorganized Venoco of the New Common Stock and the New Warrants, the issuance of shares pursuant to the exercise of the New Warrants, and the issuance to the Noteholder HoldCo of the Unsecured LLA Override Shares is authorized without the need for any further corporate action and without any further action by any holder of a Claim or Equity Interest.

(b)      Exemption from Registration. The offering, issuance, and distribution of the New Common Stock, New Warrants and Unsecured LLA Override Shares shall be exempt from the registration requirements of section 5 of the Securities Act under section 1145(a) of the Bankruptcy Code.

(c)     SEC Reporting Requirements. On the Effective Date, none of the New Common Stock or the New Warrants will be listed on a national securities exchange, the Reorganized Debtors will not be reporting companies under the Securities Exchange Act, the Reorganized Debtors shall not be required to and will not file reports with the Securities and Exchange Commission or any other entity or party, and the Reorganized Debtors shall not be required to file monthly operating reports, or any other type of report, with the Bankruptcy Court after the Effective Date. In order to prevent the Reorganized Debtors from becoming subject to the reporting requirements of the Securities Exchange Act, except in connection with a public offering, the Organizational Documents may impose certain trading restrictions, and the New Common Stock and the New Warrants will be subject to certain transfer and other restrictions, as described in clause (ii) of Section 6.17 of this Plan designed to maintain the Reorganized Debtors as private, non-reporting companies.

(d)     Restrictions on New Common Stock Distributed on Account of Claims and Interests. Notwithstanding any Electing New Common Stock Recipient Election by a holder of Class V5 8.875% Senior Note Claims, to the extent determined by the Debtors or the Reorganized Debtors, as applicable, to be necessary to ensure that the total number of recipients of New Common Stock or New Warrants pursuant to the Plan does not cause the Reorganized Debtors to become subject to the reporting requirements of the Securities Exchange Act, the Debtors or the Reorganized Debtors, as applicable, shall be permitted to make distributions (i) from the $6,500,000 in Cash to be distributed on account of the Class V5 8.875% Allowed Senior Notes Claims to holders of Class V5 8.875% Senior Notes Claims and (ii) in Cash to holders of Class D3 Senior PIK Toggle Note Claims or Class D4 General Unsecured Claims, in each case in an amount equal to the value of the New Common Stock or New Warrants, as applicable, that would otherwise be distributed under the Plan on account of such Claims, to the extent necessary to ensure that the Reorganized Debtors do not become subject to the reporting requirements of the Securities Exchange Act, which distribution shall start with the smallest Allowed Claim in any such Class and will proceed in ascending size of Allowed Claims in any such Class as necessary to ensure that the Reorganized Debtors do not become subject to the reporting requirements of the Securities Exchange Act

**Section 6.06.  Organizational Documents**

On the Effective Date, the Organizational Documents of the Debtors shall be deemed amended and restated in substantially the form set forth in the Plan Supplement, without any further action by the managers, directors, or equity holders of the Debtors or the Reorganized Debtors. The amended and restated Organizational Documents will, among other things, contain appropriate provisions prohibiting the issuance of nonvoting equity securities to the extent required by section 1123(a)(6) of the Bankruptcy Code. On the Effective Date, or as soon as practicable thereafter, the Debtors or the Reorganized Debtors will, if required by applicable state law, file with the Secretary of State of the appropriate jurisdiction the amended and restated Organizational Documents.

**Section 6.07.   Intercompany Equity Interests**

In order to preserve corporate structure, the Intercompany Equity Interests shall be retained and the legal, equitable, and contractual rights to which the holder of such Intercompany Equity Interests is entitled shall remain unaltered.

**Section 6.08.   Dissolution of DPC**

On the Effective Date, the Equity Interests of DPC shall be deemed cancelled and of no further force and effect, and deemed extinguished without any further corporate action. Any officers and directors of DPC shall be deemed to have been removed, and DPC shall be deemed dissolved for all purposes without any further corporate action.

**Section 6.09.   Continued Corporate Existence and Vesting of Assets**

With the exception of DPC, which will be dissolved pursuant to Section 6.08 of this Plan: (i) each Debtor will, as a Reorganized Debtor, continue to exist after the Effective Date as a separate legal entity, with all of the powers of such a legal entity under applicable law and without prejudice to any right to alter or terminate such existence (whether by merger, dissolution or otherwise) under applicable law; and (ii) on the Effective Date, all property of each Debtor's Estate, and any property acquired by each Debtor or Reorganized Debtor under the Plan, will vest in such Reorganized Debtor free and clear of all Claims, Liens, charges and other encumbrances. On and after the Effective Date, each Reorganized Debtor may operate its business and may use, acquire, and dispose of property and compromise or settle any claims without supervision or approval by the Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, subject only to those restrictions expressly imposed by the Plan or the Confirmation Order as well as the documents and instruments executed and delivered in connection therewith, including the documents, exhibits, instruments, and other materials comprising the Plan Supplement. Without limiting the foregoing, the Reorganized Debtors may pay the charges that they incur from and after the Effective Date for professional fees, disbursements, expenses, or related support services (including fees relating to the preparation of Professional fee applications) without application to, or the approval of, the Bankruptcy Court.

**Section 6.10.   Management of the Reorganized Debtors**

As of the Effective Date, the term of current members of the boards of directors for Venoco shall expire without further action by any Person. The initial directors of the board of Reorganized Venoco nominated by the Requisite Majority Consenting Secured Noteholders shall be identified in the Plan Supplement.

From and after the Effective Date, the officers identified in the Plan Supplement shall manage Reorganized Venoco. The officers of Reorganized Venoco shall have the power to enter into or execute any documents or agreements that they deem reasonable and appropriate to effectuate the terms of the Plan.

**Section 6.11.   Existing Benefits Agreements and Retiree Benefits**

(a)      Except as such benefits may be otherwise terminated by the Debtors in a manner permissible under applicable law, the Existing Benefits Agreements shall be deemed assumed as of the Effective Date, subject to the consent of the Requisite Majority Consenting Secured Noteholders. Notwithstanding anything to the contrary contained herein, pursuant to section 1129(a)(13) of the Bankruptcy Code, on and after the Effective Date, all retiree benefits (as such term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable law.

(b)      On the Effective Date, the Employee Stock Ownership Plan shall be terminated. Reorganized Venoco shall take all actions necessary or appropriate to terminate the Employee Stock Ownership Plan in accordance with the provisions of applicable law.

**Section 6.12.   Management Incentive Plan**

On or after the Effective Date, Reorganized Venoco shall adopt the Management Incentive Program, which shall provide for the distribution, and the reservation for future issuance, as applicable, of (i) the New MIP Warrants and (ii) an LLA Override to participating officers, directors and employees of the Reorganized Debtors as determined by the newly appointed board of directors of Reorganized Venoco under the terms set forth in the Management Incentive Plan agreement included in the Plan Supplement. For the avoidance of doubt, the Management Incentive Plan is an entirely post-Effective Date compensation plan and awards thereunder, to the extent earned, shall be paid by the Reorganized Debtors, and the Bankruptcy Court's confirmation of the Plan shall not be deemed to be an approval or authorization of the specific terms of the Management Incentive Plan.

**Section 6.13.   Employment Agreements**

On or after the Effective Date, Reorganized Venoco shall enter into the Employment Agreement, which shall provide for the ongoing employment of TMM.

**Section 6.14.   Causes of Action**

(a)      <u>Preservation of Causes of Action Other Than Avoidance Actions</u>

In accordance with section 1123(b) of the Bankruptcy Code or any corresponding provision of federal or state laws, and except as expressly released by this Plan, Final DIP Order, Confirmation Order or other Final Order: (i) on the Effective Date, all Causes of Action of the Debtors shall be transferred to and vest in the Reorganized Debtors; and (ii) on and after the Effective Date, all such Causes of Action for the Debtors shall be retained by the Reorganized Debtors, which may enforce, sue on, settle, or compromise (or decline to do any of the foregoing) any or all of such Causes of Action on behalf of the Debtors; <u>provided</u>, <u>however</u>, that as of the Effective Date, all Avoidance Actions of the Debtors shall be deemed to be waived and released. For the avoidance of doubt, the Debtors and the Reorganized Debtors, as applicable, shall not retain any Causes of Action against the Released Parties.

(b)     No Waiver

Except as otherwise provided in Section 6.14(a) or Section 11.02 of this Plan, or as released by the Final DIP Order, the Confirmation Order or other Final Order, nothing in this Plan shall be deemed to be a waiver or relinquishment of any Claim, Cause of Action, account receivable, right of setoff, or other legal or equitable right or defense that the Reorganized Debtors may have or choose to assert on behalf of the Debtors or their respective Estates under any provision of the Bankruptcy Code or any applicable non-bankruptcy law. No Entity may rely on the absence of a specific reference in this Plan to any Cause of Action or account receivable against it as an indication that the Reorganized Debtors will not pursue any and all available Causes of Action or accounts receivable against it, and all such rights to prosecute or pursue any and all Causes of Action or accounts receivable against any Entity are expressly reserved for later adjudication and, therefore, no preclusion doctrine, including, without limitation, the doctrines of *res judicata*, collateral estoppel, estoppel (judicial, equitable or otherwise) or laches, shall apply to such Causes of Action or accounts receivable upon or after the Confirmation or Consummation of the Plan.

## Section 6.15.   Restructuring Transactions

On or before the Effective Date or as soon as reasonably practicable thereafter and with the consent of the Requisite Majority Consenting Secured Noteholders, the Debtors or the Reorganized Debtors (as applicable) are authorized, without further order of the Bankruptcy Court, to take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by or necessary to effectuate the Restructuring Transactions under and in connection with this Plan, including, without limitation: (a) the execution and delivery of all appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, dissolution or liquidation containing terms that are consistent with the terms of this Plan, and that satisfy the requirements of applicable law and any other terms to which the applicable Entities may agree; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption or delegation of any asset, property, right, liability, debt or obligation on terms consistent with the terms of this Plan and having other terms for which the applicable parties agree; (c) rejection or assumption, as applicable, of Executory Contracts and Unexpired Leases; (d) selection of the board of directors (or equivalent) of the Reorganized Debtors; (e) the filing and/or execution of appropriate limited liability company agreements, certificates or articles of incorporation or organization, reincorporation, merger, consolidation, conversion or dissolution pursuant to applicable state law; (f) the consummation of the transactions contemplated by any post-effective date financing and the execution thereof; (g) the issuance of the New Common Stock and the New Warrants, and the execution (or deemed execution) of all documents related thereto, including, but not limited to, the New Shareholders Agreement; and (h) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law.

## Section 6.16.   Determination of Tax Filings and Taxes of the DPC Group

For all taxable periods ending on or prior to, or including, the Effective Date, Venoco shall prepare and file (or cause to be prepared and filed) all tax returns, reports, certificates,

forms or similar statements or documents (collectively, "Group Tax Returns") on behalf of the consolidated, unitary, combined or any similar tax group the parent of which is DPC that includes Venoco and/or any subsidiary thereof (the "DPC Group") as well as all separate tax returns of DPC required to be filed or that Venoco otherwise deems appropriate, including the filing of amended Group Tax Returns or requests for refunds. DPC shall not file or amend any tax returns for DPC itself or the DPC Group for any taxable periods (or portions thereof) without Venoco's prior written consent.

Accordingly, Venoco is hereby appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code to handle tax matters, including without limitation, the filing of all tax returns, and the handling of tax audits and proceedings, of the DPC Group. Without limiting the generality of the foregoing, if requested by Venoco, DPC shall promptly execute or cause to be executed and filed any tax returns or other tax filings of DPC or the DPC Group submitted by Venoco to DPC for execution or filing. Moreover, DPC shall execute on or prior to the Effective Date a power of attorney authorizing Venoco to correspond, sign, collect, negotiate, settle and administer tax payments and Group Tax Returns.

Each of the Debtors shall cooperate fully with each other regarding the implementation of this Section 6.16 (including the execution of appropriate powers of attorney) and shall make available to the other as reasonably requested all information, records and documents relating to taxes governed by this Section 6.16 until the expiration of the applicable statute of limitations or extension thereof or at the conclusion of all audits, appeals or litigation with respect to such taxes.

Venoco shall have the right to request an expedited determination of the tax liability, if any, of the Reorganized Debtors (including Venoco or DPC) under section 505(b) of the Bankruptcy Code with respect to any tax returns filed, or to be filed, for any and all taxable periods ending after the Commencement Date through the Effective Date.

If DPC receives written notice from a taxing authority of any pending examination, claim, settlement, proposed adjustment or related matters with respect to taxes, it shall promptly notify Venoco in writing. Venoco shall have the sole right, at its expense, to control, conduct, compromise and settle any tax contest, audit or administrative or court proceeding relating to any liability for taxes of DPC and the DPC Group. With respect to any such proceeding and with respect to the preparation and filing of any tax returns of DPC or the DPC Group, Venoco may act in its own self-interest and in the interest of its subsidiaries and affiliates, without regard to any adverse consequences to DPC.

To the extent permitted by law, DPC shall designate Venoco as the "agent" or "substitute agent" (within the meaning of Treasury Regulation sections 1.1502-77 and 1.1502-77B, respectively) for the Venoco Group in accordance with Treasury Regulation sections 1.1502-77 and 1.1502-77B, as amended or supplemented, and any comparable provision under state or local law, with respect to all taxable periods ending on or before, or including, the Effective Date.

Venoco shall be entitled to the entire amount of any refunds and credits (including interest thereon) with respect to or otherwise relating to any taxes of the DPC Group, including for any taxable period ending on or prior to, or including, the Effective Date. DPC shall promptly

notify Venoco of the receipt of any such refunds or credits and shall transfer any such refunds to Venoco by wire transfer or otherwise in accordance with written instructions provided by Venoco.

## Section 6.17.   New Shareholders Agreement

On the Effective Date, the holders of Allowed First Lien Note Claims, the Backstoppers and the holders of Allowed 8.875% Senior Notes Claims, in each case, who receive New Common Stock shall enter into, and be deemed to have entered into, and become subject to the following terms which will be incorporated into a New Shareholders Agreement and/or Organizational Documents. The New Shareholders Agreement and/or Organizational Documents will, *inter alia*, provide the following rights to holders of New Common Stock issued pursuant to the Plan:

(i)     Monthly financial information in customary form to be provided to all holders of New Common Stock who own more than 1% of the New Common Stock and are bound by customary confidentiality obligations reasonably acceptable to the Reorganized Debtors. Such monthly financial information may be provided by such holders to prospective bona fide transferees of such holders' New Common Stock who have executed a customary confidentiality agreement reasonably acceptable to the Reorganized Debtors.

(ii)    No restrictions on the ability of holders of shares of the New Common Stock to transfer such shares subject to (i) all transferees being qualified institutional buyers or accredited investors (in each case, as defined under the U.S. securities laws, rules and regulations), (ii) a prohibition against transfer to specified competitors of the Reorganized Debtors, (iii) a prohibition against transfers that could reasonably be expected to cause the Reorganized Debtors to have more than five hundred shareholders who are not accredited investors or two thousand shareholders who are accredited investors, or become a reporting company under applicable securities law, (iv) a prohibition against transfers requiring registration (whether of the Reorganized Debtors, such transfer or such shares of New Common Stock) pursuant to applicable securities law, (v) compliance with applicable law (including applicable securities laws), (vi) execution of a joinder to the New Shareholders Agreement, if applicable, (vii) compliance with all applicable terms of the New Shareholders Agreement, and (viii) such transfer not being a non-exempt "prohibited transaction" under ERISA or the U.S. federal tax code and not causing all or any portion of the assets of the Reorganized Debtor to constitute "plan assets" under ERISA or Section 4975 of the U.S. federal tax code.

(iii)   Pro rata preemptive rights for issuances of equity securities with customary carve-outs.

(iv)    Customary pro rata tag-along rights for all holders of New Common Stock in connection with transfers of shares of New Common Stock by one or more holders thereof comprising a percentage equity interest in Reorganized Venoco above a threshold to be agreed upon by the parties at a later time.

(v)    Customary drag-along rights for holders of a majority of New Common Stock in connection with a sale of all or substantially all of the equity or assets of the Reorganized Debtors (whether by way of a merger, share purchase, reorganization, consolidation or other business combination transaction).

# ARTICLE VII
## TREATMENT OF EXECUTORY CONTRACTS AND LEASES

### Section 7.01.  Treatment of Executory Contracts and Unexpired Leases

All executory contracts and unexpired leases not expressly rejected shall be deemed assumed pursuant to the Plan. The Plan Supplement shall contain (a) a schedule of executory contracts and unexpired leases to be assumed by the Debtors, including proposed Cure Costs (the "Assumed Contract Schedule"); and (b) a schedule of executory contracts and unexpired leases to be rejected by the Debtors as of the Effective Date (the "Rejected Contract Schedule"), determined by the Debtors in consultation with the Requisite Majority Consenting Secured Noteholders. On the fourteenth (14th) day after the Effective Date, and to the extent permitted by applicable law, all of the Debtors' executory contracts and unexpired leases that are not listed on the Rejected Contract Schedule will be assumed irrespective of whether they are listed on the Assumed Contract Schedule. All executory contracts and unexpired leases identified on the Rejected Contract Schedule shall be deemed rejected as of the Effective Date.

The Debtors shall notify all counterparties to contracts on the Assumed Contract Schedule and the Rejected Contract Schedule of the filing of such Schedules and shall provide notice of such Schedules on the Debtors' restructuring website available at http://www.bmcgroup.com/venoco, and such notice shall be deemed good and sufficient notice for the purposes of section 365 of the Bankruptcy Code and otherwise.

Notwithstanding the foregoing, the Debtors may, with the consent of the Requisite Majority Consenting Secured Noteholders, alter, amend, modify or supplement the list of executory contracts or unexpired leases identified in the Assumed Contract Schedule and/or the Rejected Contract Schedule at any time prior to the Effective Date by filing a revised Assumed Contract Schedule and/or Rejected Contract Schedule with the Bankruptcy Court.

### Section 7.02.  Cure Costs

The monetary amounts by which each of the executory contracts and unexpired leases is in default and shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, shall be the Cure Costs identified on the Assumed Contract Schedule; *provided*, *however*, if a counterparty to any of the executory contracts or unexpired leases identified on the Assumed

Contract Schedule files with the Bankruptcy Court, and serves on the Debtors and their counsel, a written objection to the proposed Cure Cost prior to the Cure Cost Objection Deadline (as defined below), then the Cure Cost associated with such executory contract or unexpired lease will be determined as set forth below.

Counterparties to the contracts on the Assumed Contract Schedule shall have until the fourteenth (14th) day after the Effective Date (the "Cure Cost Objection Deadline") to file an objection with the Bankruptcy Court with respect to the proposed Cure Costs or be forever barred from seeking any amounts exceeding the proposed Cure Costs on the Assumed Contract Schedule from the Debtors or the Reorganized Debtors and from filing any statutory lien against the Reorganized Debtors or their properties for such amounts. Unless there is a dispute as to Cure Costs, on the fourteenth (14th) day after the Effective Date, the executory contracts and unexpired leases identified in the Assumed Contract Schedule shall be assumed by the Debtors and vest in and be fully enforceable by the Reorganized Debtors or an Affiliate of the Reorganized Debtors, as designated by the Reorganized Debtors.

If an objection to a Cure Cost is timely filed with the Bankruptcy Court, then the Debtors or the Reorganized Debtors shall in good faith attempt to resolve the Cure Cost dispute. If the parties are unable to agree on a Cure Cost within ten (10) days after the filing of an objection, then the Debtors or the Reorganized Debtors, as applicable, may request that the Bankruptcy Court establish the applicable Cure Cost.

The Debtors shall satisfy the Cure Costs of assumed executory contracts and unexpired leases in Cash by the latest of (i) the Effective Date (or as soon thereafter as is practicable), (ii) in the event of a dispute regarding the Cure Cost, within thirty (30) days of the entry of an order of the Bankruptcy Court establishing such Cure Cost, or (iii) on such other terms as the parties to such executory contracts and unexpired leases and the Requisite Majority Consenting Secured Noteholders may otherwise agree.

Notwithstanding the foregoing, in the event of a dispute regarding: (1) the ability of the Reorganized Debtors to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed or (2) any other matter pertaining to assumption (each, an "Assumption Dispute"), the Cure Costs required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order resolving the Assumption Dispute and approving the assumption; provided, however, that in the event the Debtors or the Reorganized Debtors and the applicable non-Debtor party involved in any Assumption Dispute or any dispute regarding Cure Costs cannot otherwise consensually resolve such dispute, the Debtors or the Reorganized Debtors, as applicable, may reject the executory contract at issue pursuant to section 365 of the Bankruptcy Code rather than paying the disputed Cure Cost, by presenting a proposed order to the Bankruptcy Court for such rejection, without any other or further notice. In the event any executory contract is so rejected, the non-Debtor party thereto shall be entitled to file a Proof of Claim in accordance with the Bar Date Order, which Claim shall be classified pursuant to the Plan, but shall not be entitled to any other or further Claim or relief from either the Debtors or the Reorganized Debtors.

**Section 7.03.   Assumed Executory Contracts and Unexpired Leases**

Each executory contract and unexpired lease that is assumed will include (a) all amendments, modifications, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affect such executory contract or unexpired lease; and (b) all executory contracts or unexpired leases and other rights appurtenant to the property, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, powers, uses, reciprocal easement agreements, vaults, tunnel or bridge agreements or franchises, and any other interests in real estate or rights in rem related to such premises, unless any of the foregoing agreements have been rejected pursuant to an order of the Bankruptcy Court or are the subject of a motion to reject filed on or before the Confirmation Date.

Amendments, modifications, supplements, and restatements to prepetition executory contracts and unexpired leases that have been executed by the Debtors during these Chapter 11 Cases shall not be deemed to alter the prepetition nature of the executory contract or unexpired lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

**Section 7.04.   Insurance Policies**

Notwithstanding anything in this Plan to the contrary, all of the Debtors' insurance policies and any agreements, documents or instruments relating thereto, are treated as and deemed to be Executory Contracts under the Plan. On the Effective Date and subject to the consent of the Requisite Majority Consenting Secured Noteholders, the Debtors shall assume all insurance policies and any agreements, documents, and instruments related thereto, except to the extent insurance policies and any agreements, documents, and instruments related thereto have previously been rejected pursuant to section 365 of the Bankruptcy Code. Unless otherwise determined by the Bankruptcy Court prior to the Effective Date, or agreed to by the parties thereto prior to the Effective Date, no payments shall be required to cure any defaults (if any) of the Debtors existing as of the Effective Date with respect to each such insurance policy or agreement, and to the extent that the Bankruptcy Court determines otherwise as to any such insurance policy or agreement, the Debtors' right to seek the rejection of such insurance policy or agreement or other available relief within thirty (30) days of such determination are fully reserved; provided, however, that the rights of any party that issues an insurance policy or agreement to object to such proposed rejection on any and all grounds are fully reserved. Nothing in the Plan, the Plan Documents, the Plan Supplement or the Confirmation Order, (a) alters, modifies or otherwise amends the terms and conditions of (or the coverage provided by) any of the insurance policies or agreements, (b) limits the Reorganized Debtors from asserting a right or claim to the proceeds of any insurance policy or agreement that insures any Debtor, was issued to any Debtor or was assumed by the Reorganized Debtors by operation of the Plan or (c) impairs, alters, waives, releases, modifies or amends any of the Debtors' or Reorganized Debtors' legal, equitable or contractual rights, remedies, claims, counterclaims, defenses or Causes of Action in connection with any of such insurance policies or agreements.

**Section 7.05.  Officers' and Directors' Indemnification Rights**

On the Effective Date and subject to the consent of the Requisite Majority Consenting Secured Noteholders, the Debtors shall assume each indemnification obligation to a director, officer, manager or employee who was employed by any of the Debtors on the Effective Date in such capacity shall be deemed assumed effective as of the Effective Date. Each indemnification obligation that is deemed assumed pursuant to the Plan shall (i) remain in full force and effect, (ii) not be modified, reduced, discharged, impaired or otherwise affected in any way, (iii) be deemed and treated as an executory contract pursuant to sections 365 and 1123 of the Bankruptcy Code regardless of whether or not Proofs of Claim have been filed with respect to such obligations and (iv) survive Unimpaired and unaffected irrespective of whether such indemnification is owed for an act or event occurring before or after the Petition Date.

**Section 7.06.  Claims Based on Rejection of Executory Contracts and Unexpired Leases**

Unless otherwise provided by a Bankruptcy Court order, any Proofs of Claim asserting Claims arising from the rejection of the Debtors' executory contracts and unexpired leases pursuant to this Plan or otherwise must be filed no later than fourteen (14) days after the Confirmation Order is entered granting the rejection. Any Proofs of Claim arising from the rejection of the Debtors' executory contracts or unexpired leases that are not timely filed shall be disallowed automatically, forever barred from assertion, and shall not be enforceable against the Debtors or the Reorganized Debtors without the need for any objection by any Person or further notice to or action, order, or approval of the Bankruptcy Court, and any Claim arising out of the rejection of the executory contract or unexpired lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Bankruptcy Schedules or a Proof of Claim to the contrary. All Allowed Claims arising from the rejection of the Debtors' executory contracts and unexpired leases shall be classified as General Unsecured Claims and shall be treated in accordance with the particular provisions of this Plan for such Claims; provided, however, that if the Holder of an Allowed Claim for rejection damages has an unavoidable security interest in any Collateral to secure obligations under such rejected executory contract or unexpired lease, the Allowed Claim for rejection damages shall be treated as an Other Secured Claim to the extent of the value of such Holder's interest in the Collateral, with the deficiency, if any, treated as a General Unsecured Claim.

**Section 7.07.  Reservation of Rights**

Nothing contained in this Plan shall constitute an admission by the Debtors that any particular contract is in fact an executory contract or unexpired lease or that the Debtors have any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or the Reorganized Debtors, as applicable, shall have thirty (30) days following entry of a Final Order resolving such dispute to alter and to provide appropriate treatment of such contract or lease.

**Section 7.08.  Assignment**

Any Executory Contract or Unexpired Lease to be held by any of the Debtors or the Reorganized Debtors and assumed hereunder or otherwise in these Chapter 11 Cases, if not

expressly assigned to a third party previously in these Chapter 11 Cases, will be deemed assigned to the applicable Reorganized Debtor pursuant to section 365 of the Bankruptcy Code. If an objection to a proposed assumption, assumption and assignment, or Cure Claim is not resolved in favor of the Debtors before the Effective Date, the applicable Executory Contract may be designated by the Debtors (with the consent of the Requisite Majority Consenting Secured Lenders) or the Reorganized Debtors for rejection within five (5) days of the entry of the order of the Court resolving the matter against the Debtors. Such rejection shall be deemed effective as of the Effective Date.

### Section 7.09.   Nonoccurrence of the Effective Date

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request by the Debtors to extend the deadline for assuming or rejecting unexpired leases pursuant to section 365(d)(4) of the Bankruptcy Code.

## ARTICLE VIII
## PROVISIONS GOVERNING DISTRIBUTIONS

### Section 8.01.   Amount of Distributions

Notwithstanding anything to the contrary herein, no holder of an Allowed Claim shall, on account of such Allowed Claim, receive a distribution in excess of the Allowed amount of such Claim to the extent payable in accordance with this Plan.

### Section 8.02.   Method of Distributions

The Reorganized Debtors shall have the authority, in their sole discretion, to enter into agreements with a third-party Distribution Agent to facilitate the distributions required hereunder. To the extent the Reorganized Debtors do determine to utilize a third-party Distribution Agent to facilitate the distributions under the Plan to holders of Allowed Claims, any such Distribution Agent would first be required to: (a) affirm its obligation to facilitate the prompt distribution of any documents; (b) affirm its obligation to facilitate the prompt distribution of any recoveries or distributions required under the Plan; (c) waive any right or ability to setoff, deduct from or assert any lien or encumbrance against the distributions required under the Plan to be distributed by such Distribution Agent; and (d) post a bond, obtain or surety or provide some other form of security for the performance of its duties, the costs and expenses of procuring which shall be borne by the Reorganized Debtors. In no case shall the Reorganized Debtors, acting as the Distribution Agent, be required to post a bond or other form of security for the performance of their duties.

The Debtors or the Reorganized Debtors, as applicable, shall be authorized, but not directed, to pay to any third-party Distribution Agent all reasonable and documented fees and expenses of such Distribution Agent without the need for any approvals, authorizations, actions, or consents. The Distribution Agent shall be authorized, but not directed, to submit detailed invoices to the Debtors or the Reorganized Debtors, as applicable, for all fees and expenses for which the Distribution Agent seeks reimbursement and the Debtors or the Reorganized Debtors, as applicable, shall pay those amounts that they, in their sole discretion, deem reasonable, and

42

shall object in writing to those fees and expenses, if any, that the Debtors or the Reorganized Debtors, as applicable, deem to be unreasonable. In the event that the Debtors or the Reorganized Debtors, as applicable, object to all or any portion of the amounts requested to be reimbursed in a Distribution Agent's invoice, the Debtors or the Reorganized Debtors, as applicable, and such Distribution Agent shall endeavor, in good faith, to reach mutual agreement on the amount of the appropriate payment of such Disputed fees and/or expenses. In the event that the Debtors or the Reorganized Debtors, as applicable, and a Distribution Agent are unable to resolve any differences regarding Disputed fees or expenses, either party shall be authorized to move to have such dispute heard by the Bankruptcy Court.

### Section 8.03.   Delivery of Distributions

Except as provided herein, distributions to holders of Allowed Claims shall be made at the address of the holder of such Claim as indicated in the Claims Register as of the Distribution Record Date. A Distribution Agent shall have no obligation to recognize the transfer of or sale of any Claim that occurs after the close of business on the Distribution Record Date, and will be entitled for all purposes herein to recognize and distribute only to those holders of Allowed Claims who are holders as of the close of business on the Distribution Record Date.

Pursuant to Section 3.03(e) of this Plan, the Distribution of the Cash and New Common Stock on account of the Class V5 8.875% Senior Notes Claims shall be made to the 8.875% Senior Notes Trustee, which shall distribute such Cash and New Common Stock Pro Rata to the holders of Class V5 8.875% Senior Notes Claims; provided, however, that the 8.875% Senior Notes Trustee may, prior to any such distribution to the holders of Class V5 8.875% Senior Notes Claims, deduct from such Cash distributions (i) any amounts due to the 8.875% Senior Notes Trustee for fees, expenses, and indemnities (including the fees and expenses of its attorneys and other professionals) due and owing to it under the 8.875% Senior Notes Indenture, and (ii) reasonable amounts required to be used to pay for anticipated future administrative expenses related to the Noteholder Holdco as determined in good faith by a majority in amount of the Consenting Unsecured Noteholders.  The distribution of the Unsecured LLA Override Shares shall be made to Noteholder HoldCo.

### Section 8.04.   No Fractional or De Minimis Distributions

Notwithstanding anything contained herein to the contrary, payments of fractional dollars will not be made. Whenever any payment of a fraction of a dollar under the Plan would otherwise be called for, the actual payment made will reflect a rounding down of such fractions. A Debtor or a Reorganized Debtor, as applicable, or a Distribution Agent shall not be required to make any payment of less than $20.00 on any distribution.

### Section 8.05.   Undeliverable Distributions

(a)      Holding of Undeliverable Distributions

If any distribution to a holder of an Allowed Claim is returned to a Debtor or a Reorganized Debtor, as applicable, or a Distribution Agent as undeliverable, no further distributions shall be made to such holder unless and until such Debtor or Reorganized Debtor, as applicable, or Distribution Agent is notified in writing of such holder's then-current address or

other necessary information for delivery, at which time all currently due missed distributions shall be made to such holder as soon as practicable. Undeliverable Distributions shall remain in the possession of a Debtor or a Reorganized Debtor, as applicable, or a Distribution Agent until such time as a distribution becomes deliverable, and shall not be supplemented with any interest, dividends or other accruals of any kind.

(b)    Failure to Claim Undeliverable Distributions

Any holder of an Allowed Claim that does not assert a Claim pursuant to this Plan for an Undeliverable Distribution within one hundred eighty (180) days after the distribution is distributed shall be deemed to have waived its Claim for such Undeliverable Distribution and shall be forever barred from asserting any such Claim against the Reorganized Debtors or their property. In such cases, notwithstanding any applicable federal or state escheat, abandoned or unclaimed property laws to the contrary, any Cash held for distribution on account of such Undeliverable Distribution shall be property of the relevant Reorganized Debtor, free of any restrictions thereon. Nothing contained in this Plan shall require the Debtors, the Reorganized Debtors, or a Distribution Agent to attempt to locate any holder of an Allowed Claim.

**Section 8.06.  Tax Withholding From Distributions**

A Debtor or a Reorganized Debtor, as applicable, or a Distribution Agent shall withhold all amounts required by law to be withheld from payments made under this Plan. Any amounts so withheld from any payment made under the Plan shall be deemed paid to the holder of the Allowed Claim subject to withholding. Notwithstanding the above, each holder of an Allowed Claim that is to receive a distribution under this Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any taxes imposed on such holder by any Governmental Unit on account of such distribution, except for taxes withheld from payments made under the Plan. A Debtor or a Reorganized Debtor, as applicable, or a Distribution Agent has the right, but not the obligation, not to make a distribution until such holder has made arrangements satisfactory to a Debtor or a Reorganized Debtor, as applicable, or a Distribution Agent for payment of any withholding tax obligations. If a Debtor or a Reorganized Debtor, as applicable, or a Distribution Agent fails to withhold with respect to any such holder's distribution, and is later held liable for the amount of such withholding, the holder shall reimburse the relevant Debtor, Reorganized Debtor or any Distribution Agent, as applicable. Notwithstanding any provision in this Plan to the contrary, the Debtors, Reorganized Debtors or any Distribution Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under this Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms it believes are reasonable and appropriate. The Debtors, Reorganized Debtors or any Distribution Agent may require, as a condition to the receipt of a distribution, that the holder complete the appropriate Form W-8 or Form W-9, as applicable to each holder. If the holder fails to comply with such a request within six (6) months, such distribution shall be deemed an Undeliverable Distribution. Finally, a Debtor or a Reorganized Debtor, as applicable, or a Distribution Agent reserves the right to allocate all distributions made under this Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, Liens, and encumbrances.

### Section 8.07.    Allocations

Unless otherwise provided in this Plan, distributions in respect of Allowed Claims shall be allocated first to the principal amount (as determined for U.S. federal income tax purposes) of such Allowed Claims, and then, to the extent the consideration exceeds the principal amount of such Allowed Claims, to any portion of such Allowed Claims for accrued but unpaid interest.

### Section 8.08.    Time Bar to Cash Payments

Checks issued on account of Allowed Claims shall be null and void if not negotiated within ninety (90) days after the date of issuance therein. Requests for reissuance of any check shall be made in writing directly to the appropriate Debtor or Reorganized Debtor, or any Distribution Agent by the holder of the Allowed Claim with respect to which such check originally was issued. Any Claim in respect of such a voided check shall be made in writing on or before the later of one hundred eighty (180) days after the Effective Date or ninety (90) days after the date of issuance of such check. After such date, all Claims in respect of void checks shall be discharged and forever barred and the distribution on account of such Claims shall be treated in accordance with Section 8.05 of this Plan.

### Section 8.09.    Means of Cash Payments

Any Cash payment to be made pursuant to this Plan will be made in U.S. dollars by checks drawn on or by wire transfer from a domestic bank selected by a Debtor or a Reorganized Debtor, as applicable, or a Distribution Agent. No post-Effective Date interest shall be paid on Cash distributions hereunder.

### Section 8.10.    Foreign Currency Exchange Rates

As of the Effective Date, any Claim asserted in currency(ies) other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the mid-range spot rate of exchange for the applicable currency as published in *The Wall Street Journal*, National Edition, the day after the Petition Date.

### Section 8.11.    Setoffs

Except as otherwise provided herein (including Section 11.02 of this Plan), a Final Order of the Bankruptcy Court, or as agreed to by the holder of a Claim and the Debtors or Reorganized Debtors, as applicable, each Debtor or a Reorganized Debtor, as applicable, or a Distribution Agent may, pursuant to section 553 of the Bankruptcy Code and applicable non-bankruptcy law, set off against any Allowed Claim and the distributions to be made pursuant to this Plan on account of such Claim (before any distribution is made on account of such Claim), the claims, rights and Causes of Action of any nature that the Debtors or the Reorganized Debtors, as applicable, may hold against the holder of such Allowed Claim; provided, however, that neither the failure to effect such a setoff nor the allowance of any Claim hereunder shall constitute a waiver or release of any such claims, rights and Causes of Action that the Debtors or the Reorganized Debtors may possess against such holder.

**Section 8.12.  Claims Paid or Payable by Third Parties**

A Claim shall be reduced in full and such Claim shall be disallowed without a Claims objection having to be filed and without any further notice to, or action, order or approval of, the Bankruptcy Court, to the extent that the holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor, Reorganized Debtor or a Distribution Agent. To the extent a holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor, a Reorganized Debtor or a Distribution Agent, such holder shall repay, return or deliver any distribution held by or transferred to the holder to the applicable Debtor or Reorganized Debtor, as applicable, to the extent the holder's total recovery on account of such Claim from the third party and under this Plan exceeds the total amount of such Claim.

**ARTICLE IX**
**PROCEDURES FOR RESOLVING DISPUTED CLAIMS**

**Section 9.01.  Prosecution of Objections to Claims**

After the Effective Date, the Reorganized Debtors shall have and shall retain any and all rights and defenses they may have with respect to any Claim, and shall have the exclusive authority to file objections and to settle, compromise, withdraw or litigate to judgment objections to Claims (except those Allowed by, or released by, this Plan, or by the Final DIP Order, the Confirmation Order or other Final Order). The Reorganized Debtors shall file objections to any Disputed Claims in accordance with the Bankruptcy Rules on or before the Claims Objection Deadline, as the same may be extended pursuant to the terms of this Plan or order of the Bankruptcy Court.

**Section 9.02.  Estimation of Claims**

The Debtors or the Reorganized Debtors, as applicable, may at any time request that the Bankruptcy Court estimate any contingent or unliquidated Claim, pursuant to section 502(c) of the Bankruptcy Code, regardless of whether the Debtors or the Reorganized Debtors, as applicable, previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time, including during litigation concerning any objection to any Claim, and during the pendency of any appeal relating to any such objection. If the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount will constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on such Claim, the applicable Debtor or Reorganized Debtor may elect to pursue any supplemental proceedings to object to the allowance and any ultimate payment on such Claim. Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.

**Section 9.03.   No Distributions on Disputed Claims**

Notwithstanding any provision in this Plan to the contrary, no distributions, partial or otherwise, shall be made with respect to a Disputed Claim until all disputes with respect to such Claim are resolved by Final Order. Subject to the provisions of this Plan, after a Disputed Claim becomes an Allowed Claim, the holder of such an Allowed Claim will receive all distributions to which such holder is then entitled under this Plan. No post-Effective Date interest shall be paid on distributions hereunder. If a Creditor incorporates more than one Claim in a Proof of Claim then: (a) such Claims will be considered one Claim for purposes of this Plan, and (b) no such Claim will be bifurcated into an Allowed portion and a Disputed portion.

**ARTICLE X**
**CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THIS PLAN**

**Section 10.01.  Conditions Precedent to Confirmation**

It shall be a condition to Confirmation of the Plan that the Disclosure Statement Order shall have been entered by the Bankruptcy Court on the docket of the Chapter 11 Cases, in form and substance acceptable to the Debtors, the DIP Lenders and the Restructuring Support Parties (except that the consent of Consenting Unsecured Noteholders shall only be required to the extent provided for under the RSA), and such order shall not be subject to a stay.

**Section 10.02.  Conditions Precedent to the Effective Date**

It shall be a condition to occurrence of the Effective Date of the Plan that the following conditions shall have been satisfied or waived pursuant to Section 10.03 of this Plan:

(i)    all conditions precedent to Confirmation have been satisfied;

(ii)   the RSA shall have been approved pursuant to a Final Order of the Bankruptcy Court and shall not have been terminated in accordance with its terms;

(iii)  the Confirmation Order shall have been entered by the Bankruptcy Court on the docket of the Chapter 11 Cases, in form and substance acceptable to the Debtors, the DIP Lenders and the Restructuring Support Parties (except that the consent of Consenting Unsecured Noteholders shall only be required to the extent provided for under the RSA), and such order shall not be subject to a stay;

(iv)   the Plan, the Plan Supplement, and all other documents related to the Restructuring Transactions shall each be in form and substance consistent with the RSA and this Plan and otherwise acceptable to the Debtors and Restructuring Support Parties (except that the consent of Consenting Unsecured Noteholders shall only be required to the extent provided for under the RSA);

47

(v)    all other actions and documents necessary to implement the provisions of this Plan to be effectuated on or before the Effective Date (including but not limited to the Plan Supplement) shall be satisfactory to the Debtors, the DIP Lenders, the Restructuring Support Parties (except that the consent of Consenting Unsecured Noteholders shall only be required to the extent provided for under the RSA);

(vi)    the Debtors shall have closed the Exit Facility; and

(vii)    the Debtors shall have received all authorizations, consents, approvals, regulatory approvals, rulings, letters, opinions or documents, if any, necessary to implement this Plan.

## Section 10.03. Effect of Non-Occurrence of Conditions to Confirmation or Conditions Precedent to the Effective Date

If the conditions in Section 10.01 and Section 10.02 of this Plan are not satisfied, or if the Confirmation Order is vacated, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall: (a) constitute a waiver or release of any Claims by or against, or any Equity Interests in, the Debtors; (b) prejudice in any manner the rights of the Debtors, or any other Person or Entity; or (c) constitute an admission, acknowledgment, offer or undertaking by the Debtors or any other Person or Entity in any respects.

## Section 10.04. Waiver of Conditions Precedent

The Debtors may waive any of the conditions precedent set forth in Section 10.01 and Section 10.02 of this Plan in whole or in part at any time with the written consent of the DIP Lenders and the Consenting Secured Noteholders.

## ARTICLE XI
## EFFECT OF CONFIRMATION OF THIS PLAN

### Section 11.01. Discharge of Claims Against and Equity Interests in the Debtors

**Except as otherwise provided for herein or in the Confirmation Order and effective as of the Effective Date: (a) the rights afforded in this Plan and the treatment of all Claims against and Equity Interests in the Debtors shall be in exchange for and in complete satisfaction, discharge, and release of all Claims against and Equity Interests in, their property and Estates of any nature whatsoever, including any interest accrued on such Claims from and after the Petition Date; (b) this Plan shall bind all holders of Claims against and Equity Interests in the Debtors, notwithstanding whether any such holders failed to vote to accept or reject this Plan or voted to reject this Plan; (c) the Debtors shall be deemed discharged and released under and to the fullest extent provided under the Bankruptcy Code from any and all Claims against and Equity Interests in the Debtors, of any kind or nature whatsoever, and all Claims against and Equity Interests in the Debtors, their property and Estates shall be deemed satisfied, discharged, and released in full, and**

the Debtors' liability with respect thereto shall be extinguished completely, including any liability of the kind specified under section 502(g) of the Bankruptcy Code; and (d) all Entities shall be precluded from asserting against the Debtors or the Reorganized Debtors, as applicable, their Estates, their successors and assigns and their assets and properties any and all Claims, Equity Interests, damages, debts, and other liabilities based upon any documents, instruments, or any act or omission, transaction or other activity of any kind or nature that occurred prior to the Effective Date.

**Section 11.02. Certain Releases by the Debtors**

Notwithstanding anything contained herein to the contrary, on the Confirmation Date and effective as of the Effective Date, and to the fullest extent authorized by applicable law, for good and valuable consideration, the adequacy of which is hereby confirmed, the Released Parties are deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by the Debtors, the Reorganized Debtors, their Estates and any Person or Entity seeking to exercise the rights of the Debtors, the Reorganized Debtors or their Estates from any and all claims, obligations, suits, judgments, damages, demands, debts, remedies, Causes of Action, rights of setoff, other rights, and liabilities whatsoever, whether for tort, contract, violations of federal or state securities laws, Avoidance Actions, including any derivative claims, asserted or that could possibly have been asserted directly or indirectly on behalf of the Debtors, the Reorganized Debtors, their Estates or their Affiliates, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity, or otherwise, and any and all Causes of Action asserted or that could possibly have been asserted on behalf of the Debtors, the Reorganized Debtors, the Estates or their Affiliates (whether individually or collectively) or on behalf of the holder of any Claim or Equity Interest or other Entity, based on or in any way relating to, or in any manner arising from, in whole or in part, the Debtors, the Reorganized Debtors, their Estates or their Affiliates, the conduct of the Debtors' businesses, the negotiation and issuance of the First Lien Notes and the Second Lien Notes and any act or omission, transaction, agreement, event or other occurrence taking place in connection therewith, the in-court or out-of-court efforts to implement the Exit Facility, the formulation, preparation, solicitation, dissemination, negotiation, or filing of the Disclosure Statement or Plan or any contract, instrument, release, or other agreement or document created or entered into in connection with or pursuant to the Disclosure Statement, or the Plan, the filing and prosecution of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan, the business or contractual arrangements between the Debtors, their Estates or their Affiliates, on the one hand, and any Released Party, on the other hand, prepetition contracts and agreements with one or both Debtors, or any other act or omission, transaction, agreement, event, or other occurrence taking place before the Effective Date; **provided** that to the extent that a claim or Cause of Action (other than with respect to the negotiation and issuance of the First Lien Notes and the Second Lien Notes and any act or omission, transaction, agreement, event or other occurrence taking place in connection therewith) is determined by a Final Order to have resulted from fraud, gross negligence or willful misconduct of a Released Party, such claim

or Cause of Action shall not be so released against such Released Party; provided further, that the foregoing "Release by the Debtors" shall be deemed to include any and all pre-Effective Date claims and Causes of Action which may be asserted against any Released Party and their respective predecessors, successors and assigns, and current and former shareholders, affiliates, subsidiaries, principals, employees, agents, officers, directors, managers, trustees, partners, members, professionals, representatives, advisors, attorneys, financial advisors, accountants, investment bankers, and consultants, in each case in their capacity as such, at any time including (without limitation) arising from, related to, or in connection with any prepetition debt purchases or exchanges by Prepetition Secured Parties. Notwithstanding anything to the contrary in the foregoing, the release set forth above does not release any obligations arising on or after the Effective Date of any party under the Plan, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the release set forth in this Section 11.02, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that such release is: (a) in exchange for the good and valuable consideration provided by the Released Parties; (b) a good faith settlement and compromise of the claims released by this Section 11.02; (c) in the best interests of the Debtors, their Estates and all holders of Claims and Equity Interests; (d) fair, equitable, and reasonable; (e) given and made after due notice and opportunity for hearing; and (f) a bar to any Entity asserting any claim or Cause of Action released by this Section 11.02.

**Section 11.03. Certain Voluntary Releases by Holders of Claims and Equity Interests**

Notwithstanding anything contained herein to the contrary, on the Confirmation Date and effective as of the Effective Date, and to the fullest extent authorized by applicable law, the Releasing Parties shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever, released and discharged the Released Parties from any and all claims, obligations, suits, judgments, damages, demands, debts, remedies, Causes of Action, rights of setoff, other rights, and liabilities whatsoever, whether for tort, contract, violations of federal or state securities laws, Avoidance Actions, including any derivative claims, asserted or that could possibly have been asserted directly or indirectly on behalf of the Releasing Parties or their Affiliates, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity, or otherwise, and any and all Causes of Action asserted or that could possibly have been asserted on behalf of the Releasing Parties or their Affiliates (whether individually or collectively) or on behalf of the holder of any Claim or Equity Interest or other Entity, based on or in any way relating to, or in any manner arising from, in whole or in part, the Debtors, their Estates or their Affiliates, the conduct of the Debtors' businesses, the negotiation and issuance of the First Lien Notes and the Second Lien Notes and any act or omission, transaction, agreement, event or other occurrence taking place in connection therewith, the in-court or out-of-court efforts to implement the Exit Facility, the formulation, preparation, solicitation, dissemination, negotiation, or filing of the Disclosure Statement or Plan or any contract, instrument,

release, or other agreement or document created or entered into in connection with or pursuant to the Disclosure Statement, or the Plan; the filing and prosecution of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan, the business or contractual arrangements between the Debtors, their Estates or their Affiliates, on the one hand, and any Released Party, on the other hand, prepetition contracts and agreements with one or both Debtors, or any other act or omission, transaction, agreement, event, or other occurrence taking place before the Effective Date; **provided** that to the extent that a claim or Cause of Action (other than with respect to the negotiation and issuance of the First Lien Notes and the Second Lien Notes and any act or omission, transaction, agreement, event or other occurrence taking place in connection therewith) is determined by a Final Order to have resulted from fraud, gross negligence or willful misconduct of a Released Party, such claim or Cause of Action shall not be so released against such Released Party; **provided** further, that the foregoing "Release by Holders of Claims and Equity Interests" shall be deemed to include any and all pre-Effective Date claims and Causes of Action which may be asserted against any Released Party and their respective predecessors, successors and assigns, and current and former shareholders, affiliates, subsidiaries, principals, employees, agents, officers, directors, managers, trustees, partners, members, professionals, representatives, advisors, attorneys, financial advisors, accountants, investment bankers, and consultants, in each case in their capacity as such, at any time, including (without limitation) arising from, related to, or in connection with any prepetition debt purchases or exchanges by Prepetition Secured Parties. Notwithstanding anything to the contrary in the foregoing, the release set forth above does not release any obligations arising on or after the Effective Date of any party under the Plan, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the release set forth in this Section 11.03, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that such release is: (a) in exchange for the good and valuable consideration provided by the Released Parties; (b) a good faith settlement and compromise of the claims released by this Section 11.03; (c) in the best interests of the Debtors, their Estates and all holders of Claims and Equity Interests; (d) fair, equitable, and reasonable; (e) given and made after due notice and opportunity for hearing; and (f) a bar to any Entity granting a release under this Section 11.03 from asserting any claim or Cause of Action released by this Section 11.03.

Section 11.04. Exculpation

Effective as of the Effective Date and to the fullest extent authorized by applicable law, no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from, any Exculpated Claim or any obligation, Cause of Action, or liability for any Exculpated Claim; **provided** that each Exculpated Party shall be entitled to rely upon the advice of counsel concerning his, her or its duties pursuant to, or in connection with, the Plan or any other related document, instrument, or agreement; provided, further,

that the foregoing "Exculpation" shall have no effect on the liability of any Exculpated Party to the extent determined in a Final Order to have resulted from actual fraud, gross negligence or willful misconduct of such Exculpated Party; **provided**, further, that the foregoing "Exculpation" shall be deemed to include any and all claims and Causes of Action arising before the Effective Date which may be asserted against any Exculpated Party or their respective predecessors, successors and assigns, and current and former shareholders, affiliates, subsidiaries, principals, employees, agents, officers, directors, managers, trustees, partners, members, professionals, representatives, advisors, attorneys, financial advisors, accountants, investment bankers, and consultants, in each case in their capacity as such, at any time, including (without limitation) arising from, related to, or in connection with any prepetition debt purchases or exchanges by the Prepetition Secured Parties. The Exculpated Parties have, and upon Confirmation shall be deemed to have, participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code with regard to the solicitation of acceptances and rejections of the Plan and the making of distributions pursuant to the Plan and, therefore, are not and shall not be liable at any time for the violation of any applicable, law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

**Section 11.05. Injunction**

Except as otherwise provided herein or in the Confirmation Order, from and after the Effective Date and to the fullest extent authorized by applicable law, all Entities are, to the fullest extent provided under section 524 and other applicable provisions of the Bankruptcy Code, permanently enjoined and forever barred from taking any of the following actions against, as applicable, the Released Parties, the Debtors, the Reorganized Debtors, and/or the Exculpated Parties and their respective properties and Assets: (a) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any Claims or Equity Interests; (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order on account of or in connection with or with respect to any such Claims or Equity Interests; (c) creating, perfecting, or enforcing any encumbrance of any kind on account of or in connection with or with respect to any such Claims or Equity Interests; (d) asserting any right of setoff, subrogation, or recoupment of any kind on account of or in connection with or with respect to any such Claims or Equity Interests unless such holder has filed a motion requesting the right to perform such setoff on or before the Confirmation Date; and (e) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Equity Interests released, exculpated or settled pursuant to the Plan.

**Section 11.06. Protection Against Discriminatory Treatment**

In accordance with section 525 of the Bankruptcy Code, and consistent with paragraph 2 of Article VI of the United States Constitution, no Governmental Unit shall discriminate against any Debtor or Reorganized Debtor, as applicable, or any Entity with which a Debtor or Reorganized Debtor has been or is associated, solely because such Debtor or Reorganized Debtor was a debtor under chapter 11, may have been insolvent before the commencement of the

Chapter 11 Cases (or during the Chapter 11 Cases but before such Debtor or Reorganized Debtor was granted a discharge) or has not paid a debt that is dischargeable in the Chapter 11 Cases.

### Section 11.07. Release of Liens

Except as otherwise provided herein, in the Confirmation Order, or in any contract, instrument, release or other agreement or document created pursuant to or as contemplated under this Plan, on the Effective Date all mortgages, deeds of trust, Liens, pledges or other security interests against any property of the Debtors' Estates shall be fully released, settled and discharged, and all of the rights, title and interest of any holder of such mortgages, deeds of trust, Liens, pledges or other security interests shall revert to the Debtors or the Reorganized Debtors, as applicable.

### Section 11.08. Cancellation of Securities and Notes Against the Debtors

(a)      So long as the treatments provided for herein, and the distributions contemplated thereby, are effectuated or made, on the Effective Date, but subject to this Section 11.08 and the introductory paragraph to ARTICLE III, each of (a) the DIP Loan Documents; (b) the First Lien Senior Notes; (c) the Second Lien Senior Notes; (d) the 8.875% Senior Notes; (e) the PIK Toggle Notes; (f) the Equity Interests in the Debtors; and (g) any other notes, bonds, indentures, certificates or other instruments or documents evidencing or creating any Claims or Equity Interests that are Impaired by this Plan, shall be cancelled and deemed terminated and satisfied and discharged without any need for further action or approval of the Bankruptcy Court solely with respect to the Debtors, and the holders thereof shall have no further rights or entitlements in respect thereof against the Debtors or the Reorganized Debtors, except the rights to receive the distributions, if any, to which the holders thereof are entitled under this Plan.

(b)      The 8.875% Senior Notes Trustee shall be released from all duties under the 8.875% Senior Notes Indenture, provided however, that notwithstanding Confirmation or Consummation of the Plan, the 8.875% Senior Notes Indenture shall remain in effect solely for the purposes of:

(i)      preserving any rights of the 8.875% Senior Notes Trustee to payment of fees, expenses, indemnification obligations and liens securing such right to payment from or on any money or property distributed in respect to the 8.875% Senior Notes Claims under this Plan or from the holders of Allowed 8.875% Senior Notes Claims;

(ii)      allowing the 8.875% Senior Notes Trustee to make the distributions in accordance with the Plan;

(iii)      allowing the holders of Allowed 8.875% Senior Notes Claims to receive distributions under the Plan from the 8.875% Senior Notes Trustee or from any other source, to the extent provided for under the Plan; and

(iv)      allowing the 8.875% Senior Notes Trustee to enforce any obligations owed to it under the Plan.

For the further avoidance of doubt, prior to making any distribution thereof to the holders of such claims, the 8.875% Senior Notes Trustee shall be entitled to apply the $6,500,000 in Cash to be distributed on account of the 8.875% Allowed Senior Notes Claims as necessary to provide for (i) the payment of the 8.875% Senior Notes Trustee's own fees and expenses and the fees and expenses of its attorneys and other professionals due and owing under the 8.875% Senior Notes Indenture, and (ii) reasonable amounts required to be used to pay for anticipated future administrative expenses related to the Noteholder Holdco as determined in good faith by a majority of the Consenting Unsecured Noteholders.

## ARTICLE XII
## MODIFICATION, REVOCATION OR WITHDRAWAL OF THIS PLAN

### Section 12.01. Modification of the Plan

The Debtors reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules and with the consent of the DIP Lenders and the Restructuring Support Parties (except that the consent of Consenting Unsecured Noteholders shall only be required to the extent provided for under the RSA), to amend or modify this Plan before the entry of the Confirmation Order. After entry of the Confirmation Order, the Debtor(s) may, with the consent of the DIP Lenders and the Restructuring Support Parties (except that the consent of Consenting Unsecured Noteholders shall only be required to the extent provided for under the RSA), amend or modify the Plan in accordance with section 1127(b) of the Bankruptcy Code, remedy any defect or omission or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan.

Entry of a Confirmation Order shall mean that all modifications or amendments to this Plan occurring after the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

### Section 12.02. Revocation or Withdrawal of the Plan

The Debtors reserve the right, with the consent of the DIP Lenders and the Restructuring Support Parties (except that the consent of Consenting Unsecured Noteholders shall only be required to the extent provided for under the RSA), to revoke or withdraw this Plan before the Confirmation Date and to file subsequent chapter 11 plans. If the Debtors revoke or withdraw the Plan, or if Confirmation or Consummation does not occur with respect to the Plan, then: (a) the Plan will be null and void in all respects; (b) any settlement or compromise embodied in the Plan, assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant hereto shall be null and void in all respects; and (c) nothing contained in the Plan or the Disclosure Statement shall: (i) constitute a waiver or release of any Claims by or against, or any Equity Interests in, the Debtors; (ii) prejudice in any manner the rights of the Debtors or any other Entity; or (iii) constitute an admission, acknowledgment, offer or undertaking by the Debtors or any other Entity in any respects.

## ARTICLE XIII
## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date for the Plan, the Bankruptcy Court shall retain such jurisdiction over the Chapter 11 Cases after the Effective Date as legally permissible, including jurisdiction to:

(i)    allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the allowance or priority of Claims;

(ii)    grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or this Plan, for periods ending on or before the Effective Date;

(iii)    resolve any matters related to the assumption, assumption and assignment or rejection of any Executory Contract or Unexpired Lease (including Cure Costs);

(iv)    ensure that distributions to holders of Allowed Claims are accomplished pursuant to the provisions of this Plan;

(v)    decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters and grant or deny any applications involving the Debtors that may be pending on the Effective Date;

(vi)    enter such orders as may be necessary or appropriate to implement or consummate the provisions of this Plan and all contracts, instruments, releases, indentures and other agreements or documents created in connection with this Plan, the Disclosure Statement and the Exit Facility;

(vii)    enter and enforce any order related to or otherwise in connection with any sale of property by the Debtors pursuant to sections 363 or 1123 of the Bankruptcy Code;

(viii)    decide or resolve any Causes of Action arising under the Bankruptcy Code, including, without limitation, Avoidance Actions and Claims under sections 362, 510, 542 and 543 of the Bankruptcy Code;

(ix)    resolve any cases, controversies, suits or disputes that may arise in connection with the Consummation, interpretation or enforcement of this Plan, or any Person's or Entity's obligations incurred in connection with this Plan;

(x)    issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any

Person or Entity with Consummation or enforcement of this Plan, except as otherwise provided herein;

(xi)    resolve any cases, controversies, suits or disputes with respect to the releases, injunction and other provisions contained in ARTICLE XI of this Plan and enter such orders as may be necessary or appropriate to implement such releases, injunction and other provisions;

(xii)    enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked or vacated;

(xiii)    determine any other matters that may arise in connection with or relate to this Plan, the Disclosure Statement, the Confirmation Order, the Exit Facility or any contract, instrument, release, indenture or other agreement or document created in connection with this Plan or the Disclosure Statement;

(xiv)    enter order(s) and/or Final Decree(s) concluding the Chapter 11 Cases;

(xv)    hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code;

(xvi)    consider any modifications of this Plan, to cure any defect or omission, or reconcile any inconsistency in any order of the Bankruptcy Court, including the Confirmation Order; and

(xvii)    hear any other matter not inconsistent with the Bankruptcy Code.

## ARTICLE XIV

## MISCELLANEOUS PROVISIONS

### Section 14.01. General Settlement of Claims

Unless otherwise set forth in this Plan, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under this Plan, on the Effective Date, the provisions of this Plan constitute a good-faith compromise and settlement of all Claims against and Equity Interests in the Debtors.

### Section 14.02. Preservation of Causes of Action Not Expressly Released

The Debtors or the Reorganized Debtors, as applicable, retain all rights to commence and pursue, as appropriate, any and all claims or Causes of Action of the Debtors or the Reorganized Debtors, as applicable, whether arising before or after the Petition Date, in any court or other tribunal including, without limitation, in an adversary proceeding filed in one or more of the Chapter 11 Cases, other than Avoidance Actions or any Causes of Action released under this

Plan. The failure to list any potential or existing claims or Causes of Action is not intended to limit the rights of the Debtors or the Reorganized Debtors, as applicable, to pursue any claims or Causes of Action not listed or identified.

Unless a claim or Cause of Action against a Creditor or other Person or Entity is expressly waived, relinquished, released, compromised or settled in this Plan or any Final Order, the Debtors or the Reorganized Debtors, as applicable, expressly reserve such claim or Cause of Action for later adjudication for and on behalf of the Debtors or the Reorganized Debtors, as applicable (including, without limitation, claims and Causes of Action not specifically identified or which Debtors may presently be unaware or which may arise or exist by reason of additional facts or circumstances unknown to the Debtors at this time or facts or circumstances which may change or be different from those which the Debtors now believe to exist). No preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches shall apply to such claims or Causes of Action upon or after the Confirmation or Consummation of this Plan based on the Disclosure Statement, this Plan or the Confirmation Order, except where such claims or Causes of Action have been released in this Plan or other Final Order. In addition, the Debtors or the Reorganized Debtors, as applicable, and their successor entities under this Plan expressly reserve the right to pursue or adopt any claims alleged in any lawsuit in which the Debtors or the Reorganized Debtors, as applicable, are a defendant or an interested party, against any Person or Entity, including, without limitation, the plaintiffs or co-defendants in such lawsuits.

Except as otherwise provided in this Plan or in any contract, instrument, release, indenture or other agreement entered into in connection with this Plan, in accordance with section 1123(b)(3) of the Bankruptcy Code, any claims, rights, and Causes of Action that the Debtors or the Reorganized Debtors, as applicable, may hold against any Person, shall vest as of the Effective Date in the Reorganized Debtors, and the Reorganized Debtors, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such claims, rights or Causes of Action without the consent or approval of any third party and without any further order of court.

Delivery (by any means) of this Plan or Disclosure Statement to any Person to whom the Debtors or the Reorganized Debtors, as applicable, have incurred an obligation (whether on account of services, purchase or sale of goods or otherwise), or who has received services from the Debtors or the Reorganized Debtors, as applicable, or a transfer of money or property of the Debtors or the Reorganized Debtors, as applicable, or who has transacted business with the Debtors or the Reorganized Debtors, as applicable, or leased equipment or property from the Debtors or the Reorganized Debtors, as applicable, shall constitute actual notice that such obligation, transfer, or transaction may be reviewed by the Debtors or the Reorganized Debtors, as applicable subsequent to the Effective Date and may, if appropriate, be the subject of an action after the Effective Date, whether or not: (a) such Person has filed a Proof of Claim in these Chapter 11 Cases; (b) such Person's Proof of Claim has been objected to by the Debtors or the Reorganized Debtors, as applicable; (c) such Person's Claim was included in Debtors' Schedules; (d) such Person's scheduled Claim has been objected to by the Debtors or the Reorganized Debtors, as applicable, or has been identified by the Debtors or the Reorganized

Debtors, as applicable, as a Disputed Claim; or (e) such action falls within the list of affirmative Causes of Action in the Plan Supplement.

### Section 14.03. Section 1146(a) Exemption

Pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property under this Plan shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording tax, or other similar tax or governmental assessment. Upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forego the collection of any such tax, fee, or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment.

### Section 14.04. Elimination of Vacant Classes

Any Class of Claims or Equity Interests that is not populated as of the commencement of the Confirmation Hearing by an Allowed Claim or Equity Interest, or a Claim or Equity Interest that is temporarily allowed under Bankruptcy Rule 3018, shall be deemed eliminated from the Plan for purposes of: (a) voting to accept or reject the Plan; and (b) determining the acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

### Section 14.05. Intercompany Claims

On the Effective Date, or as soon as practicable thereafter, all Intercompany Claims between and among the Debtors shall be reinstated or compromised by the Reorganized Debtors, as applicable, consistent with the Reorganized Debtors' business plan, and subject to the consent of the DIP Lenders and the Consenting Secured Noteholders.

### Section 14.06. Additional Documents

On or before the Effective Date, the Debtors may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The Debtors or the Reorganized Debtors, as applicable, and all holders of Claims and Equity Interests receiving distributions pursuant to the Plan, and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of this Plan.

### Section 14.07. Successors and Assigns

The rights, benefits and obligations of any Entity named or referred to in this Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

**Section 14.08. Reservation of Rights**

Except as expressly set forth in this Plan, this Plan shall have no force or effect unless the Bankruptcy Court has entered the Confirmation Order. Neither this Plan, any statement or provision contained in this Plan, nor any action taken or not taken by any Debtor or Reorganized Debtors, as applicable, with respect to this Plan, the Disclosure Statement, the Confirmation Order or the Plan Supplement, shall be or shall be deemed to be an admission or waiver of any rights of the Debtors or the Reorganized Debtors, as applicable, with respect to the holders of Claims or Equity Interests prior to the Effective Date.

**Section 14.09. Notices**

Except as otherwise set forth in this Plan, all notices or requests in connection with this Plan shall be in writing and will be deemed to have been given when received by personal delivery, facsimile, e-mail, overnight courier or first class mail and addressed to:

| **If to the Debtors:** | Bracewell LLP<br>Attn: Robert G. Burns, Robin J. Miles<br>1251 Avenue of Americas, 49th Floor<br>New York, New York 10020<br>Facsimile: (800) 404-3970<br>Robert.Burns@bracewelllaw.com<br>Robin.Miles@bracewelllaw.com |
|---|---|
| **If to the DIP Lenders and/or the Consenting Secured Noteholders** | Davis Polk & Wardwell LLP<br>Attn: Damian S. Schaible, Darren S. Klein<br>450 Lexington Avenue<br>New York, NY 10017<br>Fax: (212) 701-5580<br>damian.schaible@davispolk.com<br>darren.klein@davispolk.com |

**Section 14.10. Term of Injunctions or Stay**

**Unless otherwise provided in this Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases (pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court) and existing on the Confirmation Date (excluding any injunctions or stays contained in this Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date. All injunctions or stays contained in this Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.**

**Section 14.11. Entire Agreement**

Except as otherwise indicated, on the Effective Date, this Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and

representations on such subjects, all of which will have become merged and integrated into this Plan on the Effective Date. To the extent the Confirmation Order is inconsistent with this Plan, the Confirmation Order shall control for all purposes.

### Section 14.12. Plan Supplement Exhibits

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of this Plan as if set forth in full in this Plan. After the exhibits and documents are filed, copies of such exhibits and documents shall be made available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the Claims and Solicitation Agent's website at http://www.bmcgroup.com/venoco or the Bankruptcy Court's website at www.deb.uscourts.gov.

### Section 14.13. Severability

If, prior to the entry of the Confirmation Order, any term or provision of this Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court, at the request of the Debtors, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of this Plan shall remain in full force and effect and shall in no way be affected, impaired or invalidated by such holding, alteration or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with the foregoing, is (a) valid and enforceable pursuant to its terms; (b) integral to this Plan; and (c) non-severable and mutually dependent.

### Section 14.14. Substantial Consummation

On the Effective Date, this Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

*[Remainder of Page Intentionally Left Blank]*

Dated: April  8 , 2016
Wilmington, Delaware


VENOCO, INC.
DENVER PARENT CORPORATION
ELLWOOD PIPELINE, INC.
WHITTIER PIPELINE CORPORATION
TEXCAL ENERGY (GP) LLC

By: _____
Name: Scott M. Pinsonnault
Title: Chief Financial Officer and Chief Restructuring Officer of Venoco, Inc.


TEXCAL ENERGY (LP) LLC

By: VENOCO, INC., its Manager

By: _____
Name: Scott M. Pinsonnault
Title: Chief Financial Officer and Chief Restructuring Officer of Venoco, Inc.


TEXCAL ENERGY SOUTH TEXAS, L.P.

By: TEXCAL ENERGY (GP) LLC, as general partner

By: _____
Name: Scott M. Pinsonnault
Title: Chief Financial Officer and Chief Restructuring Officer of Venoco, Inc.


*[Signature Page to Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code]*